Abigail V. O'Brient (*pro hac vice pending*)
Covington & Burling LLP
1999 Avenue of the Stars,
Los Angeles, CA 90067-4643
Telephone: (424) 332-4846
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: (307) 778-8178
Facsimile: (307) 638-1975
Email:  bhunsicker@markuswilliams.com

PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | | |
|---|---|---|
| In re: | ) | |
| | ) | Chapter 11 |
| MODE ELEVEN BANCORP, | ) | |
| | ) | Case No. 25-20240 |
| | ) | |
| Debtor in Possession | ) | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE BIDDING PROCEDURES; (II) APPROVING BID PROTECTIONS; (III) APPROVING PROCEDURES FOR ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND RELATED NOTICES; (IV) SCHEDULING THE BID DEADLINE, THE AUCTION AND SALE HEARING; (V) APPROVING THE FORM AND MANNER OF NOTICE THEREOF; AND (VI) GRANTING RELATED RELIEF**

Mode Eleven Bancorp ("Debtor"), debtor-in-possession herein, by and through undersigned proposed counsel, hereby files this motion (the "Motion") for an order (the "Bidding Procedures Order") (i) approving the proposed bidding procedures for the sale of substantially all of the Debtor's assets (the "Sale"), (ii) approving certain bid protections

in the event that a stalking horse bidder is designated by the Debtor (the "Bid Protections"),
(iii) establishing procedures for assumption and assignment of certain executory contracts
and related notices, (iv) scheduling the bid deadline, auction, if any, and sale hearing,
(v) approving the form and manner of notice thereof, and (vi) granting related relief. In
further support of this Motion, the Debtor respectfully states as follows.

## JURISDICTION

1.    This Bankruptcy Court (the "Court") has jurisdiction to consider this matter
pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C.
§ 157(b)(2).

2.    Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.    The bases for the relief requested herein are sections 105, 363, and 365 of
Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code") and
Federal Rules of Bankruptcy Procedure 6003 and 6004.

## BACKGROUND

4.    On June 9, 2025 (the "Petition Date"), the Debtor filed a voluntary petition
for relief under chapter 11 of the Bankruptcy Code.  The Debtor continues to manage its
business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy
Code.  No creditors' or other committee has been formed.

**A.    The Debtor's Business Operations, Corporate Structure and Events Leading
Up to the Filing of The Case**

5.    The Debtor, a Wyoming corporation, is a holding company for its non-debtor
subsidiary Summit National Bank (the "Bank"), a national banking association providing

banking products and services to businesses and consumers in Salmon, Idaho; Ekalaka, Montana; and Hulett, Wyoming. *See Declaration of John Miller in Support of Debtor's Chapter 11 Petition and Related Motions* (the "First Day Declaration") [Dkt. 6] at ¶ 1. The Debtor owns 100% of the capital stock (the "Equity Interests") in the Bank. *Id*. at ¶ 2.

6.    The Bank, which was originally chartered in 1984 in Wyoming as Hulett National Bank, was founded to provide needed banking infrastructure by offering community banking services in small towns in the Mountain West. *Id*. at ¶ 12. After changing its name to Summit National Bank in 2005, the Bank added its Idaho and Montana branch locations, as well as a processing center in Laurel, Montana. *Id*.

**B.    Efforts to Diversify Service Offerings**

7.    In 2021, Forrest Gilman became CEO of the Debtor and sought to leverage the Debtor's compliance, technology, and business innovation experience by creating a new fintech division at the Bank.  The expansion into fintech was intended to provide the Bank's clients with convenient access to a banking-as-a-service ("BaaS") platform that could be used by clients to service their own customers, including lending-as-a-service, deposits and branded accounts, access to payment rails, digital asset custody, and compliance management. *Id*. at ¶ 16.

8.    On February 24, 2022, the OCC conditionally approved the Bank's establishment of this new fintech division, subject to the Bank's development and adoption of a safe and sound third-party risk management program. *Id*. at ¶ 17. However, as described below, the Debtor was ultimately unable to continue pursuing this line of business. *See id*. at ¶ 19.

C.    **Regulatory Enforcement Actions Prior to Filing**

9.    The Bank is subject to regulation, examination, and supervision by the Office of the Comptroller of the Currency (the "OCC"), and the Debtor is subject to regulatory oversight by the Board of Governors of the Federal Reserve System (the "FRB"). *Id*. at ¶ 20.

10.    On September 18, 2023, the FRB conducted an inspection of the Debtor and identified various purported deficiencies in the Debtor's operations, including with respect to pursuit of a fintech business strategy. *Id*. at ¶ 21. The FRB noted deficiencies related to board oversight, capital, earnings, liquidity, risk management, and compliance with rules related to affiliate transactions. *Id*. As a result of these regulatory challenges, as noted above, the Debtor voluntarily ceased its fintech business strategy, including the BaaS platform, and unwound the fintech business by February 2024. *Id*. On March 28, 2024, the Debtor and the FRB entered into an *Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended* with respect to the deficiencies identified by the FRB during the September 2023 inspection (the "FRB Consent Order").

11.    Subsequently, the Bank became subject to an enforcement action by the OCC, and on or about June 4, 2024, the Bank entered into a Consent Order with the OCC (the "OCC Consent Order", and with the FRB Consent Order, the "Consent Orders") to address purported deficiencies in the Bank's BSA/AML program, capital and strategic planning, liquidity risk management, transactions with affiliates, accounting, and compliance with laws. *Id*. at ¶ 23. A copy of the OCC Consent Order is attached hereto as **Exhibit 1**.

