UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING

FILED

10:23 am, 7/16/25

HJ Esterholdt
Clerk of Court

| | | |
|---|---|---|
| In re: | ) | |
| | ) | |
| MODE ELEVEN BANCORP, | ) Chapter 11 | |
| | ) | |
| | ) | |
| | ) Case No. 25-20240 | |
| Debtor in Possession. | ) | |

### ORDER GRANTING MOTION TO PLACE DEBTOR'S FIRST DAY DECLARATION UNDER SEAL AND GRANTING RELATED RELIEF

THIS MATTER comes before the Court upon the *Motion of Debtor and Debtor in Possession Mode Eleven Bancorp to Place the Debtor's First Day Declaration Under Seal and Grant Related Relief* (the "Motion") filed on July 14, 2025 by debtor and debtor in possession Mode Eleven Bancorp ("Debtor") in the above captioned chapter 11 bankruptcy case.[1] The Court has considered the Motion and determined there is good cause to grant the relief requested therein.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:**

1. The Motion is hereby granted as provided herein.

2. The Clerk of Court shall file under seal the First Day Declaration, and the First Day Declaration shall be accessible only by the Court unless otherwise ordered by the Court after the Debtor and the OCC have had an opportunity to object to any request for such access by any other party.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

3. The Clerk of Court shall replace the publicly filed First Day Declaration with the Redacted Declaration in the form attached hereto as <u>Exhibit 1</u>.

BY THE COURT:

_____ 7/16/2025
Hon. Cathleen D. Parker
United States Bankruptcy Court

# EXHIBIT 1

## REDACTED DECLARATION

Abigail V. O'Brient (*pro hac vice pending*)
Covington & Burling LLP
1999 Avenue of the Stars,
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4846
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
James T. Markus *(pro hac vice pending)*
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email:  bhunsicker@MarkusWilliams.com

PROPOSED COUNSEL FOR DEBTOR
AND DEBTOR-IN-POSSESSION
MODE ELEVEN BANCORP

# UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) |
| | ) |
| MODE ELEVEN BANCORP, | ) Chapter 11 |
| | ) |
| | ) |
| | ) Case No. 25-20240 |
| Debtor-in-Possession. | ) |

### DECLARATION OF JOHN MILLER, CEO OF MODE ELEVEN BANCORP, IN SUPPORT OF CHAPTER 11 PETITION AND RELATED MOTIONS

I, John Miller, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1. I am the President and Chief Executive Officer of Mode Eleven Bancorp (the "Debtor" or "Mode Eleven"), a bank holding company organized under the laws of the State of Wyoming. I have served as the Debtor's CEO since December 15, 2023, and I am familiar with the Debtor's day-to-day operations, financial affairs, and books and records.

2. The Debtor's primary asset is 100 percent of the outstanding equity in Summit National Bank (the "Bank" or "Summit"), a national banking association with three branch locations across Wyoming, Montana, and Idaho. The Bank is not a debtor in this Chapter 11 case and continues to operate in the ordinary course of business. In addition to my position with the Debtor, I am also the Bank's Chief Executive Officer.

3. On June 9, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (as amended, the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Wyoming. The Debtor continues to operate its businesses and manage its properties as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4. As discussed in more detail herein, the Debtor filed this Chapter 11 case to preserve the value of its assets, particularly is equity interest in the Bank, for the benefit of stakeholders, including the rural communities served by the Debtor and the Bank, and to conduct a robust and fair sale process to facilitate the sale of substantially all of its assets, including its interest in the Bank, pursuant to section 363 of the Bankruptcy Code (the "Sale") to a well-funded purchaser capable of obtaining the requisite regulatory approvals to consummate the transaction.

5. I submit this declaration (hereinafter, "Declaration") to provide an overview of the Debtor, its business, and this Chapter 11 case and to support the Debtor's applications and motions for "first-day" relief. All facts and opinions set forth in this Declaration are based upon my personal knowledge of the Debtor's business operations and finances, information learned from my review of relevant documents, information

2

supplied to me by the management team and professional advisors of the Debtor and the Bank, or are my opinion based on experience and knowledge.

6. I am authorized to submit this Declaration on behalf of the Debtor, and, if called upon to testify, I could and would testify competently to the facts set forth herein.

