Abigail V. O'Brient (*admitted pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4826
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email:  bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| In re: | ) |
| | ) |
| MODE ELEVEN BANCORP, | ) Chapter 11 |
| | ) |
| | ) |
| | ) Case No. 25-20240 |
| Debtor in Possession. | ) |

**DEBTOR AND DEBTOR IN POSSESSION'S REPORT PURSUANT TO 11 U.S.C.**
**§ 1188(C)**

Mode Eleven Bancorp ("Debtor"), debtor-in-possession herein, by and through its undersigned counsel, hereby files this report pursuant to 11 U.S.C. § 1188(c) as follows:[1]

**A.    Debtor's Business Background**

1.    The Debtor is a bank holding company organized under the laws of

---

[1]    Unless otherwise specified, all references herein to "Section," "§," "Bankruptcy Code" and "Code" refer to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

1

Wyoming, with its principal office located at 133 Main Street, Hulett, Wyoming 87270.

2. The Debtor is the 100% owner of non-debtor, Summit National Bank ("Summit"), a national banking association with three branch locations across Wyoming, Montana, and Idaho.

3. The Debtor, as a holding company, does not have significant operations of its own. Summit is in the business of providing banking products and services to businesses and consumers in Salmon, Idaho; Ekalaka, Montana; and Hulett, Wyoming.

**B.     Reasons for Filing Bankruptcy**

4. In 2021, Forrest Gilman became CEO of the Debtor and sought to leverage the Debtor's compliance, technology and business innovation experience by creating a new fintech division (the "Division") at Summit. The expansion into fintech was intended to provide Summit's clients with convenient access to a banking-as-a-service ("BaaS") platform that could be used by clients to service their own customers, including by providing lending-as-a-service, deposits and branded accounts, access to payment rails, digital asset custody, and compliance management. The Debtor and Summit entered into a number of business arrangements with third parties to facilitate the implementation of the Division, which necessitated significant cash investment by the Debtor.

5. However, shortly after establishing the Division, the Debtor and Summit became subject to significant scrutiny by the Office of the Comptroller of the Currency (the "OCC") and the Board of Governors of the Federal Reserve System (the "FRB"). In turn, the Debtor and Summit became increasingly unlikely to be able to successfully

2

implement the third-party partnerships that had been intended to support the fintech expansion. In order to preserve the value of its equity interests in Summit and address potentially devastating regulatory action, the Debtor voluntarily ceased operation of the Division, though not before significantly depleting its cash reserves to establish the Division.

6. On September 18, 2023, the FRB conducted an inspection of the Debtor and identified various purported deficiencies in the Debtor's operations, including with respect to pursuit of a fintech business strategy. The FRB noted deficiencies related to board oversight, capital, earnings, liquidity, risk management, and compliance with rules related to affiliate transactions. As a result of these regulatory challenges, the Debtor voluntarily ceased its fintech business strategy, including the BaaS platform, and unwound the Division entirely by February 2024.

7. On March 28, 2024, and on or about June 4, 2024, the Debtor and FRB, and Summit and the OCC, respectively, entered into consent orders requiring, respectively, (i) the Debtor to cease all activities related to the Division and (ii) Summit to take a number of actions to improve Summit's overall financial position. As of the Petition Date (defined below), Summit was well below the minimum 13% capital ratio required by the consent order entered into with the OCC, and its capital ratio is projected to fall under 2% by 2026, which would require the OCC to take action to close Summit.

8. In addition to the financial and regulatory challenges arising as a result of the establishment of the Division, the Debtor has also faced adverse creditor action that has

negatively impacted its ability to raise additional capital. More specifically, around the time the Debtor sought to establish the Division, in February 2022, the Debtor sold an equity stake to Nexo, Inc. ("Nexo") for approximately $5 million, seeking to establish a strategic partnership which would enable Nexo to provide certain banking services to U.S. retail and institutional clients, while simultaneously boosting the Debtor's technological capabilities in support of the Division.

9. Ultimately, shortly after agreeing to collaborate with the Debtor, Nexo ceased its operations in the U.S., and sent a letter to the Debtor dated March 10, 2025, threatening claims against the Debtor based on Nexo's equity investment, demanding payment in an amount equal to $5,003,200 in exchange for the redemption of Nexo's equity interest in the Debtor (the "Nexo Demand").

10. The Debtor, following the entry into the consent orders with the FRB and OCC, and in light of the Nexo Demand, sought to implement various strategies to raise capital to improve its liquidity, including seeking financing, conducting a private placement offering to current and potential investors, and accepting and considering unsolicited letters of intent for the purchase of the Debtor's assets. All such attempts were unsuccessful.

11. Thus, on June 9, 2025 (the "Petition Date") the Debtor filed for protection under Subchapter V of chapter 11 of the Bankruptcy Code in order to preserve the value of the Debtor's ownership interest in Summit and to allow for a robust marketing process for a sale of Summit to a well-funded purchaser capable of obtaining the requisite regulatory

approvals to consummate the transaction (such sale, the "Sale"), for the benefit of the Debtor's creditors and other stakeholders.

## C. Efforts Toward Formulation of a Consensual Plan and Anticipated Disputes

12. Since the Petition Date, the Debtor has focused its efforts on conducting a robust marketing process for the Sale. The results of the Sale process will determine the amount of funds available for distribution under a plan.

13. The Debtor anticipates that once the Sale is approved and consummated, the Debtor will be able to propose a consensual and confirmable, plan.

Dated: July 16, 2025　　　　　　　　　　Respectfully submitted,

COVINGTON & BURLING LLP

By: /s/ *Abigail V. O'Brient*
Abigail V. O'Brient
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4826
Email: aobrient@cov.com

MARKUS WILLIAMS YOUNG AND HUNSICKER LLC

By: /s/ *Bradley T. Hunsicker*
Bradley T. Hunsicker (WY Bar No 7-4579) 2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 303-830-0809
Email: bhunsicker@markuswilliams.com

*Counsel for the Debtor and Debtor-in-Possession Mode Eleven Bancorp*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing **DEBTOR AND DEBTOR IN POSSESION'S REPORT PURSUANT TO 11 U.S.C. § 1188(C)** to be filed and served this 16th day of July, 2025, upon those registered for notice via CM/ECF.

*/s/ Abigail V. O'Brient*
Abigail V. O'Brient