12.     In light of the Consent Orders, over the past year, the Debtor sought financing and other potential liquidity solutions to stabilize its operations and allow it to raise sufficient capital to allow the Debtor to serve as a source of strength to the Bank, and allow the Bank to propose an acceptable strategic and capital plan to the OCC. *Id*. at ¶ 29. However, as more fully described in the First Day Declaration, despite the Debtor's best efforts, there were significant regulatory and practical barriers to addressing the Debtor's business challenges outside of the chapter 11 process. *Id*. at ¶¶ 29-34.

13.     In December 2024, the Debtor conducted a private placement offering to current and potential investors, offering an equity investment in exchange for voting and non-voting shares of common stock of the Debtor.  The Debtor sought to raise between $10 million and $20 million.  However, the private placement offering failed to reach the minimum capital raise required and was therefore terminated on April 8, 2025 by the Debtor's board of directors. *Id*. at ¶ 29.

**D.    Near-Term Risks to Bank and Debtor's Need for Efficient Sale Process**

14.     The Bank is well below the minimum 13% capital ratio mandated in Article V of the OCC Consent Order. *Id*. at ¶ 25.  Accordingly, further regulatory action could result in a catastrophic result for the Bank and the Debtor, including a potential loss of the Bank's banking charter. *Id*.  Even setting aside the significant risk of near-term regulatory action, one of the Bank's key capital ratios is projected to fall under 2% in a matter of months—to a level of capital that would *require* the OCC to take action to close the Bank. *Id*.  The Debtor lacks sufficient liquidity to inject funds to allow the Bank to satisfy the

capital ratio required by the OCC Consent Order, and, as discussed above, the Debtor has been unable to raise the necessary capital outside of bankruptcy. *Id*.

15.     Given those barriers, the Debtor commenced this case to preserve the value of its assets, particularly the Equity Interests, for the benefit of its stakeholders, including the rural communities served by the Debtor and the Bank.  Through this case, the Debtor intends to conduct a robust and fair sale process to facilitate the sale of the Equity Interests to a well-funded buyer capable of obtaining the requisite regulatory approvals to consummate the transaction, leading to the highest and best possible bid for these assets and the best possible outcome for all stakeholders.

16.     Under these circumstances, an expedited sale process is critical to preserving the value of the Debtor's assets. Since the Petition Date, the Debtor and the Bank have continued to face significant regulatory scrutiny. *See Declaration of John Miller in Support of Bidding Procedures* (the "Miller Declaration"), filed substantially contemporaneously herewith, at ¶ 2.  While the Debtor and the Bank are legally required to preserve the OCC's confidentiality rights with respect to certain information concerning supervisory actions, 12 C.F.R. Part 4, Subpart C, given the regulatory history of the Bank, including the OCC Consent Order, the Debtor believes that there is a heightened risk of further supervisory action against the Bank in the near-term,  particularly if there is any indication of deterioration of the financial condition of the Bank.  *Id*. These supervisory actions could include:

      i.    In the discretion of the OCC, issuance of a cease and desist order based on the agency's reasonable cause to believe that the Bank has engaged in unsafe or unsound practices or in one or more violations

of law. This cease and desist order could include requirements for the Bank to take affirmative action, including divestiture of some of its business lines, to remediate the unsafe or unsound practice(s) or violation(s) or law, 12 U.S.C. § 1818(b);

ii.    In the discretion of the OCC, assessment of civil money penalties of up to $1 million per day for certain specified unsafe or unsounds conduct or violations of law, 12 U.S.C. § 1818 (i)(2); and

iii.    Appointment of the Federal Deposit Insurance Corporation as receiver to wind down the Bank's operations and liquidate it, 12 U.S.C. §§ 191(a), 1821(c)(5). The OCC may appoint a receiver at any time without prior notice to the Bank or opportunity for a hearing. *Id.* at § 191(a).

17.    In light of these regulatory risks, the Debtor must pursue an expeditious sale process in order to protect the value of the Bank, which comprises nearly all of the value of the Debtor's estate. The Debtor believes that prompt identification of a financially capable buyer with the ability to obtain regulatory approval for acquisition of the Equity Interests will best facilitate the preservation of value for the estate and all stakeholders. Miller Declaration at ¶ 4.  Thus, the Debtor seeks approval of the Bidding Procedures and a sale timeline that will allow for the efficient and orderly transfer of the Debtor's Equity Interests in the Bank. The Debtor, in consultation with its proposed investment banker, believes that the proposed timeline, which is consistent with the sale process for ownership interests in small national banks outside of the bankruptcy process, is reasonable, fair, and will avoid unnecessary deterioration in the Bank's value that might result from a prolonged sale process. *See Declaration of Kirk Hovde*, filed substantially contemporaneously herewith (the "Hovde Declaration"), at ¶ 7.