7. To minimize the adverse effects of filing for bankruptcy on its business, the Debtor is filing two motions for relief (collectively, the "Motions"). The Motions seek relief intended to allow the Debtor to continue to operate with minimal risk to the value of its estate and to perform and meet obligations necessary to fulfill its duties as debtor-in-possession.

8. I am familiar with the contents of each Motion and the exhibits thereto, and believe the relief sought in each Motion is necessary to enable the Debtor to operate in Chapter 11 with minimal disruption or loss of productivity or value, is critical to achieving a successful reorganization and/or sale transaction, and is in the best interests of the Debtor's estate and stakeholders.

9. The first part of this Declaration describes the Debtor's business operations, history, and capital structure. The second part describes the circumstances leading up to filing this Chapter 11 case. The third part sets forth the relevant facts in support of the Motions.

## I. OVERVIEW OF THE DEBTOR'S HISTORY AND OPERATIONS

### A. The Debtor's Business

10. The Debtor is a bank holding company headquartered in Hulett, Wyoming. The Debtor was originally founded in 2006 under the name Hulett Holding Company, but

3

in 2009 changed its name to Hulett Bancorp. In 2023, Hulett Bancorp changed its name to Mode Eleven Bancorp.

11. The Debtor's primary assets consist of its equity interests in the Bank, cash and cash equivalents, deferred tax assets, intangible assets (such as intellectual property), and office furniture and fixtures. As a holding company, the Debtor does not have any significant operations of its own. I, as CEO, serve as the Debtor's sole officer.

12. The Bank is a national banking association providing banking products and services to businesses and consumers in Salmon, Idaho; Ekalaka, Montana; and Hulett, Wyoming. Originally chartered in 1984 in Wyoming as Hulett National Bank, the Bank was founded to provide needed banking infrastructure by offering community banking services in small towns in the Mountain West. After changing its name to Summit National Bank in 2005, the Bank added its Idaho and Montana branch locations, as well as a processing center in Laurel, Montana. In 2009, the Bank began operating within a bank holding company capital structure under its parent, Hulett Bancorp (now Mode Eleven Bancorp). The Debtor owns 100% of the capital stock in the Bank.

13. In the small-town communities it serves, the Bank provides full-service retail and commercial banking, primarily consisting of (1) deposit gathering, (2) lending for commercial, agricultural, real estate, construction, and consumer purposes, and (3) assisting borrowers with refinancing, acquisition, and bridge lending opportunities.

B. **Equity Ownership**

14. Approximately 80 different individuals or entities hold equity interests in the Debtor. Many of the Debtor's stockholders are individual investors from the small-town

4

community of Hulett, Wyoming. Much of the Debtor's early funding was provided by these members of the local community. Over time, the pool of equity investors expanded to include investment funds as well as individual investors from outside of the Mountain West. The pool of equity investors expanded to these investment funds and other individuals at the time the Debtor, under prior management, raised several tranches of new capital to fund transformation of the Debtor's business strategy, as set out more fully below, and these new investments were expected to provide funding for long-term growth. The new pool of investors, which included both domestic and foreign investors, became the majority holders of equity in the Debtor, and ultimately the majority of equity capital became owned by foreign entities. However, ongoing, disruptive disputes largely involving these newer shareholders have hindered the business goals of the Debtor and, in some cases, have resulted in real and potential financial expense and increased regulatory risk.

15. In order to address the issues facing the Debtor and the Bank, which are discussed further below, management and the Debtor's board of directors attempted twice to convene a shareholder meeting in 2024, on August 20, 2024 and September 9, 2024. Neither attempt received a quorum to open the meeting and conduct business.

## II. EVENTS LEADING TO THE DEBTOR'S FINANCIAL DIFFICULTIES

### A.    Recent History

16. In 2021, Forrest Gilman became CEO of the Debtor and sought to leverage the Debtor's compliance, technology and business innovation experience by creating a new fintech division at the Bank. The expansion into fintech was intended to provide the Bank's clients with convenient access to a banking-as-a-service ("BaaS") platform that could be

5

used by clients to service their own customers, including lending-as-a-service, deposits and branded accounts, access to payment rails, digital asset custody, and compliance management.