## E.    Marketing and Sale Process

18.     Given its determination that an expeditious bankruptcy and sale process is in the best interest of its estate, creditors, and other stakeholders, the Debtor retained a qualified investment banker prior to the Petition Date to market and sell substantially all of its assets (the "Assets"). *See* First Day Declaration, at ¶ 35.  To that end, the Debtor entered into an engagement agreement with Hovde Group, LLC ("Hovde"), a boutique investment bank focused exclusively on the financial services sector.  Hovde Declaration, at ¶ 3.  The Debtor anticipates that Hovde will continue to assist in the marketing and bidding process described below, and has sought the Court's approval to employ Hovde postpetition. *See Ex Parte Application to Employ Hovde Group, LLC as Investment Banker for the Debtor-In-Possession* [Dkt. 12].

19.     Hovde is a leading boutique investment bank providing a full suite of investment banking and capital markets, research, equity sales and trading services to its client base, which includes community and regional banks and other financial companies located throughout the United States. Hovde Declaration, at ¶ 4.  Hovde draws from deep industry expertise in the financial services sector, where it focuses exclusively on banks and other financial institutions.  *Id*.  Kirk Hovde, who is leading the marketing and sale process, is the Head of Investment Banking at Hovde, regularly evaluates the financial and strategic options of financial institutions, performing analysis and valuation for depository institutions similar to Summit National Bank and facilitating transactions like the ones the Debtor contemplates here. *Id*. at ¶¶ 4-5.

20.     Since being engaged, Hovde has commenced the marketing process for the Debtor's assets and is providing logistical support for the sale process. *Id*. at ¶ 9.  Hovde

has set up an online data room (the "Data Room") to facilitate the diligence process for potential buyers. *Id*. The Data Room has been populated with confidential information including financial statements, significant agreements, and operational details relevant to the Debtor's Assets. *Id*. Hovde has also used its significant experience and contacts in the market to identify potential buyers to determine their interest in purchasing the Assets. *Id*. Prior to the Petition Date, nine interested parties had entered into non-disclosure agreements with the Debtor, including two banks and a credit union. *Id*. at ¶ 10. Since the Petition Date, Hovde has been in contact with ten potential buyers that have either entered into or are anticipated to enter into non-disclosure agreements with the Debtor within the next several days. *Id*. at ¶ 10. These potential purchasers include several state-chartered banks with, in aggregate, over $6 billion in assets and capital, as well as several other potential purchasers that own bank holding companies, banks and credit unions. *Id*. In addition to the parties it has already contacted, Hovde is in the process of reaching out to more than thirty financial institutions, many of whom would face reduced regulatory scrutiny given that they are already state- or federally-chartered. *Id*.

21.    The proposed sale timeline is not unusual for sales of equity interests in small banks, and will permit a value-maximizing sale process. *Id*. at ¶ 7. Similar sales typically proceed on a timeline of five to seven weeks from potential buyers entering into non-disclosure agreements until the submission of bids. *Id*. The Debtor has proposed a ten-week period from the commencement of Hovde's marketing efforts following its retention in mid-May until the proposed July 25 bid deadline, and numerous bidders have entered into non-disclosure agreements and are active in the Data Room. *See id*.

22.     Thus, the Debtor submits that the proposed Bid Procedures will facilitate a fair, reasonable sale process and, ultimately allow the Debtor to consummate a value-maximizing transaction pursuant to Bankruptcy Code section 363.

## **RELIEF REQUESTED**

23.     To maximize the value of its Assets for the benefit of the Debtor's estate and its creditors, the Debtor proposes to implement a competitive bidding process designed to generate maximum recovery.  Accordingly, the Debtor requests entry of the Bidding Procedures Order, substantially in the form attached hereto as **Exhibit A**:

i.      authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1, in connection with the Sale;

ii.     granting related relief, including without limitation the Bid Protections, for a Stalking Horse Bidder, to the extent designated by the Debtor;

iii.    scheduling an auction (if necessary) in connection with the sale of the Assets (the "Auction") and a final hearing to consider approval of the proposed Sale (the "Sale Hearing");

iv.     authorizing and approving the form of (A) notice of the Sale, Bidding Procedures, Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as Exhibit 2 (the "Sale Notice"); and (B) notice to each relevant Counterparty (as defined below) to a Potentially Assumed Contract (as defined below)

regarding the Debtor's potential assumption and assignment of such contract and the amount necessary to cure any defaults thereunder (the "Cure Costs"), substantially in the form attached to the Bidding Procedures Order as Exhibit 3 (the "Potential Assumption and Assignment Notice"); and

v.  authorizing and approving procedures for the assumption and assignment of the certain executory contracts and the determination of Cure Costs with respect thereto (collectively, the "Assumption and Assignment Procedures").

## A.    The Bidding Procedures

24.    To optimally and expeditiously solicit, receive, and evaluate bids in a fair and efficient manner, the Debtor has developed and proposed the Bidding Procedures, attached as Exhibit 1 to the Bidding Procedures Order, to govern the Sale Process. The Debtor designed the Bidding Procedures to encourage all entities to put their best bids forward and to maximize the value of the estate. The following describes the salient points of the Bidding Procedures:[1]

i.  Parties interested in purchasing the Assets or some subset of the Assets shall submit a non-binding indication of interest ("Indication of Interest" or "IOI") by **July 11, 2025 at 4:00 p.m. Mountain Time** the ("IOI Deadline"), which deadline may be extended without notice or hearing by the Debtor. Note that submitting an Indication of Interest by the IOI Deadline does not exempt the submitting party

---

[1]    All capitalized terms that are used in this summary but not otherwise defined herein shall have the meanings in the Bidding Procedures. To the extent there are any conflicts between this summary and the Bidding Procedures, the terms of the Bidding Procedures shall govern.