17. █████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████

18.     Based on my review of the Debtor's books and records I believe that, ███████████████████████, the Debtor and the Bank entered into a number of business arrangements with outside parties to facilitate the implementation of this new fintech division, which necessitated significant cash investment by the Debtor.

19.     However, as described in more detail below, shortly after establishing the fintech division, the Debtor and the Bank became subject to significant regulatory scrutiny as a result of this new business strategy. The Debtor became increasingly unlikely to be able to successfully implement the partnerships that had been intended to support its fintech expansion. In order to preserve the value of its equity interests in the Bank and address potentially devastating regulatory action, the Debtor voluntarily ceased operation of the fintech division, though not before significantly depleting its cash reserves to establish this division.

**B.    Regulatory Enforcement Risks**

20.     The Bank is subject to regulation, examination, and supervision by the Office of the Comptroller of the Currency (the "OCC"), and the Debtor is subject to oversight and regulation by the Board of Governors of the Federal Reserve System (the "FRB").

6

21. On September 18, 2023, the FRB conducted an inspection of the Debtor and identified various purported deficiencies in the Debtor's operations, including with respect to pursuit of a fintech business strategy. The FRB noted deficiencies related to board oversight, capital, earnings, liquidity, risk management, and compliance with rules related to affiliate transactions. As a result of these regulatory challenges, as noted above, the Debtor voluntarily ceased its fintech business strategy, including the BaaS platform, and unwound the fintech business by February of 2024.

22. On March 28, 2024, the Debtor and the FRB entered into an *Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended* with respect to the deficiencies identified by the FRB during the September 2023 inspection (the "FRB Consent Order"). That order requires that the Debtor "not engage in any expansionary activities related to the fintech business strategy, including the establishment of any new subsidiaries, business lines, products, programs, services, customers, or program managers in connection with the fintech business strategy, without the prior written approval [of the FRB]."

23. Subsequently, the Bank also became subject to enforcement action by the OCC. On or about June 4, 2024, the Bank entered into a Consent Order with the OCC (the "OCC Consent Order," and with the FRB Consent Order, the "Consent Orders") to address purported deficiencies in the Bank's Bank Secrecy Act/Anti-Money Laundering program, capital and strategic planning, liquidity risk management, transactions with affiliates, accounting, and compliance with laws.

7

24. The OCC Consent Order required the Bank to take a number of actions to remediate the purported issues and improve the Bank's financial condition including, *inter alia*, increasing its total capital ratio to at least thirteen percent (13%), increasing its leverage ratio to at least ten percent (10%), and submitting strategic and capital plans to the OCC.

25. The Bank is well below the minimum 13% capital ratio mandated in Article V of the OCC Consent Order by June 2025. Accordingly, further regulatory action could result in catastrophic regulatory action for the Bank and the Debtor, including a potential loss of the banking charter. Even setting aside the significant risk of near-term regulatory action, the Bank's capital ratio is projected to fall under 2% by 2026—a capital ratio that would *require* the OCC to take action to close the Bank. The Debtor lacks sufficient liquidity to inject funds to allow the Bank to satisfy the required capital ratio, and, as discussed below, has been unable to implement a strategic transaction to allow the Debtor to raise the necessary capital to serve as a source of strength for the Bank.

C. **Nexo Equity Investment and Subsequent Litigation Threat**

26. Around the time the Debtor established the fintech division, in February 2022, the Debtor sold an equity stake, consisting of 1,060 shares of voting common stock, to Nexo Inc. ("Nexo") for approximately $5 million (the "Nexo Equity Investment"). With its investment, Nexo sought a strategic partnership with the Debtor which would enable Nexo to offer bank accounts, asset-backed loans, and card programs to its U.S. retail and institutional clients, while boosting the Debtor's technical capabilities in in support of its new fintech business strategy. Shortly after agreeing to collaborate with the Debtor, Nexo,

8

citing significant difficulty navigating United States regulations, announced in December of 2022 that it was phasing out its product offerings from the United States altogether. However, Nexo still holds its equity interests in the Debtor.

27. Unfortunately, the Nexo Equity Investment resulted in litigation risk. In a letter dated March 10, 2025 (the "Nexo Demand Letter"), Nexo threatened claims against the Debtor based on the events surrounding and following the Nexo Equity Investment, and demanded payment of $5,003,200 in exchange for Nexo's redemption of its equity interest in the Debtor.