from also having to submit a Qualified Bid by the Bid Deadline in order to participate in the Auction.

ii.    The Debtor will accept one or more bids offering to purchase all of the Assets or a subset of the Assets (each a "Bid"). The Debtor intends to accept whatever bid or bids that, separately or together, provide the most value in exchange for the Assets as determined by the Debtor, in its sole discretion.

iii.    The bid deadline ("Bid Deadline") shall be on **July 25, 2025 at 4:00 p.m. Mountain Time** (or such other date as set by the Court). Prospective bidders may elect to submit Bids for the Assets by executing and electronically delivering to Hovde a completed Share Purchase Agreement (the "Agreement") that is in a form that will be available in the Data Room.

iv.    Following completion of the bidding process, if the Debtor receives more than one Qualified Bid (as defined in the Bidding Procedures) for the same Asset(s), or if the Debtor otherwise deems an auction necessary, the Debtor shall conduct an Auction to be held on **July 28, 2025 at 10:00 a.m. Pacific Time** (or such other date as set by the Court) at the offices of Debtor's proposed counsel, Covington and Burling LLP, 1999 Avenue of the Stars, Los Angeles, California 90067. Only parties that have submitted Qualified Bids as defined in the Bidding Procedures, and their representatives, will be allowed to attend the Auction.

v.    During the period between the Bid Deadline and the Auction, the Debtor may hold discussions with one or more competing bidders to clarify their Bid(s).  Prior to the commencement of the Auction, the Debtor in its discretion shall designate the Qualified Bid(s) it believes to be the highest and best offer(s) for the Assets, or a subset thereof (the "Initial Best Bid(s)").

vi.    At any time on or before the date of the Auction (the "Stalking Horse Deadline"), the Debtor is authorized, but not obligated, in an exercise of its business judgment to (i) select one or more Qualified Bidders to act as Stalking Horse Bidders; (ii) enter into a Stalking Horse Agreement with each Stalking Horse Bidder so selected; and (iii) in connection with any Stalking Horse Agreement with a Stalking Horse Bidder, (a) provide a breakup fee (the "Breakup Fee") and (b) agree to reimburse the reasonable and documented out of pocket fees and expenses (the "Expense Reimbursement" and, together with the Breakup Fee, the "Bid Protections"), not to exceed three percent of

the purchase price with respect to the foregoing clauses (a) and (b) in the aggregate.

vii.    In the event the Debtor designates a Stalking Horse Bidder at least two business days prior to the Auction, within two business days after entry into a Stalking Horse Agreement, the Debtor will file a notice which will provide information about the Stalking Horse Bidder and the Stalking Horse Agreement (the "Stalking Horse Notice").

viii.    Before the commencement of bidding at the Auction, the Debtor will announce its designation of the Initial Best Bid(s). The Auction shall proceed in the order and manner deemed advisable by the Debtor, in its discretion, to promote the most competitive bidding process possible. After the Initial Best Bid or Bids are disclosed, subsequent Bids shall be at least $100,000, or such other amount as the Debtor, in its discretion, may announce at the commencement of the Auction, greater than the previous bid (an "Overbid Increment").

ix.    The amount of any Bid Protections may be added to and deemed a part of any Bid submitted by a Stalking Horse Bidder.

x.    For the avoidance of doubt, any Stalking Horse Bidder is hereby deemed to be a Qualified Bidder.

xi.    The Auction shall continue until there is only one offer that the Debtor, in its discretion, determines is the highest and best offer for the Assets (or, if the Assets will be sold in multiple lots, only one offer with respect to each such lot). In making such a determination, the Debtor may consider: (1) the amount of the purchase price; (2) the form of consideration being offered; (3) the likelihood of the Qualified Bidder's ability to close a transaction (including, in the case of the Equity Interests, the likelihood of regulatory approval of a transaction with such Qualified Bidder); and (4) the net benefit to the Debtor's estate and its stakeholders.

xii.    The Debtor reserves the right to designate with respect to the Successful Bid a competing bid (a "Backup Bid") that shall be substituted for such Successful Bid in the event that the Successful Bidder is unable to consummate the sale with respect to such Successful Bid.

xiii.    Immediately after its Bid is selected as the Successful Bid, each successful bidder must immediately execute and deliver to the Debtor

an addendum to its Agreement that binds the successful bidder to perform its Successful Bid.

xiv. No later than two (2) business days following the closing of the Auction, or following the Debtor's determination that it has received a Qualifying Bid and that no Auction is necessary, the Debtor will file on the docket a notice identifying the applicable bidder or bidders whose Bids constitute the highest and best offer for the Assets (each a "<u>Successful Bidder</u>" and each such bid a "<u>Successful Bid</u>"), the relevant Assets, and key terms of the relevant agreements.

xv. The Debtor shall present the Successful Bid(s) for approval at a hearing to consider the entry of a sale order (the "<u>Sale Order</u>") which hearing shall be on August 4, 2025, at a time to be determined by the Court, or at such other date and time as provided by the Court.

xvi. The Debtor, in its discretion, reserves the right to modify, augment, or amend the Bidding Procedures at any time and, without limitation, the Debtor reserves the right to extend, modify or terminate the sale process up until the time of entry of the Sale Order.