28. While I view Nexo's claims as spurious and unlikely to succeed, any litigation of these claims would result in significant legal expenses for the Debtor at a time in which the Debtor is already facing liquidity issues. Moreover, the dispute with Nexo has hindered the Debtor's ability to raise capital, as several parties have noted concerns with Nexo's demand in declining to move forward with potential investments.

**D.    The Debtor's Efforts to Stabilize its Financial Condition**

29. In light of the Consent Orders, threatened shareholder action against the Debtor, and the Debtor's need to raise sufficient capital to help the Bank meet its regulatory capital minimums, the Debtor has sought financing and other potential liquidity solutions to stabilize its operations and allow it to successfully address ongoing, significant regulatory oversight. In December 2024, the Debtor conducted a private placement offering to current and potential investors, offering an equity investment in exchange for voting and non-voting shares of common stock of the Debtor. The Debtor sought to raise between $10 million and $20 million. However, the private placement offering failed to

9

reach the minimum capital raise required and was therefore terminated on April 8, 2025 by the Debtor's board of directors.

30. The Debtor has also considered accepting unsolicited Letters of Intent (collectively, the "LOIs") submitted by various parties between December 2024 and March 2025 in order to assist it in its goal to raise the necessary capital to allow the Bank to meet regulatory capital minimums. However, upon consideration of each LOI, the Debtor determined that none of these LOIs proposed a potentially viable transaction. Many of them contained insufficient information, or proposed transactions that lacked a viable pathway to implementation, often due to probable regulatory concerns by the OCC and FRB.

31. As stated above, the Bank is closely supervised by the OCC. ▮

▮▮▮▮▮▮▮▮▮▮

10

32. As noted above, the Debtor determined that the transactions proposed by the LOIs were unlikely to be viable. For example, one LOI was submitted by a company whose CEO was previously sanctioned by the United Kingdom and Canada. Though these sanctions have since been lifted, regulators likely would look into the circumstances by which those sanctions were imposed, as well as the reasons the sanctions were lifted. (This same individual was also required by the United States Department of Defense to sell his stake in an aerospace company, deeming his investment a threat to national security.) Given that background, regulators would likely seek additional information about this investment, including whether it would potentially cause the Bank to do business with certain foreign (and domestic) entities, and thus the proposed transaction presented significant regulatory concerns.

33. Regulators would also recognize that the time and expense necessary to obtain sufficient information to decide whether to approve such an LOI would cause further depletion of the Debtor's and the Bank's capital. Further, this LOI sought an investment which would potentially cause this company to effectively control the Bank, which would then require additional approval by the FRB. Finally, while the regulatory concerns alone would have justified rejection, the Debtor additionally considered that this particular LOI had no connection to the Bank's long-term business strategy or plans. As a result of the foregoing, this LOI was summarily rejected.

34. Since the Debtor's extensive attempts to raise sufficient capital in order to operate as a source of strength for the Bank have failed, it is my belief that bankruptcy protection is warranted and necessary to preserve the Debtor's banking business as a going

11

concern (and as a valuable asset of the estate). The Bank was rated as "Outstanding'" in its latest Community Reinvestment Act evaluation by the OCC (performed in August 2022), demonstrating that the Bank has the capability to operate effectively and responsibly. I believe the bankruptcy process will allow Debtor to maintain the Bank's value both as an asset and as a banking resource for smaller communities in the Mountain West, while affording the Debtor an opportunity to conduct a robust marketing process to allow a sale of the Bank to a well-funded purchaser capable of obtaining the requisite regulatory approvals to consummate the transaction, for the benefit of the Debtor's creditors and other stakeholders.

35. To that end, the Debtor has retained Hovde Group, LLC, which has significant experience marketing small community banks, as its investment banker, and has commenced a marketing and sale process. While that process remains in early stages, the Debtor has received expressions of interest from several potential purchasers with substantial bank operational experience.

### III. MOTIONS AND ORDERS

36. Concurrently with filing its Chapter 11 petition, the Debtor is seeking orders granting the Motions. Each motion is integral to maximizing the value of the Debtor's estate for the benefit of all parties in interest.