25. Importantly, the Bidding Procedures recognize the Debtor's fiduciary obligations to maximize sale value, and, as such, do not impair the Debtor's ability to consider all qualified bid proposals, and, as noted, preserve the Debtor's right to modify the Bidding Procedures as necessary or appropriate to maximize value for the estate.

**B.    Form and Manner of Notice**

26. The Auction shall take place at **10:00 a.m. (prevailing Pacific Time) on Monday, July 28, 2025**, at the law offices of Covington & Burling LLP, 1999 Avenue of the Stars, Los Angeles, California 90067, or such other date and time as selected by the Debtor.

27. On or before the date that is twenty-one (21) calendar days prior to the Sale Hearing, in accordance with Bankruptcy Rule 2002(a) and (c), the Debtor (or its agent) shall serve the Sale Notice, substantially in the form attached to the Bidding Procedures

Order as <u>Exhibit 2</u>, by first-class mail, postage prepaid, upon (a) all parties on the Debtor's

creditor matrix; (b) the Office of the United States Trustee for the District of Wyoming; (c)

counsel to any official committee appointed in these cases; (d) any entities known to have

asserted any lien, claim, or encumbrance in or upon any assets comprising the Assets, (e)

known counterparties to any Potentially Assumed Contract that could potentially be

assumed and assigned to a Successful Bidder and (f) all persons and entities that have filed

a request for service of filings in this chapter 11 case pursuant to Bankruptcy Rule 2002.

28.     The Sale Notice shall indicate that copies of the Motion and the Bidding

Procedures can be obtained from the Debtor's counsel. The Sale Notice will also indicate

the deadline for objecting to the Sale to the Successful Bidder and the date and time of the

Sale Hearing.

29.     The Debtor further submits that notice of this Motion and the related hearing

to consider entry of the Bidding Procedures Order, together with service of the Sale Notice,

constitutes good and adequate notice of the Auction and the proceedings with respect

thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy

Rule 2002. The Debtor proposes that no other or further notice of the Auction shall be

required. Accordingly, the Debtor requests that the Court approve the form and manner of

the notice.

**C.     Assumption and Assignment Procedures**

30.     In connection with any Sale, the Debtor proposes to assume and assign to the

Successful Bidder the contracts that the Successful Bidder seeks to assume (the

"<u>Potentially Assumed Contracts</u>"). The Assumption and Assignment Procedures will,

among other things, notice the counterparties (each a "Counterparty" and collectively, the

"Counterparties") of the potential assumption and assignment of their Contracts and the

Debtor's calculation of costs of curing defaults under the Contracts (the "Cure Costs") with

respect thereto. Specifically, the Assumption and Assignment Procedures provide that:

i.    **Assumption and Assignment Notice**: No later than two (2) business days following the entry of the Bidding Procedures Order, the Debtor shall file with this Court and serve on each non-Debtor Counterparty to the Potentially Assumed Contracts a notice the ("Assumption and Assignment Notice"), which shall (i) identify the Potentially Assumed Contracts; (ii) list the Debtor's good faith calculation of Cure Costs with respect to each Potentially Assumed Contract; (iii) expressly state that assumption or assignment of a Potentially Assumed Contract is not guaranteed and is subject to the agreement of the Successful Bidder and Court approval; and (iv) prominently display the deadline to file objections to the assumption, assignment, or sale of the Potentially Assumed Contracts. In the event that the Debtor identifies Counterparties that were not served with the Assumption and Assignment Notice, the Debtor may subsequently serve such Counterparty with an additional Assumption and Assignment Notice (each a "Supplemental Assumption and Assignment Notice"), and the following procedures will nevertheless apply to such Counterparty; provided, however, that the deadline to file an objection with respect to such additional Counterparty shall be 4:00 p.m. (prevailing Mountain Time) on the date that is 14 days following service of the Supplemental Assumption and Assignment Notice.

ii.    **Contract Objections**

a)    Objections: Objections, if any, to either the Cure Costs or the assumption or assignment of the Potentially Assumed Contracts to the successful bidder or adequate assurance of future performance (each a "Contract Objection") must be filed on or before Thursday, July 31, 2025 at 4:00 p.m. prevailing Mountain Time. Objections must: (a) be in writing; (b) conform to the applicable provisions of the Bankruptcy Rules and the Local Rules; (c) state with particularity the legal and factual basis for the objection and the specific grounds therefor; and (d) be filed with the Court and electronically

served upon all parties registered for CM/ECF service in this case so as to be actually be received no later than above-referenced objection deadline.

b)   <u>Resolution</u>: If the parties are unable to consensually resolve the Contract Objection prior to the commencement of the Sale Hearing, the resolution of issues raised by the Contract Objection will be determined at the Sale Hearing or, at the Debtor's sole discretion, be adjourned to a subsequent hearing (an "<u>Adjourned Objection</u>"). Upon resolution of an Adjourned Objection and subject to the payment of the applicable cure amount, if any, the applicable Contract that was the subject of such Adjourned Objection may be deemed assumed and assigned to the Successful Bidder as of the closing date of the Sale. All objections to the potential assumption and assignment of the estate's right, title, and interest in, to, and under a Potentially Assumed Contract will be heard at the Sale Hearing, except with respect to an Adjourned Objection as set forth herein.

c)   <u>Failure to Timely Object</u>: If a Counterparty fails to timely file with the Bankruptcy Court and serve on the Debtor a Contract Objection, the Counterparty shall be deemed to have consented to the assumption, assignment, and sale of the Contract to the Successful Bidder or any Backup Bidder and forever shall be barred from asserting any objection with regard to such assumption, assignment, and sale. The Cure Costs set forth in the Assumption and Assignment Notice shall be controlling and will be the only amount necessary to cure outstanding defaults under the Contract under Bankruptcy Code section 365(b), notwithstanding anything to the contrary in any Contract, or any other document, and the Counterparty to the Contract shall be deemed to have consented to the Cure Costs and forever shall be barred from asserting any other claims related to such Contract against the estate or any Successful Bidder or their property.