37. In connection with preparing this Chapter 11 petition, I have reviewed those Motions that are described herein, and the facts set forth therein are (a) true and correct to the best of my knowledge, information, and belief, and based upon the information supplied or verified by professionals working at the Debtor's direction, as well as

information provided to me by other professionals and (b) incorporated herein by reference. I believe that granting the Motions is critical to the Debtor's ability to preserve the value of its estate and facilitate the Sale.

**A.     Bank Accounts and Intercompany Claims Motion**

38.     On or about the Petition Date, the Debtor filed its *Motion for Entry of Order (A) Authorizing Maintenance of Bank Accounts and Business Forms; (B) Waiving Strict Compliance With 11 U.S.C. § 345(B) and Certain Operating Guidelines, as Applicable; (C) Authorizing Payment of Intercompany Claims and Granting Administrative Expense Priority Status to Postpetition Intercompany Claims Against the Debtor; and (D) Granting Related Relief* (the "Bank Accounts and Intercompany Claims Motion").

39.     The Debtor intends to continue its operations during this Chapter 11 case while it facilitates an asset sale. The Debtor believes that each of its bank accounts complies with 11 U.S.C. § 345(b) of the Bankruptcy Code because it is maintained at Summit National Bank, and its deposits, which total significantly less than $250,000, are thereby insured by the Federal Deposit Insurance Company. Information about each of the Debtor's bank accounts is included in the Bank Accounts and Intercompany Claims Motion. Given that the Debtor holds limited cash, does not receive regular operational income, and does not currently pay fees to maintain these bank accounts, allowing those accounts to stay open and hold the Debtor's cash poses no meaningful risk to the safety of the Debtor's funds.

40.     Moreover, were the Debtor to close its accounts at the Bank, other account holders could perceive the Debtor's actions as a lack of confidence in the Bank's ability to

13

honor deposits – despite the Bank's ability to honor all deposits and other customer obligations – potentially jeopardizing the operations of the Bank and the value of the Debtor's equity interest therein. Therefore, to the extent applicable, the Debtor requests that the Court waive the U.S. Trustee Guidelines and the requirements of 11 U.S.C. § 345(b) with respect to the Bank Accounts.

41. The Debtor also requests that the Court provide the Debtor with the authority to pay certain prepetition and postpetition Intercompany Claims and grant administrative expense priority status to postpetition Intercompany Claims against the Debtor, as appropriate. Payment of these claims will facilitate the continued operations of both the Debtor and the Bank, which is the Debtor's primary asset, with minimal disruption. Furthermore, the payment of these Intercompany Claims is required by regulatory requirements specific to the banking industry. Given those considerations, the Debtor believes that providing the relief requested is necessary to preserve the value of the estate.

42. I believe that the relief requested in the Bank Accounts and Intercompany Claims Motion is necessary to preserve value and to efficiently administer the estate for the benefit of all stakeholders. Accordingly, the Debtor asks that the relief requested in the Bank Accounts and Intercompany Claims Motion be approved.

**B.  Ordinary Course Professionals Motion**

43. On or about the Petition Date, the Debtor filed its *Motion for Order Authorizing the Payment of Certain Ordinary Course Professionals* (the "Ordinary Course Professionals Motion").

14

44. Through the Ordinary Course Professionals Motion, the Debtor seeks authorization to employ and compensate certain professionals utilized in the ordinary course of business and to pay reasonable fees and expenses for those professionals, up to a $10,000 monthly cap. The continuation of these relationships is vital for the Debtor's ongoing operations and to assist in the Chapter 11 process. These professionals have extensive knowledge and experience with the Debtor's operations and are integral to maintaining day-to-day business activities.

45. The Debtor will be seeking authorization to continue the employment and compensation of the professionals listed in **Exhibit A** to the Ordinary Course Professionals Motion. The use of these ordinary course professionals will reduce the administrative burden and costs associated with seeking separate approval for each professional, facilitating a smoother sale process. For these reasons, I believe the Ordinary Course Professionals Motion is crucial to the Debtor's efforts in this Chapter 11 case and should therefore be granted.

*[Remainder of Page Intentionally Left Blank]*

Dated: June 9, 2025

Las Vegas, Nevada                                   /s/ *John Miller*

                                                John Miller
                                                Chief Executive Officer
                                                Mode Eleven Bancorp