**D.     Timeline**

31.     Set forth below for convenience is a chart reflecting the various _**proposed**_ deadlines and dates requested by the Debtor set forth herein and the Bidding Procedures Order:

| | |
|---|---|
| Bidding Procedures Hearing | [●], 2025 at ● a.m. prevailing Mountain Time |
| Deadline to File Assumption and Assignment Notice | Two business days following entry of Bidding Procedures Order |
| Indication of Interest Deadline | July 11, 2025 at 4:00 p.m. prevailing Mountain Time |
| Deadline for Parties to Submit Stalking Horse Bids | July 11, 2025 at 4:00 p.m. prevailing Mountain Time |
| Stalking Horse Notice | Two business days after entry into a Stalking Horse Agreement, should a Stalking Horse Bidder be announced two or more business days before the Auction |
| Deadline to Announce Stalking Horse Bidder | At any time prior to Auction |
| Qualifying Bid Deadline | July 25, 2025 at 4:00 p.m. prevailing Mountain Time |
| Auction | July 28, 2025 at 10:00 a.m. prevailing Pacific Time |
| Sale Objection Deadline | Thursday, July 31, 2025 at 4:00 p.m. prevailing Mountain Time |
| Contract Objection Deadline | Thursday, July 31, 2025 at 4:00 p.m. prevailing Mountain Time |
| Sale Approval Hearing | Monday, August 4, 2025 at a time to be determined by the Court, or such other date as may be determined by the Court |

## ARGUMENT

### A.    The Bidding Procedures Order Is in the Best Interests of the Estate and Should Be Approved

32.    Adoption of the Bidding Procedures is a valid exercise of the Debtor's business judgment. Courts have consistently held that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling an estate's assets. *See, e.g., In re Trilogy Dev. Co., LLC*, No. 09-42219, 2010 Bankr. LEXIS 5636, at *3–4 (Bankr. W.D. Mo. 2010) (holding that section 363 of the Bankruptcy Code permits debtors in possession to sell their assets if a sound business purpose exists); *In re Channel One Commc'ns, Inc.*, 117 B.R. 493, 496 (Bankr. E.D. Mo. 1990) (same); *In re Schipper*, 933 F.2d 513, 515 (7th Cir. 1991) (holding that "[u]nder Section 363, the debtor in possession can sell property of the estate if…he has an 'articulated business justification'") (quoting *In re Continental Air Lines*, 780 F.2d 1223, 1226 (5th Cir.1986)); *In re Integrated Res., Inc.*, 147 B.R. 650, 656–57 (S.D.N.Y. 1992).

33.    Maximization of proceeds received by the estate is one of the dominant goals of any proposed sale of estate property. "[I]t is a well-established principle of bankruptcy law that the objective of the bankruptcy rules and the Debtor's duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate." *In re Integrated Res., Inc.*, 147 B.R. at 659. Given the risk of regulatory action, the Debtor's ownership interest in the Bank is the prototypical melting ice cube, where "quick action" in the form of a 363 sale is "justified to increase or maintain the value of an asset to the estate." *In re GSC, Inc.*, 453 B.R. 132, 166 (Bankr. S.D.N.Y. 2011).

34.    It is the Debtor's business judgment that, after considering potential alternatives, the proposed Bidding Procedures are in the best interests of the Debtor, its estate, and all its stakeholders. The Debtor is unable to provide adequate capital for the Bank without further borrowing or investment, which is unavailable outside of a sale process. First Day Declaration at ¶ 29-34.  The timeline for that sale process must take into account the risk of regulatory action should the sale process be prolonged or delayed, given that the threatened regulatory action could be value-destructive to the Bank and, in turn, to the Debtor's estate.

35.    Overall, the anticipated benefits of the proposed Bidding Procedures greatly exceed any benefits that could theoretically result from a more extended sale process. The Debtor believes that the proposed Bidding Procedures represent the best avenue for identifying and promoting active bidding from interested and financially capable parties and will maximize the proceeds of the Sale for the benefit of the estate. The proposed Bidding Procedures will allow the Debtor to conduct a sale process in a manner customary for assets like the Equity Interests, and were designed, in consultation with Hovde, to encourage participation by financially capable bidders who can demonstrate the ability to close a Sale. *See* Hovde Declaration, at ¶¶ 6-8.

36.    The proposed sale timeline is not unusual for sales of equity interests in small banks, and will permit a value-maximizing sale process. Similar sales typically proceed on a timeline of five to seven weeks from potential buyers entering into non-disclosure agreements until the submission of bids.  *Id*. at ¶ 7.  The Debtor has proposed a ten-week

period from the commencement of Hovde's marketing efforts, following its retention in mid-May, until the proposed July 25 bid deadline.

37.     Given that the proposed timeline provides the Debtor with more than adequate time to market the Assets, and provides potential buyers with the time they need to diligence the Assets and prepare a Bid, the benefits, if any, of further extending the marketing and sale process are limited, at best. In contrast, an extended Sale process would increase the Bank's risk of value-destructive regulatory action, to the detriment of the Debtor's estate.  Miller Declaration at ¶ 4.  Thus, the Debtor believes the timeline proposed in the Bidding Procedures is supported by sound business justification and is in the best interests of the Debtor's creditors and other stakeholders.

38.     The Debtor believes that the proposed Bidding Procedures provide an appropriate framework for expeditiously establishing that the Debtor is receiving the best and highest offer for a Sale, will encourage competitive bidding, are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings, and are consistent with the controlling legal standard. Accordingly, the Court should approve the Debtor's adoption of the Bidding Procedures as reasonable, appropriate, and a valid exercise of the Debtor's business judgment.

39.     The Debtor is also seeking authority to offer certain bid protections, specifically, the Break-Up Fee and the Expense Reimbursement, in connection with the designation of a Stalking Horse Bidder, in an aggregate amount not to exceed three percent of the Stalking Horse Bidder's purchase price. Debtors customarily utilize a stalking horse bidder, an initial bidder "whose due diligence and research serve to encourage future

bidders, and whose bid sets a floor for subsequent bidding," to maximize the value of estate assets at auction. *In re Old Cold LLC*, 879 F.3d 376, 379 n.2 (1st Cir. 2018). "A 'stalking horse' contract is a first, favorable bid strategically solicited by the bankrupt company to prevent low-ball offers…Stalking horse bidders often contract to receive a 'break-up-fee' compensating it for its bidding activities should a higher bid ultimately emerge and win an eventual asset auction." *In re Rumsey Land Co., LLC*, 944 F.3d 1259, 1266 (10th Cir. 2019).

40.    The offering of Bid Protections to induce stalking horse bidders to provide these benefits has become an established and important practice in chapter 11 cases. "Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value." *In re Integrated Res. Inc.*, 147 B.R. at 659–60 (emphasis in original). Specifically, bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also In re Integrated Res. Inc.*, 147 B.R. at 660–61 (noting bid protections can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid").

41.    Moreover, courts in this circuit have provided bid protections where appropriate, including bid protections totaling more than 3% of the total assets sold. *See, e.g.,* Order Granting Debtor's Mot. for Order Authorizing Debtor to Provide Bid

Protections to Stalking Horse, *In Re Naartjie Custom Kids, Inc.*, No. 14-29666 (Bankr. D. Utah Sept. 9, 2013) (order approving bid protections totaling up to 5% of the total purchase price for the assets as fair and reasonable in light of, *inter alia*, "the substantial benefits the Stalking Horse will provide to the Debtor, its estate and creditors and all parties in interest herein, including, among other things, by increasing the likelihood that the Debtor will receive the best possible price for its Assets"), ECF No. 228; *In re Stelera Wireless, LLC*, No. 13-13267, 2016 WL 11900735 (Bankr. W.D. Okla. Mar. 18, 2016) (authorizing a breakup fee and expense reimbursement for a stalking horse bidder, if any).

42.    As discussed above, courts have made clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling estate assets. *See, e.g.*, *In re Culp*, 550 B.R. 683, 697 (D. Del. 2015) ("'In determining whether to authorize use, sale or lease of property of the estate under Section 363, courts require the [debtor] to show that a sound business purpose justifies such actions.' If the [debtor's] decision evidences a sound business purpose, then the Bankruptcy Court should approve the sale."). With respect to the granting of bid protections, courts have held that there is no "compelling justification for treating an application for a break-up fee and expenses under § 503(b) differently from other applications for administrative expenses under the same provision." *Reliant Energy Channelview LP v. Kelson Channelview LLC* (*In re Reliant Energy Channelview LP*), 594 F.3d 200, 206 (3d Cir. 2010) (citing *Calpine Corp.* v. *O'Brien Envtl. Energy, Inc.* (*In re O'Brien Envtl. Energy, Inc.*), 181 F.3d 527 (3d Cir.1999)).

43.     Therefore, courts have ruled that bid protections must meet the standard set forth in the administrative expense provisions of section 503(b) of the Bankruptcy Code, which is generally satisfied if such bid protections provide some benefit to the debtor's estate. *See In re Energy Future Holdings Corp.*, 904 F.3d 298, 314 (3rd Cir. 2018); *In re Tama Beef Packing, Inc.*, 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) ("We . . . hold that the determination of whether break-up fees or expenses are allowable under section 503(b)(1)(A) will be made in reference to general administrative expense jurisprudence."). Benefits to the debtor's estate may be found if "assurance of a break-up fee promoted more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited," *In re Tama Beef Packing, Inc.*, 290 B.R. at 97-98, and where the availability of the breakup fees and expenses "were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely . . . increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 537. The Bid Protections contemplated herein may be necessary to induce parties to act as Stalking Horse Bidders.

44.     Notably, the flexibility to offer Bid Protections is a critical component of the Debtor's ability to potentially obtain the commitment of one or more Stalking Horse Bidders. To qualify as a Stalking Horse Bidder, a bidder will need to have expended and will continue to expend time and resources negotiating, drafting, and performing due diligence activities necessitated by the Sale, despite the fact that its Bid will be subject not only to Court approval but also to overbidding by third parties at the Auction. Any Bid

24

Protections offered to a Stalking Horse Bidder will have been negotiated in good faith and at arm's length. As a result, by preserving the flexibility to offer Bid Protections, the Debtor's ensure that their estates can realize the benefit of a transaction with a Stalking Horse Bidder without sacrificing the potential for interested parties to submit overbids at the Auction. Additionally, a Stalking Horse Bid would establish a substantial "baseline" for a thorough, postpetition auction. In consideration of the foregoing, the Debtor's submit that the Court should authorize the Debtor's to offer Bid Protections pursuant to sections 503(b), 507(a)(2), and 507(b) of the Bankruptcy Code.

**B.    The Form and Manner of the Notice Should Be Approved**

45.    Pursuant to Bankruptcy Rule 2002(a), the Debtor is required to provide creditors with 21 days' notice of the Auction. Pursuant to Bankruptcy Rule 2002(c), such notice must include the time and place of the Auction and the deadline for filing any objections to the relief requested herein.

46.    The Debtor submits that notice of this Motion and the related hearing to consider entry of the Bidding Procedures Order constitutes good and adequate notice of the Auction and the proceedings with respect thereto in compliance with, and satisfaction of, the applicable requirements of Bankruptcy Rule 2002. Accordingly, no further notice is necessary and the Debtor requests that this Court approve the form and manner of notice of the Auction. Nevertheless, the Debtor proposes to file on the docket and serve a notice of entry of the Bidding Procedures Order with a copy of the entered Bidding Procedures Order attached to such notice.

47.    "A proceeding to assume, reject, or assign an executory contract or unexpired lease. . . is governed by Rule 9014." Fed. R. Bankr. P. 6006(a). Bankruptcy Rule 9014 provides that "[i]n a contested matter not otherwise governed by these rules, relief shall be requested by motion, and reasonable notice and opportunity for hearing shall be afforded the party against whom relief is sought." Fed. R. Bankr. P. 9014(a). The notice and hearing requirements for contested matters under Bankruptcy Rule 9014 are satisfied if appropriate notice and an opportunity for hearing are given in light of the particular circumstances. See 11 U.S.C. § 102(1)(A) (defining "after notice and a hearing" or a similar phrase to mean such notice and opportunity for hearing "as [are] appropriate in the particular circumstances.").

48.    The Debtor respectfully submits that the proposed Assumption and Assignment Procedures are appropriate and reasonably tailored to provide appropriate notice and opportunity for hearing. Accordingly, the Debtor submits that implementation of the Assumption and Assignment Procedures is appropriate in this case and request that the Court approve them.

## WAIVER OF BANKRUPTCY RULES 6004(A) AND 6006(D)

49.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the Debtor to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order unless the court orders otherwise." The Debtor requests that the Bidding Procedures Order be effective

immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

## **RESERVATION OF RIGHTS**

50.     Nothing contained herein or any actions taken pursuant to such relief requested is intended to be or should be construed as: (a) an admission as to the amount of, basis for, or validity of any claim against the Debtor under the Bankruptcy Code or other applicable law; (b) a waiver of the Debtor's or any other party in interest's right to dispute any claim on any grounds; (c) a promise or requirement to pay any claim; (d) an implication or admission that any particular claim is of a type specified or defined in this motion or any order granting the relief requested by this motion or a finding that any particular claim is an administrative expense claim or other priority claim; (e) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (f) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtor's estate; (g) a waiver or limitation of the Debtor's or any other party in interest's rights under the Bankruptcy Code or any other applicable law; (h) a waiver of the obligation of any party in interest to file a proof of claim; or (i) a concession by the Debtor that any liens (contractual, common law, statutory, or otherwise) that may be satisfied pursuant to the relief requested in this motion are valid, and the rights of all parties in interest are expressly reserved to contest the extent, validity, or perfection of, or seek avoidance of, all such liens. If the Court grants the relief sought herein, any payment made pursuant to the Court's order is not intended and should not be construed as an admission as to the validity of any

particular claim or a waiver of the Debtor's or any other party in interest's rights to subsequently dispute such claim.

## **NOTICE**

51.     The Debtor, by and through its undersigned attorneys, will provide notice of this motion to: (a) the parties on the Debtor's creditor matrix; (b) the Office of the United States Trustee for the District of Wyoming; (c) counsel to any official committee appointed in these cases; (d) any entities known to have asserted any lien, claim, or encumbrance in or upon any assets comprising the Assets and (e) all persons and entities that have filed a request for service of filings in these chapter 11 cases pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## **NO PRIOR REQUEST**

52.     No prior request for the relief sought in this Motion has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court enter the Order granting the relief requested herein and such other relief as the Court deems appropriate under the circumstances.

Dated: June 18, 2025
Cheyenne, Wyoming

COVINGTON & BURLING LLP

By: */s/ Abigail V. O'Brient*   

Abigail V. O'Brient (*pro hac vice pending*)
Covington & Burling LLP
1999 Avenue of the Stars,
Los Angeles, CA 90067-4643
Telephone: 424-332-4846
Email: aobrient@cov.com

MARKUS WILLIAMS YOUNG &
HUNSICKER LLC

By: */s/ Bradley T. Hunsicker*   

Bradley T. Hunsicker (WY Bar No 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email: bhunsicker@markuswilliams.com

Proposed Counsel for the Debtor and Debtor in
Possession