**EXHIBIT B**

*Execution Version*
*Confidential*

*PROPOSED FORM OF SHARE PURCHASE AGREEMENT DRAFT FOR DISCUSSION PURPOSES ONLY. NEITHER THE CIRCULATION OF THIS DRAFT NOR ANY SUBSEQUENT DRAFTS SHALL GIVE RISE TO ANY DUTY TO NEGOTIATE OR CREATE OR IMPLY ANY OTHER LEGAL OBLIGATION. NO LEGAL OBLIGATION OF ANY KIND WILL ARISE UNLESS AND UNTIL A DEFINITIVE WRITTEN AGREEMENT IS EXECUTED AND DELIVERED BY ALL PARTIES. SUBJECT TO PURCHASER'S CONFIDENTIALITY AGREEMENT WITH THE COMPANY AND THE BIDDING PROCEDURES.*

SHARE PURCHASE AGREEMENT[1]

by and between

VICTOR REMSHA

and

MODE ELEVEN BANCORP

Dated as of July 30, 2025

---

[1] **Note to Draft**: Subject to the Company's ongoing review and preparation of the Disclosure Schedule.

## TABLE OF CONTENTS

| | | |
|---|---|---|
| ARTICLE 1 | INTERPRETATION | 2 |
| Section 1.1. | Definitions | 2 |
| Section 1.2. | Interpretation | 10 |
| Section 1.3. | Governing Law | 11 |
| ARTICLE 2 | PURCHASE OF SHARES AND OTHER ASSETS | 11 |
| Section 2.1. | Purchase and Sale of the Shares and Other Purchased Assets | 11 |
| Section 2.2. | Assumption of the Assumed Liabilities | 11 |
| Section 2.3. | Consideration | 11 12 |
| Section 2.4. | Purchase Price Deposit | 11 12 |
| Section 2.5. | Closing Payments | 12 |
| Section 2.6. | Withholding | 12 13 |
| ARTICLE 3 | REPRESENTATIONS AND WARRANTIES OF THE COMPANY | 13 |
| Section 3.1. | Organization; Non-contravention | 13 |
| Section 3.2. | Capitalization of the Bank | 14 |
| Section 3.3. | Title to the Shares and the Other Purchased Assets | 14 15 |
| Section 3.4. | Governmental Consents | 15 |
| Section 3.5. | Permits | 15 |
| Section 3.6. | Compliance with Law | 15 16 |
| Section 3.7. | Reports | 15 16 |
| Section 3.8. | Deposits | 16 17 |
| Section 3.9. | Financial Statements; Reporting; Internal Controls | 16 17 |
| Section 3.10. | Tax Matters | 17 |
| Section 3.11. | Litigation | 17 18 |
| Section 3.12. | Employee Benefit Plans | 17 19 |
| Section 3.13. | Real Property | 18 19 |
| Section 3.14. | Absence of Certain Changes | 18 19 |
| Section 3.15. | Material Contracts | 18 20 |
| Section 3.16. | Insurance | 20 21 |
| Section 3.17. | Derivative Instruments | 21 |
| Section 3.17 3.18. | Related Party Transactions | 20 22 |
| Section 3.18 3.19. | Community Reinvestment Act and Consumer Compliance | 20 22 |
| Section 3.19 3.20. | Money Laundering; Unlawful Payments | 20 22 |
| Section 3.20 3.21. | Loans | 20 22 |
| Section 3.21 3.22. | Environmental Matters | 21 23 |
| Section 3.22 3.23. | Intellectual Property; Privacy | 21 23 |
| Section 3.23 3.24. | Brokers | 22 24 |
| Section 3.24 3.25. | Disclaimer Of Other Representations and Warranties | 23 25 |
| ARTICLE 4 | REPRESENTATIONS AND WARRANTIES OF THE PURCHASER | 23 25 |
| Section 4.1. | Organization; Non-contravention | 23 25 |
| Section 4.2. | Governmental Consents | 24 26 |
| Section 4.3. | Investment Intent | 24 26 |
| Section 4.4. | Compliance with Law | 25 26 |

Section 4.5.    Available Funds ............................................................. 2527
Section 4.6.    Litigation ..................................................................... 2527
Section 4.7.    Solvency ....................................................................... 2527

Section 4.8.    Community Reinvestment Act and Consumer Compliance .......... 25

Section 4.94.8.  Money Laundering; Unlawful Payments ............................... 2527
Section 4.104.9.  Qualification ............................................................... 2627
Section 4.114.10.  Brokers ...................................................................... 2628
Section 4.124.11.  Independent Investigation; Acknowledgements and Confirmations ... 2628

ARTICLE 5    PRE-CLOSING MATTERS AND OTHER COVENANTS ..................... 2729

Section 5.1.    Conduct of Business Prior to Closing ................................... 2729
Section 5.2.    Access ......................................................................... 3032
Section 5.3.    Employee Matters .................................. 31Transition Services Agreement33
Section 5.4.    Consents and Approvals ................................................... 3233
Section 5.5.    Notice of Certain Events .................................................. 35
Section 5.55.6.  Indemnification; D&O Insurance; D&O Tail Coverage ............. 3435
Section 5.65.7.  Communications with Customers and Suppliers ..................... 3536
Section 5.75.8.  Resignations ................................................................ 36
Section 5.85.9.  Public Announcements ................................................... 3637
Section 5.95.10.  Tax Sharing Agreement .................................................. 3637
Section 5.105.11.  Preparation and Filing of Tax Returns; Taxes ..................... 3637
Section 5.115.12.  Tax Cooperation .......................................................... 3738
Section 5.125.13.  Post-Closing Actions ..................................................... 3738
Section 5.135.14.  Tax Refunds ............................................................... 3839
Section 5.145.15.  Tax Proceedings .......................................................... 3839
Section 5.155.16.  Transfer Taxes ............................................................ 3839
Section 5.165.17.  Bankruptcy Filings ....................................................... 3940
Section 5.175.18.  Appeal ...................................................................... 3940
Section 5.185.19.  Bidding Procedures ....................................................... 3940
Section 5.20.    Plan ........................................................................... 40
Section 5.195.21.  Ability to Supplement Disclosure Schedules ....................... 3940
Section 5.22.    DIP Loan ...................................................................... 41

ARTICLE 6    CONDITIONS OF CLOSING ............................................... 3941

Section 6.1.    Conditions to Purchaser's Obligations .................................. 3941
Section 6.2.    Conditions to the Company's Obligations .............................. 4042
Section 6.3.    Mutual Condition ........................................................... 4143
Section 6.4.    Frustration of Closing Conditions ....................................... 4143
Section 6.5.    Termination .................................................................. 4243

Article 7    Closing ............................................................................ 4345

Section 7.1.    Time and Place .............................................................. 4345
Section 7.2.    Company's Closing Deliverables .......................................... 4345
Section 7.3.    Purchaser's Closing Deliverables ........................................ 4445
Section 7.4.    Concurrent Delivery ........................................................ 4446
Section 7.5.    Transfer of Shares and Other Purchased Assets ...................... 4446

0

ARTICLE 8      Miscellaneous ............................................................................ 4446

          Section 8.1.      Survival ............................................................................ 4446
          Section 8.2.      Expenses ............................................................................ 4446
          Section 8.3.      Notices ............................................................................ 4446
          Section 8.4.      Further Assurances ............................................................ 4547
          Section 8.5.      Release ............................................................................ 4648
          Section 8.6.      No Rights Against Nonparties ............................................ 4648
          Section 8.7.      Time of the Essence ........................................................ 4749
          Section 8.8.      Entire Agreement ............................................................ 4749
          Section 8.9.      Assignability ................................................................... 4749
          Section 8.10.     Severability ..................................................................... 4749
          Section 8.11.     Waiver and Amendment .................................................... 4749
          Section 8.12.     Benefit ............................................................................ 4749
          Section 8.13.     Captions .......................................................................... 4750
          Section 8.14.     Counterparts .................................................................... 4850
          Section 8.15.     Specific Performance ...................................................... 4850
          Section 8.16.     Consent to Jurisdiction .................................................... 4850
          Section 8.17.     Waiver of Jury Trial ........................................................ 4850
          Section 8.18.     Fiduciary Obligations ...................................................... 4851


Exhibit
Exhibit A          Form of the Transition Services Agreement

0

## SHARE PURCHASE AGREEMENT

THIS SHARE PURCHASE AGREEMENT (this "**Agreement**") is made as of [•]July 25, 2025, by and between [•], a [•]Victor Remsha (the "**Purchaser**"), and Mode Eleven Bancorp, a Wyoming corporation (the "**Company**").

## RECITALS

WHEREAS, the Company is the record and beneficial owner of all of the issued and outstanding shares of capital stock of Summit National Bank, a national banking association (the "**Bank**");

WHEREAS, the Company wishes to sell, and the Purchaser wishes to purchase, all of the shares of capital stock of the Bank at the Closing (the "**Shares**") and certain other assets of the Company, free and clear of all Encumbrances other than Permitted Encumbrances(except for Encumbrances (a) arising pursuant to, in connection with or as a result of this Agreement or the Contemplated Transactions, (b) arising pursuant to the Charter Documents of the Bank, (c) being released on or prior to the Closing, or (d) as may be provided for in the Sale Order) and on the terms and conditions set forth in this Agreement;

WHEREAS, on June 9, 2025, the Company filed a voluntary petition for relief under chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Wyoming (the "**Bankruptcy Court**"), thereby commencing the case captioned *In re Mode Eleven Bancorp*, Case No. 25-20240 (the "**Bankruptcy Case**");

WHEREAS, the Company intends to seek approval of and authorization for the sale and transfer of the Shares and the Other Purchased Assets to the Person(s) submitting the highest or otherwise best bid(s) for such Shares and the Other Purchased Assets in a process approved by the Bankruptcy Court and to be consummated in accordance with the Bidding Procedures Order (the "**Sale Process**") and pursuant to the Sale Order;

WHEREAS, the Purchaser desires to purchase from the Company the Shares and Other Purchased Assets and assume from the Company the Assumed Liabilities through the Sale Process (the "**Sale**"), in exchange for the Purchase Price, on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the Company has determined, in the exercise of its business judgment, that the sale to the Purchaser as contemplated herein is the highest or otherwise best bid for the acquisition of the Shares and the Other Purchased Assets, and therefore it is advisable and in the best interest of the Company's estate and beneficiaries of its estate to enter into this Agreement and to consummate the Contemplated Transactions; and

WHEREAS, the Company and the Purchaser hereby acknowledge and agree that, except as expressly provided herein to the contrary, the Contemplated Transactions are subject to the Bankruptcy Court's approval of this Agreement.

NOW THEREFORE, in consideration of the covenants, agreements, representations and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, covenant and agree as follows:

ARTICLE 1

INTERPRETATION

Section 1.1.    *Definitions*.  In this Agreement and any Exhibit or Schedule hereto, unless the context otherwise requires or unless otherwise specifically provided herein:

"**Affiliate**" means, with respect to any Person, any other Person controlling, controlled by or under common control with, such Person, with "control" for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities or voting interests, by Contract or otherwise.

"**Agreement**" is defined in the Preamble.

"**Applicable Termination**" is defined in Section 2.4(a).

"**Assumed Liabilities**" is defined in Section 2.2.

"**Auction**" is defined in the Bidding Procedures.

"**Bank**" is defined in the Recitals.

"**Bank IT Systems**" is defined in ~~Section 3.22(d)~~Section 3.23(d).

"**Bank Significant Agreement**" is defined in Section 3.15(a).

"**Bankruptcy Case**" is defined in the Recitals.

"**Bankruptcy Code**" is defined in the Recitals.

"**Bankruptcy Court**" is defined in the Recitals.

"**Benefit Plan**" means any "employee benefit plan" as defined in ERISA Section 3(3) and any bonus, incentive compensation, deferred compensation, change in control, equity or severance plan, program or policy.

"**BHCA**" means the Bank Holding Company Act of 1956.

"**Bidding Procedures**" means the procedures governing the Auction and Sale Process, as approved by the Bankruptcy Court pursuant to the Bidding Procedures Order and attached as Exhibit 1 to the Bidding Procedures Order, and as may be amended from time to time in accordance with their terms.

2

"**Bidding Procedures Order**" means the order entered by the Bankruptcy Court on July [●]11, 2025 approving the Bidding Procedures.

"**Broker**" means Hovde Group, LLC.

"**Broker's Fees**" means the fees and expenses payable by the Company and/or the Bank to the Broker in connection with the Contemplated Transactions.

"**Burdensome Condition**" is defined in Section 5.4(c).

"**Business**" means the business carried on by the Bank as conducted as of the date hereof.

"**Business Day**" means any day other than a Saturday, Sunday or any other calendar day which is a federal holiday in the United States or any calendar day in which commercial banks in the States of Idaho, Montana, New York or Wyoming are required by Legal Requirements to close.

"**Call Reports**" means the Bank's Consolidated Reports of Condition and Income (FFIEC Form 051) or any successor form of the Federal Financial Institutions Examination Council, as may be amended, supplemented or restated from time to time.

"**Charter Documents**" means articles or certificate of incorporation or association, bylaws and any other comparable constituent document of an entity.

"**Closing**" means the consummation of the Sale in accordance with Article 7.

"**Closing Date**" means the third (3rd) Business Day following the satisfaction or (to the extent permitted by Legal Requirements) waiver, as applicable, of the conditions set forth in Article 6 (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or (to the extent permitted by Legal Requirements) waiver of those conditions), or such other date as may be agreed upon in writing by the Company and the Purchaser.

"**Code**" means the Internal Revenue Code of 1986 and the rules and regulations promulgated thereunder.

"**Company**" is defined in the Preamble.

"**Company Tax Returns**" is defined in Section 5.10Section 5.11.

"**Company Termination**" is defined in Section 2.4(a).

"**Confidentiality Agreement**" means that certain Confidentiality Agreement, dated as of [●]July 17, 2025, by and between the Company and [the Purchaser].

"**Consent**" means any approval, consent, ratification, waiver, clearance, or other authorization of, notice to, or registration, qualification, designation, declaration or filing with any Person, including any Governmental Authority.

0

"**Contemplated Transactions**" mean the transactions contemplated by this Agreement (including the sale and transfer of the Shares and Other Purchased Assets and the assumption of the Assumed Liabilities) and any other documents, instruments and agreements executed or delivered in connection with herewith and therewith.

"**Contract**" means any written agreement, arrangement, commitment, contract, lease, license, indenture, undertaking, understanding or other document that is legally binding.

"**Criticized Assets**" is defined in ~~Section 3.20(a)~~Section 3.21(a).

"**D&O Indemnified Parties**" is defined in ~~Section 5.5(a)~~Section 5.6(a).

"**D&O Policy**" is defined in ~~Section 5.5(b)~~Section 5.6(b).

"**Deposit Amount**" is defined in ~~Section 2.4~~Section 2.4(a).

[ "**DIP Loan**" means the term loan made pursuant to the DIP Loan ~~Agreement~~Term Sheet whereby the Purchaser, as lender, [will lend] [has lent] the Company up to $[●]1,000,000 for the purpose of funding the Company's ongoing working capital requirements, which may include one or more equity contributions by the Company to the Bank, and ~~the~~administrative expenses ~~incurred during~~of the Bankruptcy Case.][2], to the extent that the Debtor does not otherwise have proceeds sufficient to pay those expenses.

[ "**DIP Loan ~~Agreement~~Term Sheet**" means the ~~agreement~~term sheet between Purchaser and the Company governing the DIP Loan ~~.~~], to be approved by an Order of the Bankruptcy Court.

"**Disclosure Schedule**" means the disclosure schedule delivered by the Company to the Purchaser concurrently with the execution and delivery of this Agreement, as may be supplemented, modified or amended by any Disclosure Update.  Notwithstanding anything to the contrary contained in the Disclosure Schedule or in this Agreement, (a) the information and disclosures contained in any section of the Disclosure Schedule shall be deemed to be disclosed and incorporated by reference in any other section of the Disclosure Schedule as though fully set forth in such other section for which the applicability of such information and disclosure is reasonably apparent on the face of such information or disclosure, (b) the disclosure of any matter in the Disclosure Schedule shall not be construed as indicating that such matter is necessarily required to be disclosed in order for any representation or warranty to be true and correct, (c) the Disclosure Schedule is qualified in its entirety by reference to this Agreement and is not intended to constitute, and shall not be construed as constituting, representations and warranties by any party except to the extent expressly set forth herein, (d) the inclusion of any item in the Disclosure Schedule shall be deemed neither an admission that such item is material to the business, financial condition or results of operations of the Company, the Other Purchased Assets, the Assumed Liabilities, the Business or the Bank nor an admission of any Liability to any Third Party, (e) matters reflected in the Disclosure Schedule are not necessarily limited to

---

[2] **Note to Draft**: ~~Parties to discuss the DIP Loan to fund the working capital of the Bank at or prior to the Closing.~~

0

matters required by this Agreement to be reflected therein and any additional matters are set forth therein for informational purposes, and (f) headings are inserted in the Disclosure Schedule for convenience of reference only and shall not have the effect of amending or changing the express description of the sections as set forth in this Agreement.

"**Disclosure Update**" is defined in ~~Section 5.19~~Section 5.21.

"**Employee**" means any employee of the Bank as of the applicable date of determination.

"**Encumbrance**" means, with respect to any property or asset, any lien, mortgage, pledge, charge, security interest or other encumbrance in respect of such property or asset, other than, with respect to the Shares, any transfer restrictions imposed by federal or state securities Legal Requirements or the Bankruptcy Code.

~~"**Enforceability Exceptions**" is defined in Section 3.1(c).~~

"**ERISA**" means the Employee Retirement Income Security Act of 1974 and the rules and regulations promulgated thereunder.

"**Escrow Account**" means the account or accounts maintained by the Escrow Agent into which the Deposit Amount is deposited in accordance with the Escrow Agreement.

"**Escrow Agent**" means ~~[●]~~Western Alliance Bank, an Arizona corporation.

"**Escrow Agreement**" means that certain Escrow Agreement, dated as of the date hereof, by and among the Purchaser, the Company and the Escrow Agent.

"**Escrow Funds**" means all the funds in the Escrow Account, including any interest or other earnings earned thereon.

"**FDIC**" means the Federal Deposit Insurance Corporation, or any successor thereto.

"**Federal Home Loan Bank**" means any bank of the Federal Home Loan Bank System created by the Federal Home Loan Bank Act of 1932.

"**Federal Reserve**" means the Board of Governors of the Federal Reserve System, or any successor thereto.

"**Fraud**" means, with respect to a party, an actual and intentional misrepresentation of a material existing fact with respect to the making of any representation or warranty expressly set forth in Article 3 or Article 4, made by such party, as applicable, and (a) with respect to the Company or the Bank, to the Knowledge of the Company, or (b) with respect to the Purchaser, to the Purchaser's knowledge, of its falsity and made for the purpose of inducing the other party to act, and upon which the other party justifiably relies with resulting losses. Fraud shall not include any claim for equitable fraud, constructive fraud, promissory fraud, unfair dealings fraud, fraud by reckless or negligent misrepresentation or any tort based on negligence or recklessness.

0

"**GAAP**" means United States generally accepted accounting principles.

"**Governmental Authority**" means (a) any federal, state, local, municipal or foreign government or political subdivision thereof, or any agency, bureau, ministry, commission, division or instrumentality of such government or political subdivision thereof, (b) any regulatory authority or quasi-governmental authority (to the extent that the rules, regulations or Orders of such authority have the force of a Legal Requirement) and (c) any arbitrator, arbitration panel, administrative agency, court or tribunal, in each case of the foregoing, with competent jurisdiction.

"**Hazardous Material**" means any pollutant, toxic substance, hazardous waste, hazardous materials, or hazardous substances as defined in, or listed under, any Environmental Law.

"**Intellectual Property**" means all (a) patents and patent applications; (b) trademarks, service marks and trademark and service mark applications and registrations, trade dress, logos, trade names and domain names, and all goodwill associated with the foregoing; (c) copyrights and other rights in any work of authorship, together with all applications, registrations and renewals therefor; and (d) trade secrets and confidential business information.

"**Knowledge**" of the Company, or words of similar import, means the actual knowledge, after reasonable inquiry, of John Miller.

"**Leased Real Properties**" means any real property used primarily by the Business that is leased, subleased, licensed or otherwise occupied by the Bank pursuant to a Contract as of the date hereof.

"**Legal Requirement**" means, with respect to any Person, any (a) federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, rule, regulation, statute, treaty or administrative pronouncement having the force of law, (b) Order, or (c) other similar requirement enacted, adopted, promulgated or applied by a Governmental Authority, in each case, that is binding upon or otherwise applicable to such Person, unless expressly specified otherwise.

"**Liability**" means, with respect to any Person, any liability or obligation of such Person, whether known or unknown, absolute or contingent, whether or not accrued, disputed or undisputed, liquidated or unliquidated, or due or to become due.

"**Loans**" is defined in ~~Section 3.20(a)~~Section 3.21(a).

"**[March 31]** **Balance Sheet**" means the balance sheet dated as of [March 31, 2025], as included in the Call Report for the quarter ended [March 31, 2025] (as may be amended, supplemented or restated from time to time).[3]

---

[3] ~~**Note to Draft:** To be updated to reflect the latest balance sheet available prior to signing.~~

0

"**Material Adverse Effect**" means, with respect to any Person, any effect, event, change, occurrence or condition that has had or would reasonably be expected to have, individually or in the aggregate, a material and adverse effect on the business, assets, Liabilities, financial condition or results of operations of such Person and its Subsidiaries, taken as a whole; provided, however, that a Material Adverse Effect shall not be deemed to include any effects, events, changes, occurrences or conditions arising out of, relating to or resulting from, alone or in combination, (a) changes in applicable GAAP or regulatory accounting requirements, or the interpretations thereof, (b) changes in Legal Requirements or the interpretations thereof, (c) changes in global, national or regional social or political conditions (including the outbreak, continuation or escalation of war or acts of terrorism (whether or not declared) or cyberattacks) or economic or market conditions (including international tariffs, trade policies or any "trade war" or similar actions, equity, credit and debt markets, as well as changes in interest rates), (d) occurrence of any act of god or other calamity, including strike, labor dispute, civil disturbance, embargo, hurricanes, earthquakes, tornados, floods, fires or other natural disasters or from any outbreak of any disease, pandemic, epidemic, or other public health event or concern, whether or not declared as such by any Governmental Authority (including any Legal Requirements, directive or guideline issued by a Governmental Authority in response thereto), (e) any change (including decline) in and of itself, in the market price or trading volume of any securities or debts of any Person or its Affiliate or a failure, in and of itself, to meet earnings projections or internal or external financial forecasts (it being understood that the underlying causes of such change or failure may be taken into account in determining whether a Material Adverse Effect has occurred, except as otherwise excepted by this proviso), (f) the entry into, announcement, performance or existence of this Agreement, ~~[the DIP Loan~~ ~~Agreement]~~Term Sheet or the Contemplated Transactions or the pendency or consummation of the Contemplated Transactions (including any effect on such Person's or its Affiliate's relationships with its customers, suppliers, creditors, borrowers, shareholders, employees or others having business relationships with such Person or its Affiliates), (g) the expenses incurred by such Person or its Affiliates in negotiating, documenting, effecting and consummating the Contemplated Transactions, (h) the announcement, pendency or consummation of the Bankruptcy Case (and any limitations therein pursuant to the Bankruptcy Code, any Order of the Bankruptcy Court~~[~~, or the DIP Loan ~~Agreement]~~Term Sheet (or limitations of funding thereunder))~~]~~, (i) actions or omissions taken by the Company (or its Affiliates) or the Purchaser (or its Affiliates), as applicable, with the prior written consent or request of the Purchaser or the Company, respectively, or required, permitted or contemplated by this Agreement~~[~~– or the DIP Loan ~~Agreement]~~Term Sheet, (j) the identity of the Purchaser or any of its Affiliates, (k) any shareholder litigation arising out of, related to, or in connection with the Bankruptcy Case, this Agreement~~[~~, the DIP Loan ~~Agreement]~~Term Sheet or the Contemplated Transactions that is brought or threatened against the Bank, Purchaser or the Company, or any members of such Person's board of directors (or comparable governing body) or such Person's officers from and following the date of this Agreement, (l) any matter disclosed on the Disclosure Schedule, or (m) any regulatory action taken by any Governmental Authority (including the OCC) pursuant to the "Prompt Corrective Action" regulations set forth in 12 C.F.R. Part 6 or any actions taken by the OCC pursuant to the Consent Order between the OCC and the Bank dated as of June 5, 2024 or the Federal Reserve pursuant to the Consent Order between the Federal Reserve and the Company dated as of March 28, 2024, except that, any effects attributable to or resulting from any of the changes, events, conditions or trends described in clauses (a), (b), (c), and (d) shall not be excluded to the extent of any materially

disproportionate adverse impact they have on such Person and its Subsidiaries, taken as a whole, as compared to other companies in the industry in which such Person and its Subsidiaries operate.

"**Material Permit**" is defined in Section 3.5(a).

"**Materially Burdensome Regulatory Condition**" means, any restraint, limitation, term, requirement, provision or condition imposed by any Governmental Authority on the Bank or the Purchaser that is materially and unreasonably financially burdensome on the Business or on the Purchaser, in each case at the Closing; provided, that the following shall not be deemed to be a "Materially Burdensome Regulatory Condition": (i) any contribution of capital by Purchaser or his Affiliates to the Bank not in excess of Twenty-five Million Dollars ($25,000,000.00) in the aggregate, (ii) any regulatory actions taken by any Governmental Authority (including the OCC) pursuant to the "Prompt Corrective Action" regulations set forth in 12 C.F.R. Part 6 or any actions taken by the OCC pursuant to the Consent Order between the OCC and the Bank dated as of June 5, 2024 or the Federal Reserve pursuant to the Consent Order between the Federal Reserve and the Company dated as of March 28, 2024, (iii) any restraint, limitation, term, requirement, provision or condition that applies to the Purchaser, his Affiliates, or generally to bank holding companies and banks as provided by statute, regulation, or written and publicly available supervisory guidance of general applicability, in each case, as in effect on the date hereof, or (iv) any restraint, limitation, term, requirement, provision or condition on any business between the Bank, on the one hand, and Purchaser, his Affiliates and/or any specific Person or category of Persons, on the other hand.

"**OCC**" means the Office of the Comptroller of the Currency.

"**Order**" means any order, judgment, decree, decision, ruling, writ, assessment, charge, stipulation, injunction or other determination of any Governmental Authority, or any arbitration award entered into by an arbitrator, in each case having competent jurisdiction to render such.

"**Ordinary Course of Business**" or "**the Ordinary Course**" means, with respect to an action taken by any Person, an action taken by such Person if such action is, in all material respects, in the ordinary course of business of such Person, subject to those actions necessary and incident, or otherwise relating, to the Bankruptcy Case.

"**Other Purchased Assets**" is defined in Section 2.1.

"**Outside Date**" is defined in Section 6.5(a).

"**Owned Real Property**" means any real property owned by the Bank as of the date hereof.

"**Permits**" means all permits, licenses, registrations, consents, authorizations, approvals, privileges, waivers, exemptions, certificates or qualifications issued by any Governmental Authorities.

"**Permitted Encumbrances**" means (a) any Encumbrance for Taxes that are not yet due or delinquent, (b) any landlords', mechanics', workmen's, repairmen's, warehousemen's,

0

carriers' or other like Encumbrances arising in the Ordinary Course of Business, (c) easements, rights of way, zoning, planning, building, imperfections, irregularities of title and other similar limitations and other Encumbrances that do not and would not, individually or in the aggregate, materially detract from the value of, or materially interfere with, the present use and enjoyment of the asset or property subject thereto or affected thereby, (d) easements, rights of way, zoning, planning, building and other similar limitations, restrictions and rights of any Governmental Authority to regulate property, (e) any Encumbrance to be released on or prior to the Closing, (f) any Encumbrance arising pursuant to, in connection with or as a result of this Agreement[, the DIP Loan Agreement]Term Sheet or the Contemplated Transactions, (g) any condition that may be shown on a current survey or by inspection of a property, (h) any Encumbrance that a reputable title insurance company would be willing to omit as an exception or affirmatively insure against in a title insurance policy for the affected property, (i) any Encumbrance recorded or filed in any land register or other public register, (j) any non-exclusive licenses to any Intellectual Property granted in the Ordinary Course of Business, (k) any Encumbrance being contested in good faith through appropriate Proceedings and for which adequate reserves have been established in accordance with GAAP, (l) any Encumbrance that is not material to the Bank, the Business or the Other Purchased Assets, (m) any Encumbrance on assets given to secure advances by a Federal Home Loan Bank or the Federal Reserve discount window in the Ordinary Course of Business, (n) any Encumbrance listed on Section 1.1 of the Disclosure Schedule or (o) any Encumbrances permitted by or that will be removed or released by operation of the Sale Order.

"**Person**" means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority.

"**Pre-Closing Tax Period**" is defined in Section 5.10Section 5.11.

"**Premium Cap**" is defined in Section 5.5(b)Section 5.6(b).

"**Proceeding**" means any action, cause of action, suit, hearing, claim, complaint, dispute, demand, lawsuit, litigation, arbitration or other legal proceeding (in each case, whether civil, criminal or administrative) by or before a Governmental Authority.

"**Purchase Price**" is defined in Section 2.3.

"**Purchaser**" is defined in the introductory paragraph.

"**Purchaser Required Approvals**" is defined in Section 4.2.

"**Related Party**" means, with respect to a Person, such Person's former, current or future, direct or indirect, equityholders, controlling Persons, shareholders, members, general or limited partners, managers, Affiliates, directors, officers, employees, agents or other Representatives, or any of their respective assignees or successors or any former, current or future, direct or indirect, equityholders, controlling Persons, shareholders, members, general or limited partners, managers, Affiliates, directors, officers, employees, agents or other Representatives of any of the foregoing.

0

"**Representatives**" means, with respect to a Person, the officers, directors, managers, shareholders, members, trustees, employees, counsel, attorneys, accountants, agents, financial advisers, consultants and other representatives of such Person.

"**Sale**" is defined in the Recitals.

"**Sale Order**" means an Order ~~of the Bankruptcy Court approving consummation of the Sale and the other Contemplated Transactions, as may be altered, amended, modified or supplemented from time to time, in accordance with the terms and conditions of this Agreement, which Order shall (a) provide for the transfer of the Shares and Other Purchased Assets to the Purchaser free and clear of all Encumbrances (other than Permitted Encumbrances and the Assumed Liabilities), to the fullest extent permitted by Sections 363(f) of the Bankruptcy Code, (b) contain a finding that the Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, and (c) otherwise be~~ <u>in substantially the form of the Order attached hereto as Exhibit A, or such other Order approving the Sale</u> in form and substance <u>reasonably</u> acceptable to the Company and the Purchaser.

"**Sale Process**" is defined in the Recitals.

"**Securities Act**" means the Securities Act of 1933.

"**Shares**" is defined in the Recitals.

"**Straddle Tax Period**" means any Tax period beginning on or before the Closing Date and ending after the Closing Date.

"**Subsidiary**" means all those corporations, associations, companies or other business entities of which the entity in question either (i) owns or controls more than 50% of the outstanding equity securities or other ownership interests either directly or through an unbroken chain of entities as to each of which more than 50% of the outstanding equity securities is owned directly or indirectly by its parent (provided that there shall not be included any such entity the equity securities of which are owned or controlled in a fiduciary capacity), (ii) in the case of partnerships, serves as a general partner, (iii) in the case of a limited liability company, serves as a managing member, or (iv) otherwise has the ability to elect a majority of the directors, trustees or managing members thereof or has "control" over, as defined under the Bank Holding Company Act of 1956.

"**Tax**" or "**Taxes**" means all federal, state, local and foreign taxes, charges, fees, imposts, levies or other like assessments, including all income, gross income, gross receipts, business, alternative or add-on minimum, capital, sales, use, ad valorem, commercial rent, value added, transfer, registration, franchise, profits, windfall profits, inventory, capital stock, license, premium, withholding, payroll, employment, social security, unemployment, disability, excise, severance, stamp, occupation, recapture, real and personal property, estimated taxes, customs duties, or other similar fees, assessments or charges, together with any interest, penalties, additions to tax or additional amounts imposed by any taxing authority, whether disputed or not.

"**Tax Matter**" is defined in ~~Section 5.14~~<u>Section 5.15</u>.

0

"**Tax Returns**" means all returns, statements, reports, documents, declarations, forms, designations, claims for refund, and other information and filings (including elections, disclosures, schedules and estimates), including any amendments thereto relating to Taxes.

"**Tax Sharing Agreement**" is defined in ~~Section 3.10(d)~~Section 3.10(e).

"**Third Party**" means Person that is not (a) a party to this Agreement or their successors and permitted assigns or (b) an Affiliate of a party to this Agreement.

"**Transfer Tax Returns**" is defined in ~~Section 5.15~~Section 5.16.

"**Transfer Taxes**" is defined in ~~Section 5.15~~Section 5.16.

"**Transition Services Agreement**" is defined in Section 5.3.

"**USA PATRIOT Act**" is defined in ~~Section 3.19~~Section 3.20.

Section 1.2.    *Interpretation*.   For the purposes of this Agreement: (a) words in the singular shall be held to include the plural and vice versa, and words of one gender shall be held to include the other gender as the context requires; (b) references to the terms Article, Section, paragraph, Exhibit and Schedule are references to the Articles, Sections, paragraphs, Exhibits and Schedules to this Agreement unless otherwise specified; (c) the terms "hereof," "herein," "hereby," "hereto," and derivative or similar words refer to this entire Agreement, including the Disclosure Schedule, Schedules and Exhibits hereto; (d) references to "$" shall mean United States dollars and except where otherwise provided, all monetary amounts in this Agreement are stated and shall be paid in United States dollars; (e) the word "including" and words of similar import when used in this Agreement shall mean "including without limitation," unless otherwise specified; (f) the word "or" shall not be exclusive; (g) references to "written" or "in writing" include in electronic form; (h) the Company and the Purchaser have each participated in the negotiation and drafting of this Agreement and if an ambiguity or question of interpretation should arise, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or burdening any party by virtue of the authorship of any of the provisions in this Agreement; (i) a reference to any Person includes such Person's successors and permitted assigns; (j) any reference to "days" shall mean calendar days unless Business Days are expressly specified; (k) when calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded and if the last day of such period is not a Business Day, the period shall end at the close of business on the next succeeding Business Day; (l) to the extent any representations and warranties contained in this Agreement relate to the same underlying subject matter, the more specific representation and warranty shall control and shall be deemed the sole and exclusive representation and warranty made with respect to such subject matter; and (m) reference to any Legal Requirement means such Legal Requirement, as amended, modified, codified, replaced or reenacted from time to time, and all rules and regulations promulgated thereunder.

Section 1.3.    *Governing Law*.  Except to the extent governed by the Bankruptcy Code, this Agreement and the agreements contemplated hereby, and all Proceedings that may be based upon, arise out of or relate to this Agreement, or the negotiation, execution or performance of

0

this Agreement (including any Proceeding based upon, arising out of or related to any representation or warranty made in or in connection with this Agreement or as an inducement to enter into this Agreement) shall be construed and interpreted, and the rights of the parties shall be governed by, and enforced in accordance with the internal laws of the State of Delaware, including its statutes of limitations, without giving effect to any Legal Requirement that would cause application of any Legal Requirement of any jurisdiction other than the State of Delaware.

ARTICLE 2
PURCHASE OF SHARES AND OTHER ASSETS

Section 2.1.    *Purchase and Sale of the Shares and Other Purchased Assets*.  Under the terms and subject to the conditions set forth in this Agreement and subject to the entry of the Sale Order, the Company agrees to sell, assign and transfer to the Purchaser, free and clear of all Encumbrances (other than Permitted Encumbrances except for Encumbrances (i) arising pursuant to, in connection with or as a result of this Agreement or the Contemplated Transactions, (ii) arising pursuant to the Charter Documents of the Bank, (iii) being released on or prior to the Closing, or (iv) as may be provided for in the Sale Order), and the Purchaser agrees to purchase from the Company, on the Closing Date, effective as of and from the Closing, (a) all of the Shares, and (b) all right, title and interest of the Company in and to the assets set forth on Section 2.1 of the Disclosure Schedule (the "**Other Purchased Assets**").

Section 2.2.    *Assumption of the Assumed Liabilities*.  On the terms and subject to the conditions set forth in this Agreement, the Purchaser shall, on the Closing Date, effective as of the Closing, assume and agree to pay, discharge and perform in accordance with their terms (or as otherwise provided herein) the following Liabilities of the Company (collectively, the "**Assumed Liabilities**"): (a) any and all Liabilities arising out of, relating to or otherwise in respect of the ownership, use, sale, license or operation of the Shares and Other Purchased Assets for the period on or after the Closing; and (b) all Taxes for which the Purchaser is liable pursuant to this Agreement, including the Transfer Taxes as set forth in Section 5.15Section 5.16 and Taxes allocated to Purchaser pursuant to Section 5.10Section 5.11.

Section 2.3.    *Consideration*.  The aggregate amount payable to the Company for the acquisitionFollowing the entry of the Sale Order by the Bankruptcy Court and on the terms and subject to conditions set forth in this Agreement, the Purchaser shall purchase from the Company, on the Closing Date, effective as of the Closing, all of the Shares and the Other Purchased Assets will befor the amount of $[•]5,450,000 (the "**Purchase Price**") and the assumption of the Assumed Liabilities, which shall, subject to the terms and conditions hereof, be payable, as set forth in Section 2.5, at the Closingand shall assume the Assumed Liabilities.

Section 2.4.    *Purchase Price Deposit*.

(a)    The Purchaser shall deposit or cause to be deposited with the Escrow Agent immediately available funds in an amount equal to ten percent (10%) of the Purchase Price (the "**Deposit Amount**") in accordance with the Bidding Procedures Order and the Bidding Procedures.  The Deposit Amount (and any other Escrow Funds) will be either delivered to the Purchaser or paid to the Company as follows: (i) if the Closing occurs, the Deposit Amount and all other Escrow Funds shall be applied towards the Purchase Price payable by the Purchaser, (ii)

0

if this Agreement is terminated by the Company pursuant to Section 6.5(b)(iii), Section 6.5(b)(iv) (only if the existence of the Order described therein was caused by or resulting from any breach by the Purchaser of this Agreement), or by the Company or the Purchaser pursuant to Section 6.5(b)(v) (each, ~~a~~an "~~Company~~**Applicable** Termination"), then the Company and the Purchaser shall promptly submit joint written instructions to the Escrow Agent to release the Deposit Amount and all other Escrow Funds to the Company (and such Deposit Amount and such other Escrow Funds will be deemed fully earned by the Company as compensation and consideration for entering into this Agreement), or (iii) if this Agreement is terminated for any reason other than ~~a Company~~an Applicable Termination (provided that upon such termination the Company was not entitled to terminate this Agreement under Section 6.5(b)(iii), Section 6.5(b)(iv) (only if the existence of the Order described therein was caused by or resulting from any breach by the Purchaser of this Agreement), or Section 6.5(b)(v)), then the Company and the Purchaser~~, upon prior written notice to the Company, shall~~ shall promptly submit joint written instructions to the Escrow Agent to release the Deposit Amount and all other Escrow Funds to the Purchaser.

(b)    The parties acknowledge that the agreements contained in this Section 2.4 are an integral part of the Contemplated Transactions, that the damages resulting from termination of this Agreement under circumstances where the Company is entitled to the Escrow Funds are uncertain and incapable of accurate calculation and that the delivery of the Escrow Funds is not a penalty but rather shall constitute liquidated damages in a reasonable amount that will compensate the Company in the circumstances where the Company is entitled to the Escrow Funds for the efforts and resources expended and opportunities forgone while negotiating this Agreement and in reliance on this Agreement and on the expectation of the consummation of the Contemplated Transactions, and that, without these agreements, the Company would not enter into this Agreement.  If the Purchaser fails to take any action necessary to cause the delivery of the Escrow Funds to the Company pursuant to the terms of this Agreement under circumstances where the Company is entitled to the Escrow Funds and, in order to obtain such Escrow Funds, the Company commences a Proceeding or files a motion which results in an Order in favor of the Company, the Purchaser shall pay to the Company an amount in cash equal to the costs and expenses (including attorney's fees) incurred by the Company in connection therewith.

Section 2.5.    *Closing Payments.*  At or prior to the Closing, the Purchaser shall pay the Purchase Price (less the Deposit Amount and all other Escrow Funds applied towards the Purchase Price pursuant to Section 2.4(a)) to the Company in cash by wire transfer of immediately available funds to an account or accounts designated by the Company in writing at least three (3) Business Days prior to the Closing Date.  ~~[~~At the option of the Purchaser, the Purchaser may pay a portion of the Purchase Price ~~payable to the Company~~ by offsetting ~~of amounts due under~~the amount of the DIP Loan ~~Agreement.]~~  In connection with the foregoing, the Purchaser and the Company shall submit joint written instructions to the Escrow Agent on or prior to the Closing Date to release the Deposit Amount and all other Escrow Funds to the Company at the Closing or as soon as reasonably practicable thereafter, but in no event later than three (3) Business Days after the Closing.

Section 2.6.    *Withholding.*  Notwithstanding anything in this Agreement to the contrary, the Purchaser shall be entitled to deduct and withhold from any amount (or portion thereof) payable under this Agreement such Taxes as are required to be deducted and withheld from such

0

amount under the Code or any other applicable provision of U.S. or foreign Tax Legal Requirements.  To the extent that the Purchaser intends to withhold any such amounts from the Purchase Price, it shall notify the Company of such intention as soon as reasonably possible after the date hereof and shall provide the Company with an opportunity to provide forms or evidence that would exempt or reduce such amounts from withholding and shall otherwise cooperate in good faith with the Company and use reasonable best efforts to minimize or eliminate any such deductions or withholdings.  To the extent that any amounts are so deducted and withheld and timely paid to the applicable Governmental Authority, such deducted and withheld amounts shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

ARTICLE 3

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Except (a) as set forth in the Disclosure Schedule or (b) for information and documents commonly known as "confidential supervisory information" that is prohibited from disclosure (as to which nothing in this Agreement shall require, or be understood to constitute, disclosure), the Company hereby makes the following representations and warranties to the Purchaser as of the date of this Agreement and as of the Closing Date; provided, that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only as of such date:

Section 3.1.    *Organization; Non-contravention*.

(a)    The Company is duly organized, validly existing and in good standing under the laws of the State of Wyoming and has the corporate power and authority to own or lease all of its properties and assets and to conduct its business in the manner in which its business is now being conducted in all material aspects, subject to the Bankruptcy Case.  The Company is duly registered with the Federal Reserve as a bank holding company under the BHCA.  The Company is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where the failure to be so qualified has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

(b)    The Bank is a direct, wholly owned Subsidiary of the Company, is duly organized, validly existing and in good standing under the laws of the United States, is authorized under the laws of the United States to engage in the Business and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct the Business in the manner in which the Business is now being conducted in all material aspects. The Bank has no direct or indirect Subsidiaries.  The Bank is duly qualified to do businessconduct the Business and is in good standing in each jurisdiction in which its ownership of conduct of business requires such qualification, except where the failure to be so qualified or in good standing, as the case may be, has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank. The Bank is a national banking association which is duly licensed by the OCC to engage in commercial banking.

14

0

(c)     Subject to the entry of the Sale Order and any other Consents of the Bankruptcy Court, (i) the Company has the corporate power and authority to enter into this Agreement and to carry out its obligations hereunder and thereunder, including the consummation of the Sale and the other Contemplated Transactions, and (ii) the execution and delivery of this Agreement and the completion and performance of the Contemplated Transactions have been duly authorized by all necessary corporate action on the part of the Company, and this Agreement and all other documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement have been duly executed and delivered by the Company and (assuming due authorization, execution and delivery by the Purchaser) constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms, except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally and by general principles of equity, regardless of whether considered in any Proceeding in equity or at law (the "**Enforceability Exceptions**").

(d)     Subject to the entry of the Sale Order and any other Consents of the Bankruptcy Court, assuming (i) all the Purchaser Required Approvals are obtained and (ii) any filings required by any applicable federal or state securities or "blue sky" Legal Requirements are made, neither the execution and delivery of this Agreement, nor the completion and performance of the Contemplated Transactions, will, with or without the giving of notice or the lapse of time or both, (A) violate the Charter Documents of the Company or the Bank, (B) violate any Legal Requirements applicable to the Company or the Bank, or (C) result in a breach of or default under, require consent under, or violate any Bank Significant Agreement, except (1) in the case of clauses (A) through (C), to the extent excused or stayed by the Bankruptcy Case, and (2) in the case of clauses (B) and (C), for any such violation, breach, consent or default, or consent that has not had or would not reasonably be expected to, individually or in the aggregate, have a Material Adverse Effect on the Bank, or prevent, materially delay or materially impair the Company's ability to consummate the Contemplated Transactions.

Section 3.2.    *Capitalization of the Bank*.

(a)     The Shares represent all of the issued and outstanding capital stock of the Bank and are directly owned by the Company.  ~~There are~~

(b)     The authorized capital stock of the Bank consists of 10,500 shares, $50.00 par value.  All Shares are duly authorized, validly issued, fully paid and non-assessable, have been issued in compliance with all applicable federal and state securities laws, and none of such outstanding shares were issued in violation of any preemptive rights or similar rights to subscribe for or purchase any Shares, except for any noncompliance or violation that would not reasonably be expected to, individually or in the aggregate, be material to the Bank.

(c)     Following the entry of the Sale Order, and except as provided in the Sale Order, there will be no outstanding restrictions on the transfer or voting of the Shares other than those (i) set forth in the Charter Documents of the Company or the Bank, (ii) arising pursuant to this Agreement or the Contemplated Transactions, (iii) arising from securities Legal Requirements, or (iv) that will be released on or prior to the Closing.  ~~Neither~~Except as provided in the Bidding Procedures Order, neither the Company nor the Bank has granted to any Person

any Contract, warrant or option, or any other conversion right or right to purchase, subscribe for or receive an issuance of, any capital stock of the Bank.

~~(b) As of the date of this Agreement, the Bank has no Subsidiary.~~

Section 3.3.    *Title to the Shares and the Other Purchased Assets*.

(a)    The Company (i) owns of record and beneficially the Shares and (ii) following the entry of the Sale Order, at the Closing, the Company will transfer to the Purchaser all of the Company's right, title and interest in and to the Shares, in each case of clauses (i) and (ii), free and clear of all Encumbrances except for Encumbrances (A) arising pursuant to, in connection with or as a result of this Agreement or the Contemplated Transactions, (B) arising pursuant to the Charter Documents of the Bank, ~~or~~ (C) being released on or prior to the Closing, or (D) as may be provided for in the Sale Order.

(b)    At the Closing, the Company will transfer to the Purchaser all of the Company's right, title and interest in and to the Other Purchased Assets, free and clear of all Encumbrances, except ~~for Permitted Encumbrances~~as may be provided for in the Sale Order.

Section 3.4.    *Governmental Consents*.  Except for the entry of the Sale Order or any other Consents of the Bankruptcy Court, assuming that (a) all the Purchaser Required Approvals are received and (b) any filings required by any applicable federal or state securities or "blue sky" Legal Requirements are made, no Consents to, with or by any Governmental Authority are necessary on the part of the Company or the Bank in connection with the execution and delivery by the Company of this Agreement and the consummation by the Company of the Contemplated Transactions, except for any such Consent, the failure in making or obtaining of which would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, or prevent, materially delay or materially impair the Company's ability to consummate the Contemplated Transactions.

Section 3.5.    *Permits*.

(a)    As of the date hereof, the Bank holds all Permits that are material to the Business (including all Permits required from the FDIC and the OCC in connection with the Business) (each, a "**Material Permit**").  As of the date hereof, (i) all of the Material Permits are validly issued and currently in full force and effect and (ii) the Bank is in compliance with the terms of each Material Permit, except for any exception, in each case of clauses (i) and (ii), that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

(b)    As of the date hereof, to the Knowledge of the Company, (i) no written notice of material breach or material default in respect of any Material Permit has been received by the Bank or the Company and (ii) there are no Proceedings pending or, to the Knowledge of the Company, threatened in writing, which has had or would reasonably be expected to result in any revocation, withdrawal, suspension, cancellation, or termination of any Material Permits.

Section 3.6.    *Compliance with Law*.

16

0

(a)    As of the date hereof, the Bank (ai) is in compliance with all Legal Requirements, and (bii) to the Knowledge of the Company, the Bank is not subject to any Order and there is no written notice received by the Company or the Bank from any Governmental Authority alleging any non-compliance of the Bank of any Legal Requirements, except, in each case of clauses (ai) and (bii), that has not had or would be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.  As of the date hereof, the Bank's deposit accounts are insured up to applicable limits by the FDIC, and all premiums and assessments required to be paid in connection therewith have been paid when due, in each case, except for any exception that has not had or would not reasonably be expected to, individually or in the aggregate, be material to the Bank.  As of the date hereof, the FDIC has not been appointed receiver of the Bank.

(b)    During the one-year period prior to the date of this Agreement, the Bank has not, nor to the Knowledge of the Company, any directors or officers acting at the direction of or on behalf of the Bank has, in the course of its actions for, or on behalf of, the Bank (i) directly or indirectly, used any corporate funds for unlawful contributions, gifts, entertainment, or other unlawful expenses relating to foreign or domestic political activity, (ii) made any direct or indirect unlawful payments to any foreign or domestic governmental officials or foreign or domestic political party from corporate funds for the purpose of influencing a decision of an official in their official capacity, inducing an official to violate their lawful duty, securing an improper advantage, or inducing an official to use their influence to affect a governmental decision, or (iii) violated any provision of the Foreign Corrupt Practices Act of 1977, except for any exception, in each case of clauses (i) through (iii), that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

Section 3.7.    *Reports*.    Since June 30, 2024, the Bank has filed or furnished, as applicable, on a timely basis, all forms, filings, registrations, submissions, statements, certifications, reports and documents required to be filed or furnished by it with any Governmental Authority, including federal and state banking authorities (including any amendments, supplements or restatements thereto, the "**Bank's Reports**"), except for any failure to file or furnish that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.  Each of the Bank's Reports, at the time of its filing or being furnished (or being amended, supplemented or restated, if applicable), complied as to form in all respects with all Legal Requirements applicable to such Bank's Reports, except for any failure to comply that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.  As of their respective dates (or, if amended, supplemented or restated prior to the date of this Agreement, as of the date of such amendment, supplement or restatement), the Bank's Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading, except for any exceptions that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

Section 3.8.    *Deposits*.    All of the deposits held by the Bank have since June 30, 2024 been established and are held in compliance with (a) all applicable policies, practices and procedures of the Bank, and (b) all Legal Requirements, except for any failure to comply, in each

0

case of clauses (a) and (b), that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

Section 3.9.    *Financial Statements; Reporting; Internal Controls*.

(a)    The financial statements contained in the Call Reports of the Bank for the periods ending December 31, 2024 and March 31, 2025 (i) have been prepared based on the books and records of the Bank in all material respects, (ii) have been prepared in accordance with GAAP and applicable regulatory accounting principles (except as may be otherwise indicated in the notes thereto, except for the omission of footnotes, and subject to normal year-end adjustments, as applicable), and (iii) fairly present in all material respects the financial position of the Bank as of the respective dates or periods set forth therein (except as may be otherwise indicated in the notes thereto, except for the omission of footnotes, and subject to normal year-end adjustments, as applicable).

(b)    The systems of internal controls of the Bank are designed to provide reasonable assurance that: (i) transactions are recorded as necessary to permit preparation of the Call Reports in conformity with GAAP; (ii) material receipts and expenditures are executed only in accordance with the authorization of management of the Company or the Bank; (iii) the unauthorized acquisition, use or disposition of any of the Bank's assets that would materially affect the Call Reports are prevented and timely detected; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any material differences, except, in each case of clauses (i) through (iv), as has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

(c)    As of the date of this Agreement, the Bank has no Liabilities required by GAAP to be reflected or reversed against on the [March 31]  Balance Sheet, except for Liabilities: (i) disclosed or reserved against on the [March 31]  Balance Sheet; (ii) incurred in the Ordinary Course of Business since [March 31], 2025; (iii) incurred pursuant to this Agreement or any other documents or agreements executed or delivered in connection herewith or therewith or in connection with the Contemplated Transactions; (iv) that would be discharged at or prior to the Closing; (v) disclosed on the Disclosure Schedule; or (vi) that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

Section 3.10.    *Tax Matters.*

(a)    Within the last three (3) years, all material Tax Returns required to have been filed by the Bank (or the Company on behalf of the Bank) have been filed, and each such Tax Return reflects the Liability for material Taxes for the period reflected on such Tax Return. To the Knowledge of the Company, all Taxes shown on such Tax Returns as due have been paid. ~~To the Knowledge of the Company, there is no audit pending against the Bank in respect of any Taxes.~~  There are no material Encumbrances on any of the assets of the Bank or the Other Purchased Assets that arose in connection with any failure (or alleged failure) to pay any Tax, except for ~~Permitted Encumbrances~~<u>Taxes that are not yet due or delinquent</u>.

(b)      Within the last three (3) years, the Bank (or the Company on behalf of the Bank) has withheld and paid to the appropriate taxing authority all material Taxes required to be withheld and paid by the Bank, including in connection with any amounts owing to any employee, independent contractor, creditor, shareholder or other Third Party.

(c)      Within the last three (3) years, the Bank (or the Company on behalf of the Bank) has not waived any statute of limitations in respect of Taxes or agreed to any extension of time with respect to a Tax assessment or deficiency.

(d)      Neither the Company nor the Bank is subject to any outstanding audit, assessment, dispute or claim concerning any material Tax Liability of the Bank, either within the Company's Knowledge or claimed, pending or raised by a Governmental Authority in writing. To the Knowledge of the Company, no written claim has been made by a Tax Governmental Authority in a jurisdiction where the Company or the Bank does not pay Taxes or file Tax Returns asserting that the Bank is or may be subject to Taxes assessed by such jurisdiction.

(e)      (d) The Bank is not a party to or bound by any Tax sharing, allocation or indemnification agreement or similar agreement or arrangement other than the Tax Sharing Agreement, dated as of November 15, 2023, by and between the Company and the Bank (the "**Tax Sharing Agreement**"), which agreement shall terminate on or before Closing, as well as this Agreement and any agreement entered into in the Ordinary Course of Business the primary purpose of which is unrelated to Taxes.

(f)      To the Knowledge of the Company, the Bank has not distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Code §355.

(g)      To the Knowledge of the Company, the Bank is not, nor has been, a party to any "listed transaction," as defined in Code §6707A(c)(2) and Treas. Reg. §1.6011-4(b)(2).

(h)      To the Knowledge of the Company, the Bank has not received any letter ruling from the Internal Revenue Service (or any comparable ruling from any other Tax Governmental Authority).

(i)      (e) Notwithstanding anything to the contrary in this Section 3.10, neither the Company nor the Bank makes any representation as to the amount of, or limitations on, any net operating losses, Tax credits, Tax basis or other Tax attributes that the Bank may have.

Section 3.11.  *Litigation*.

(a)      Except for the Bankruptcy Case and any Order entered in the Bankruptcy Case, as of the date hereof, there are no Proceedings pending or, to the Knowledge of the Company, threatened in writing against the Bank or the Business, in each case, other than any Proceeding (i) pursuant to which no injunctive or equitable relief is sought and where the monetary damages are covered by insurance, or (ii) has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank. Neither the Bank, nor, to the Knowledge of the Company, any director or officer thereof, is or, during the one-year period prior to the date of this Agreement, has been the subject of any

19

0

Proceeding involving a claim of violation of or Liability under federal or state securities Laws or a claim of breach of fiduciary duty nor is any Proceeding, to the Knowledge of the Company, currently threatened in writing, other than any Proceeding that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.  As of the date hereof, there is no pending claim from any current or former director or officer of the Bank alleging for indemnification from the Bank and, during the one-year period prior to the date of this Agreement, to the Knowledge of the Company, no such claims have been threatened in writing, in each case, other than any claim that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

(b)     As of the date hereof, the Bank is not subject to any outstanding Order that (i) challenges or seeks to enjoin, alter or materially delay the consummation of the Contemplated Transactions, or (ii) would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

Section 3.12.  *Employee Benefit Plans*.

(a)     Section 3.12(a) of the Disclosure Schedule includes a list, as of the date of this Agreement, of all material Benefit Plans maintained, or contributed to, by the Company or the Bank for the benefit of any Employee (collectively, the "**Group Benefit Plans**").

(b)     As of the date hereof, each Group Benefit Plan that is maintained, sponsored or entered into by the Bank is maintained, contributed to, funded, operated and administered in accordance with the terms of such Group Benefit Plan and in accordance with Legal Requirements, except as has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

(c)     As of the date hereof, the Bank is not a party to or bound by any collective bargaining agreement.

Section 3.13.  *Real Property*.   Except as has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, the Bank has good and valid fee simple title (or its jurisdictional equivalent) to the Owned Real Property, and a valid leasehold, subleasehold or other similar interest in all Leased Real Property, that is, in each case, free and clear of all Encumbrances other than Permitted Encumbrances.  As of the date hereof, the Bank has no written leases for real property.

Section 3.14.  *Absence of Certain Changes*.  During the period commencing on [March 31],[4] 2025 and ending on the date of this Agreement, (a) the Company and the Bank have conducted the Business in the Ordinary Course of Business, except in connection with the Contemplated Transactions (including the negotiation and execution of this Agreement [and the DIP Loan Agreement]Term Sheet), and (b) there has not occurred any Material Adverse Effect on the Bank.

---

[4] **Note to Draft**:  To be the latest unaudited balance sheet date.

0

Section 3.15.   *Material Contracts.*

(a)      Except for any Group Benefits Plans and any Contracts with Employees, consultants or legal, financial or other advisors, Section 3.15 of the Disclosure Schedule sets forth a list, as of the date of this Agreement, of each of the following Contracts to which the Bank is a party or by which the Business is bound (each Contract listed on such Disclosure Schedule, a "**Bank Significant Agreement**"):

(i)      each Contract involving (A) obligations of, or payments by, the Bank in excess of $50,000 in the most recent completed fiscal year or (B) payments to the Bank in excess of $50,000 in the most recent completed fiscal year, in each case, other than any Contract relating to any Loans or deposits of the Bank, purchases of federal funds, fully secured repurchase agreements, advances and loans from a Federal Home Loan Bank, the Federal Reserve or any other Governmental Authority, and trade payables, each in the Ordinary Course;

(ii)      each Contract between the Bank and the Company;

(iii)      each Contract by the Bank with any director or executive officer of the Bank;

(iv)      each Contract which materially limits or purports to materially limit the freedom of the Bank to compete in any line of business or with any Person, or to solicit the business of any Person that is material to the Bank;

(v)      each Contract with a Governmental Authority;

(vi)      each Contract which requires the Bank to deal exclusively or on a "sole source" basis with another Person for the purchase of any material product or material service used by the Bank;

(vii)      each Contract creating a shareholders' agreement, strategic alliance, partnership or joint venture agreement, in each case, involving the Bank and that is material to the Business;

(viii)      each Contract creating indebtedness of the Bank for borrowed money in amounts in excess of $250,000; (other than any Contract relating to deposits of the Bank, purchases of federal funds, fully secured repurchase agreements, advances and loans from a Federal Home Loan Bank, the Federal Reserve or any other Governmental Authority, and trade payables, each in the Ordinary Course);

(ix)      each Contract relating to the acquisition or disposition of any material business, assets or Liabilities (whether by merger, sale of stock or assets or otherwise) of the Bank, which acquisition or disposition is not yet complete or where such Contract contains continuing material obligations of the Bank;

(x)      each Contract relating to a participation, loan purchase or similar agreement pursuant to which the Bank has (A) acquired a material interest in the

indebtedness of any Third Party or (B) sold a material interest the indebtedness of any Third Party; and

(xi)        each Contract (other than the Company's source of strength obligations pursuant to the Federal Reserve's Regulation Y) under which (A) any Person has directly or indirectly guaranteed any material Liabilities of the Bank or (B) the Bank has directly or indirectly guaranteed any material Liabilities of any other Person (other than letters of credit entered into in the Ordinary Course).

(b)        Subject to redaction or non-disclosure to protect proprietary, confidential or competitively sensitive information, to comply with obligations to not disclose confidential supervisory information, or as otherwise necessary to comply with the other confidentiality obligations of the Company or the Bank, the Company has made available to the Purchaser a copy, including all amendments, as applicable, of each of the Bank Significant Agreements. Each Bank Significant Agreement is in full force and effect and is valid, binding and enforceable in accordance with its terms against the Bank, except for the Enforceability Exceptions, and, to the Knowledge of the Company, the other parties to the Bank Significant Agreements, except (i) to the extent such Bank Significant Agreement terminates or expires after the date of this Agreement in accordance with its terms, or (ii) for such failures to be valid and binding or in full force and effect that would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank. The Bank has not, during the one-year period prior to the date of this Agreement, received written notice of any violation of or default by the Bank under any Bank Significant Agreement, except for those violations or defaults that have not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

Section 3.16.  *Insurance*.  The Bank maintains necessary insurance policies covering the Business, including directors and officers liability insurance (and subject to deductibles and self-insurance amounts) that, to the Knowledge of the Company, are materially consistent with industry practice and which the Company has reasonably determined to be materially adequate for the Business. As of the date of this Agreement, no written notice of cancellation or termination has been received by the Bank with respect to any such insurance policies that have not been replaced on substantially similar terms prior to the date of such cancellation or termination.

Section 3.17.  *Derivative Instruments.*  Except as has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, to the Knowledge of the Company (a) since January 1, 2025, all derivative instruments, including, swaps, caps, floors, and option agreements of the Bank, if any, were entered into (i) in the Ordinary Course of Business, (ii) in accordance with prudent banking practices and compliance with applicable Legal Requirements, and (iii) with counterparties believed to be financially responsible at the time and constitute the valid and legally binding obligation of the Bank, enforceable in accordance with their terms, and (b) neither the Bank nor any other party thereto, is in breach of any of its obligations under any such agreement or arrangement.

Section 3.18.  Section 3.17. *Related Party Transactions.  Section 3.17.  Section 3.18* of the Disclosure Schedule sets forth, as of the date of this Agreement, each Contract between and

0

among the Bank, on the one hand, and the Company or any of the Company's officers, directors or shareholders, on the other hand, in each case, to the extent material to the Business (except for Contracts with respect to employment or the provision of compensation and benefits to officers, directors, managers, consultants, or equityholders of the Company or powers of attorney or similar grants of authority, or any Group Benefit Plans).

Section 3.19.   ~~Section 3.18.~~ *Community Reinvestment Act and Consumer Compliance.* As of the date hereof, the Bank is not subject to any Order, or the Knowledge of the Company, any claim threatened in writing by a Governmental Authority, alleging that the Bank is not in compliance with the Community Reinvestment Act ("**CRA**") and the regulations promulgated thereunder.  The Bank has a ~~Community Reinvestment Act~~CRA rating of "satisfactory" or better.

Section 3.20.   ~~Section 3.19.~~ *Money Laundering; Unlawful Payments*.  Except as has not or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, the Bank is not operating in violation of the Bank Secrecy Act, the USA PATRIOT Act of 2001 (the "**USA PATRIOT Act**"), any Order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control, or any other anti-money laundering Legal Requirements or any license issued with respect to economic sanctions programs by the U.S. Department of the Treasury's Office of Foreign Assets Control, and, to the Knowledge of the Company, the Bank is not under investigation with respect to and has not, during the one-year period prior to the date of this Agreement, been threatened in writing to be charged with or given written notice of any violation of any of the foregoing.

Section 3.21.   ~~Section 3.20.~~ *Loans*.

(a)   The Bank is not a party to any written loan agreement in which the Bank is a creditor which, as of [March 31], 2025, had an outstanding balance of $100,000 or more and under the terms of which the obligor was, as of [March 31], 2025, over 90 days delinquent in payment of principal or interest.  ~~Section 3.20(a)~~Section 3.21(a)(1) of the Disclosure Schedule sets forth (i) the aggregate outstanding principal amount, as of [March 31], 2025, of all loan agreements, notes or borrowing arrangements (including leases, credit enhancements and participations) payable to the Bank (collectively, the "**Loans**"), other than "non-accrual" Loans, and (ii) separately, the aggregate outstanding principal amount, as of the date of this Agreement, of all "non-accrual" Loans.  Except as set forth on ~~Section 3.20(a)~~Section 3.21(a)(2) of the Disclosure Schedule, as of the date of this Agreement, the Bank has no outstanding Loan or asset classified as "Other Real Estate Owned" or that was designated internally by the Bank (or, to the Knowledge of the Company, by a Governmental Authority in an examination report or directive) as "special mention," "substandard," "doubtful," "loss" or words of similar import (any of the foregoing Loans or assets, "**Criticized Assets**").  ~~Section 3.20(a)~~Section 3.21(a)(2) of the Disclosure Schedule sets forth (A) a summary of Criticized Assets as of the date of this Agreement, by category of Loan (*e.g.*, commercial and consumer), together with the aggregate principal amount of such Loans by category and (B) each asset of the Bank that, as of the date of this Agreement, is so classified.  The Bank has good and valid title to all properties and assets reflected in ~~Section 3.20(a)~~Section 3.21(a) of the Disclosure Schedule that are classified as

0

"Other Real Estate Owned," free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    Except as has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, (i) each Loan (A) is evidenced by notes, agreements or other evidences of indebtedness, (B) to the extent purported to be secured, has been secured by valid liens and security interests which have been perfected and (C) to the Knowledge of the Company, is the legal, valid and binding obligation of the obligor named therein, enforceable in accordance with its terms (except for the Enforceability Exceptions), and (ii) the notes or other credit or security documents with respect to each such outstanding Loan were in compliance with all Legal Requirements at the time of origination or purchase by the Bank and are complete and correct.  The Bank does not administer or service, and has not in the past administered or serviced, any Loan not originated and owned by the Bank. Except as has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, all outstanding Loans originated by the Bank are administered or serviced, as applicable, in accordance with customary lending standards of the Bank, are being maintained, in accordance with the relevant notes or other credit or security documents, the Bank's written underwriting standards (and, in the case of Loans held for resale to investors, the underwriting standards, if any, of the applicable investors) and with all Legal Requirements.

(c)    Notwithstanding anything to the contrary in this Agreement, the Company makes no representation or warranty as to the sufficiency of collateral securing or the collectability of the Loans.

Section 3.22.   ~~Section 3.21.~~ *Environmental Matters.*  ~~Except as~~   To the Knowledge of the Company, (a) the Bank (i) is not in violation of any applicable Legal Requirements relating to the use, disposal or release of Hazardous Material or relating to the protection or restoration of the environment or human exposure to Hazardous Material (collectively, "**Environmental Laws**"), (ii) is not subject to any Order imposing any Liability for any off-site disposal or contamination of any Hazardous Material pursuant to any Environmental Laws, or (iii) is subject to any pending claim before any Governmental Authority relating to any violation of Environmental Laws, and (b) there is no claim threatened in writing, by any Governmental Authority that would reasonably be expected to lead to such a claim, in each case of clauses (a) and (b), except for any violation, contamination, liability or claim that has not had or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank ~~, as of the date hereof, to the Knowledge of the Company, (a) the Bank is in compliance with all applicable environmental Legal Requirements, which compliance includes the possession of, and compliance with the terms of, all environmental Material Permits and (b) there are no Proceedings pending or threatened in writing which would reasonably be expected to result in any revocation, withdrawal, suspension, cancellation or termination of any such environmental Material Permits.~~.

Section 3.23.   ~~Section 3.22.~~ *Intellectual Property; Privacy.*

(a)    ~~Section 3.22(a)~~ Section 3.23(a) of the Disclosure Schedule lists, as of the date of this Agreement, all material Intellectual Property (the "**Owned Intellectual Property**")

0

that is owned by the Bank and subject to an application or registration with a Governmental Authority.  To the Knowledge of the Company, the Bank owns, possesses, licenses, or has other rights to use all Intellectual Property necessary for the conduct of the Business as conducted as of the date hereof, except where the failure to own, possess, license, or have such rights would not have or reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.

(b)     Except as has not had or would not be reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, as of the date hereof, (i) the Bank is in compliance, in all material respects, with all Legal Requirements relating to privacy, data protection, and the collection, use, storage and disposal of personal information collected, used or held for use by the Bank in the conduct of the Business, (ii) to the Knowledge of the Company, there are no Proceedings pending or threatened in writing, alleging a material violation of any Person's rights of publicity or privacy or personal information or data privacy rights, and (iii) to the Knowledge of the Company, there is no currently occurring (A) loss, theft or data or security breach relating to the Bank's data or (B) unintended, illegal or improper use or disclosure of, or access to, any personal information in the custody or control of the Bank.

(c)     Except as has not had or would not be reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, as of the date hereof, to the Knowledge of the Company there are no Proceedings pending or threatened in writing: (i) alleging any infringement, misappropriation, dilution or violation of the Intellectual Property of any Person in relation to the conduct of the Business; (ii) challenging the validity, enforceability, registrability, patentability or ownership of any Owned Intellectual Property or the Bank's rights in and to any Intellectual Property used in the conduct of the Business; or (iii) by the Bank alleging the infringement, misappropriation, dilution or violation by any Person of any Intellectual Property.  Except as has not had or would not be reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank, as of the date hereof, no Owned Intellectual Property or Intellectual Property used by the Bank in the conduct of the Business is subject to any outstanding Order binding on the Bank that restricts in any manner the use, transfer, or licensing thereof by the Bank or that affects the validity, use, enforceability of such Intellectual Property.

(d)     All material information technology and computer systems, including software, hardware, networks, interfaces, and related systems, relating to the transmission, storage, maintenance, organization, presentation, generation, processing or analysis of data and information, used in the conduct of the Business (collectively, the "**Bank IT Systems**") are operational in all material respects, in good working condition in all material respects, and have security, disaster recovery, data back-up and security plans in place and hardware and software capacity, support, maintenance and trained personnel that are, sufficient for the operation of the Business as currently conducted, except as has not had or would not be reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank.  Since [March 31]June 30,[5] 2025, to the Knowledge of the Company, there has been no malfunction, failure, continued substandard performance, denial-of-service, or other impairment of the Bank IT

---

[5] Note to Draft:  To be the latest unaudited balance sheet date.

0

Systems that has resulted or is reasonably likely to result in material disruption or damage to the Business and that has not been remedied in all material respects. The Bank takes commercially reasonable steps to implement and maintain in all material respects, appropriate backup, disaster recovery, and software and hardware support arrangements with respect to the Bank IT Systems and to safeguard the confidentiality, availability, security and integrity of the Bank IT Systems, in each case, that is material to the Business.

Section 3.24. ~~Section 3.23.~~ *Brokers*. Except for the Broker's Fees, neither the Company nor the Bank has incurred any Liability for brokerage or finders' fees or agents' commissions payable by the Bank or the Purchaser in connection with the Contemplated Transactions.

Section 3.25. ~~Section 3.24.~~ *Disclaimer Of Other Representations and Warranties*. Except as expressly set forth in this Article 3, neither the Company, the Bank nor any other Person makes, and the Company, on behalf of itself, the Bank, their respective Affiliates and the Representatives of the foregoing Persons, hereby disclaims any other representation or warranty, express or implied, at law or in equity, with respect to the Company, the Bank, any of their respective Affiliates or the Representatives of the foregoing Persons, as well as the assets, properties, Liabilities, condition (financial or otherwise), business, operations or prospects of any of the foregoing Persons, the Shares, the Other Purchased Assets, the Assumed Liabilities and the Business, including with respect to (a) merchantability or fitness for any particular purpose, (b) non-infringement, (c) operation of the Business, the Bank or the Other Purchased Assets after the Closing, (d) the probable success or profitability of the Business, the Bank or the Other Purchased Assets after the Closing, or (e) the accuracy or completeness of any information, documents or materials furnished or made available to the Purchaser, its Affiliates or their respective Representatives in connection with the Contemplated Transactions, whether in any confidential information memorandum or presentation, teasers, process letters, "virtual data room," management presentation or otherwise, whether oral or in writing, including any projections, predictions, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial condition (or any component thereof) relating to the Bank, the Business, the Shares, the Other Purchased Assets or the Assumed Liabilities. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES AS EXPRESSLY SET FORTH IN THIS ARTICLE 3, THE BUSINESS, THE SHARES, THE OTHER PURCHASED ASSETS AND THE ASSUMED LIABILITIES ARE CONVEYED AND SOLD TO THE PURCHASER ON AN "AS IS" AND "WHERE IS" BASIS.

## ARTICLE 4
### REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the following representations and warranties to the Company as of the date of this Agreement and as of the Closing Date; provided, that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only as of such date.

Section 4.1. *Organization; Non-contravention*.

0

(a)     The Purchaser is ~~duly organized, validly existing and in good standing under the laws of [●] and has the [corporate]/[limited liability company]~~ an individual and has the power and authority to own or lease all of its properties and assets and to conduct ~~its~~his business in the manner in which its business is now being conducted in all material aspects.  [The Purchaser ~~is duly registered with the Federal Reserve as a bank holding company under the BHCA.]⁶The Purchaser~~ is duly qualified to do business and is in good standing in each jurisdiction in which ~~its~~his ownership of properties or conduct of business requires such qualification except where the failure to be so qualified would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the Purchaser's ability to consummate the Contemplated Transactions.

(b)     Subject to the entry of the Sale Order and any other Consents of the Bankruptcy Court, (i) the Purchaser has the ~~[corporate]/[limited liability company]~~ power and authority to enter into this Agreement and to carry out ~~its~~his obligations hereunder and thereunder, including the consummation of the Sale and the other Contemplated Transactions, and (ii) the execution and delivery of this Agreement and the completion and performance of the Contemplated Transactions have been duly authorized by ~~all necessary organizational or corporate action on the part of the~~the Purchaser, and this Agreement and all other documents, instruments and agreements required to be executed and delivered by the Purchaser pursuant to this Agreement have been duly executed and delivered by the Purchaser and (assuming due authorization, execution and delivery by the Company) constitute a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except for the Enforceability Exceptions.

(c)     Subject to the entry of the Sale Order and any other Consents of the Bankruptcy Court, assuming (i) all the Purchaser Required Approvals are obtained, and (ii) any filings required by any applicable federal or state securities or "blue sky" Legal Requirements are made, neither the execution and delivery of this Agreement, nor the completion and performance of the Contemplated Transactions, will, with or without the giving of notice or the lapse of time or both, (A) violate ~~the Charter Documents of the Purchaser, (B) violate~~ any Legal Requirements applicable to the Purchaser ~~or its Affiliates~~, or (~~C~~B) result in a breach of or default under, require Consent under, or violate any material Contract which the Purchaser is a party to or its assets or property is bound by, except~~, in the case of clauses (B) and (C),~~ for any such violation, breach, default, or Consent that would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the Purchaser's ability to consummate the Contemplated Transactions.

Section 4.2.    *Governmental Consents*.  Except for the entry of the Sale Order and the Consents listed in Section 4.2 of the Disclosure Schedule (collectively, the "**Purchaser Required Approvals**"), assuming that any filings required by any applicable federal or state securities or "blue sky" Legal Requirements are made, no Consents to, with or by any Governmental Authority are necessary on the part of the Purchaser or ~~its~~his Affiliates in connection with the execution and delivery by the Purchaser of this Agreement and the consummation by the Purchaser of the Contemplated Transactions.  Neither the Purchaser nor

---

⁶ **Note to Draft**: To be included based on the identity of the Purchaser.

0

any of ~~its~~his Affiliates has received any indication from any Governmental Authority that such Governmental Authority would oppose or refuse to grant a Purchaser Required Approval or otherwise knows of any reason why any of the Purchaser Required Approvals will not be obtained or that any of the Purchaser Required Approvals will not be timely granted without imposition of a Materially Burdensome Regulatory Condition.

Section 4.3.    *Investment Intent*.   The Purchaser acknowledges that the Shares being acquired pursuant to this Agreement have not been registered under the Securities Act or any state or foreign securities Legal Requirements, and that the Shares may not be sold, transferred, assigned, offered for sale, pledged, hypothecated or otherwise disposed of unless such sale, transfer, assignment, offer for sale, pledge, hypothecation or other disposition is completed pursuant to the terms of an effective registration under the Securities Act and in compliance with any applicable state and foreign securities Legal Requirements, or pursuant to an applicable exemption from registration under the Securities Act and applicable state or foreign securities Legal Requirements.  The Purchaser is purchasing the Shares for ~~its~~his own account and not with a view to any public resale or other distribution thereof, except in compliance with applicable securities Laws.  The Purchaser is an "accredited investor" as defined in Regulation D under the Securities Act.

Section 4.4.    *Compliance with Law*.   As of the date hereof, (i) the Purchaser and each of ~~its~~his Affiliates is in compliance with all Legal Requirements and (ii) to the knowledge of the Purchaser, there is no written notice received by the Purchaser or any of ~~its~~his Affiliates from any Governmental Authority alleging any non-compliance of the Purchaser or any of ~~its~~his Affiliates of any Legal Requirements, except, in each case of clauses (i) and (ii), as would not reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the Purchaser's ability to consummate the Contemplated Transactions.  Neither the Purchaser nor any of ~~its~~his Affiliates has received any notice or has any knowledge of any planned or threatened objection by any community group to the Contemplated Transactions.

Section 4.5.    *Available Funds*.   The Purchaser has, and at the Closing will have, cash on hand sufficient to satisfy all of its obligations under this Agreement and any other documents or agreements executed or delivered in connection herewith and therewith and to consummate the Contemplated Transactions, including payment of the Purchase Price pursuant to this Agreement and any related fees, costs and expenses incurred by the Purchaser or ~~its~~his Affiliates in connection with the Contemplated Transactions.

Section 4.6.    *Litigation*.   There are no current, pending or threatened Proceedings against or relating to the Purchaser or ~~its~~his Affiliates that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the Purchaser's ability to consummate the Contemplated Transactions.  There is no Order or other regulatory restriction imposed upon or relating to the Purchaser or ~~its~~his Affiliates that would reasonably be expected to, individually or in the aggregate, prevent, materially delay or materially impair the Purchaser's ability to consummate the Contemplated Transactions.

Section 4.7.    *Solvency*.   The Purchaser is not entering into this Agreement or the Contemplated Transactions with the intent to hinder, delay or defraud either present or future creditors.  After giving effect to the Contemplated Transactions, at and immediately after the

28

0

Closing, the Purchaser (a) will be solvent (in that both the fair value of its assets will not be less than the sum of its debts and that the present fair salable value of its assets will not be less than the amount required to pay its probable Liabilities on its existing debts as they mature or become due), (b) will have adequate capital and liquidity with which to engage in ~~its~~the businesses, and (c) will not have incurred and does not plan to incur debts beyond ~~its~~his ability to pay as they mature or become due.

~~Section 4.8.  [Community Reinvestment Act and Consumer Compliance.  Each of the Purchaser and any Affiliates of the Purchaser that is subject to the Community Reinvestment Act has a Community Reinvestment Act rating of "satisfactory" or better.]~~[7]

Section 4.8.    ~~Section 4.9.~~*Money Laundering; Unlawful Payments*.    Neither the Purchaser nor any of ~~its~~his Affiliates is operating in violation of the Bank Secrecy Act, the USA PATRIOT Act, any Order issued with respect to anti-money laundering by the U.S. Department of the Treasury's Office of Foreign Assets Control, or any other anti-money laundering Legal Requirements or any license issued with respect to economic sanctions programs by the U.S. Department of the Treasury's Office of Foreign Assets Control, and to the knowledge of the Purchaser, neither the Purchaser nor any of ~~its~~his Affiliates is under investigation with respect to, or has been, during the one-year period prior to the date of this Agreement, threatened in writing to be charged with or given written notice of any violation of any of the foregoing.

Section 4.9.    ~~Section 4.10.~~*Qualification*.    To the knowledge of the Purchaser, there exist no facts or circumstances that would cause, or be reasonably expected to cause, the Purchaser ~~or any of its Affiliates~~ not to qualify as "good faith" purchasers under Section 363(m) of the Bankruptcy Code.

Section 4.10.    ~~Section 4.11.~~*Brokers*.  ~~Neither the~~.  The Purchaser ~~nor any of its Affiliates nor any of their directors, officers, shareholders or employees~~ has not or will not have any commitment or Liability to pay any fees or commissions to any broker, finder or agent with respect to the Contemplated Transactions.

Section 4.11.    ~~Section 4.12.~~*Independent Investigation; Acknowledgements and Confirmations.*

(a)    The Purchaser has conducted to ~~its~~his satisfaction ~~its~~his own independent review and analysis of, and based thereon has formed an independent judgment concerning, the Contemplated Transactions, the Shares, the Other Purchased Assets, the Assumed Liabilities and the assets, properties, Liabilities, condition (financial or otherwise), operations and prospects of the Bank or the Business.  In entering into this Agreement and any other documents, instruments or agreements executed or delivered in connection herewith or therewith, the Purchaser has relied solely upon ~~its~~his own review and analysis and the representations and warranties made by the Company expressly set forth in Article 3 and not on any other representations, warranties, statements or omissions (whether by the Company, the Bank or any other Person).  The Purchaser confirms that the Company and the Bank, have made available to the Purchaser and

---

[7] ~~**Note to Draft**: To be included if the Purchaser is subject to the Community Reinvestment Act.~~

0

the Purchaser's Representatives such opportunity to ask questions of the personnel of the Company and the Bank, as well as such access to the personnel, offices, properties and books and records of the Business, the Bank, the Other Purchased Assets and the Assumed Liabilities as deemed appropriate by the Purchaser in connection with ~~its~~his determination to enter into this Agreement and any other documents, instruments or agreements executed or delivered in connection herewith or therewith, and to consummate the Contemplated Transactions. The Purchaser is knowledgeable about the industries in which the Business is conducted, is capable of evaluating the merits and risks of the Contemplated Transactions and is able to bear the substantial economic risk of such investment for an indefinite period of time. The Purchaser does not have any knowledge of any breach or inaccuracy of the representations and warranties made by the Company in this Agreement or of any material errors in, or material omissions from, the Disclosure Schedule.

(b)    Without limiting the generality of ~~Section 4.12(a)~~Section 4.11(a), the Purchaser acknowledges and agrees that, except as expressly set forth in Article 3, neither the Company, the Bank nor any other Person makes, and that the Purchaser has not relied on, any other representation or warranty, express or implied, at law or in equity, with respect to the Company, the Bank, any of their respective Affiliates or the Representatives of the foregoing Persons, as well as the assets, properties, Liabilities, condition (financial or otherwise), business, operations or prospects of any of the foregoing Persons, the Shares, the Other Purchased Assets, the Assumed Liabilities and the Business, including with respect to (i) merchantability or fitness for any particular purpose, (ii) non-infringement, (iii) operation of the Business, the Bank, the Other Purchased Assets or the Assumed Liabilities after the Closing, (iv) the probable success or profitability of the Business, the Bank, the Other Purchased Assets or the Assumed Liabilities after the Closing, or (v) the accuracy or completeness of any information, documents or materials furnished or made available to the Purchaser~~, its Affiliates or their~~ or his respective Representatives in connection with the Contemplated Transactions, whether in any confidential information memorandum or presentation, teasers, process letters, "virtual data room," management presentation or otherwise, whether oral or in writing, including any projections, predictions, forecasts, estimates, plans or budgets of future revenues, expenses or expenditures, future results of operations (or any component thereof), future cash flows (or any component thereof) or future financial or regulatory condition (or any component thereof) relating to the Bank or the Business. In furtherance of the foregoing, the Purchaser acknowledges and agrees, on ~~its~~his own behalf and on behalf of the Purchaser's Related Parties, that (A) such predictions, forecasts or estimates are being provided solely for the convenience of the Purchaser to facilitate ~~its~~his own independent investigation of the Bank, the Business, the Shares, the Other Purchased Assets and the Assumed Liabilities, (B) there are uncertainties inherent in attempting to make such projections or forecasts and the Purchaser is familiar with such uncertainties, and (C) the Purchaser is taking full responsibility for making ~~its~~his own evaluation of the adequacy and accuracy of all projections or forecasts (including the reasonableness of the underlying assumptions).

## ARTICLE 5
### PRE-CLOSING MATTERS AND OTHER COVENANTS

Section 5.1.    *Conduct of Business Prior to Closing*. Except (A) as expressly otherwise permitted, required or contemplated by this Agreement, (B) as set forth in Section 5.1 of the

0

Disclosure Schedule, (C) as may be otherwise required by, arising out of or resulting from the Bankruptcy Case, any Governmental Authority, or any Legal Requirements (including the Bankruptcy Code), (D) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, or (E) with the prior written consent of the Purchaser (which shall not be unreasonably withheld, conditioned or delayed), from the date hereof to the Closing or earlier termination of this Agreement:

(a) *Conduct of Business*. The Company shall cause the Bank to: (i) carry on and conduct the Business in all material respects in the Ordinary Course of Business and (ii) use commercially reasonable efforts to maintain and preserve intact its business organization and material and advantageous business relationships.

(b) *Bank Forbearances*. The Company shall not, and to the extent impacting the Bank, shall cause the Bank not to:

(i) enter into any material new line of business of the Bank;

(ii) make any capital expenditures by the Bank that in the aggregate are in excess of $50,000, other than any capital expenditures included in the Company's or the Bank's budget for fiscal year of 2025;

(iii) terminate (other than a termination related to a default by the counterparty under the applicable Bank Significant Agreement or a termination upon the expiration of the applicable Bank Significant Agreement), enter into, materially amend, or waive any material right under, any Bank Significant Agreement, other than in the Ordinary Course of Business;

(iv) adjust, split, combine or reclassify any of the Bank's capital stock;

(v) grant, issue, sell or otherwise dispose of or create any Encumbrances, other than Permitted Encumbrances, (except for Encumbrances (A) arising pursuant to, in connection with or as a result of this Agreement or the Contemplated Transactions, (B) arising pursuant to the Charter Documents of the Bank, (C) being released on or prior to the Closing, or (D) as may be provided for in the Sale Order) on any of the Shares;

(vi) make, declare, pay or set aside for payment any dividend or other distribution in respect of any Shares or redeem, repurchase or otherwise acquire or offer to redeem, repurchase, or otherwise acquire any Shares;

(vii) sell, lease, transfer, create any Encumbrance upon, assign, license or otherwise dispose of (A) any of properties or assets of the Bank that are material to the Business or (B) any Other Purchased Assets, in each case of clauses (A) and (B), other than in the Ordinary Course of Business, and except for any Permitted Encumbrances;

0

(viii)      incur any ~~additional~~ indebtedness for borrowed money by the Bank in excess of $250,000 ~~in the aggregate~~, other than in the Ordinary Course of Business; provided, that the Bank may continue to borrow money from a Federal Home Loan Bank, the Federal Reserve or any other Governmental Authority;

(ix)      except as have been approved by the Company or the Bank prior to the date of this Agreement, make, renew, amend or modify any Loan, extension of credit or participation therein, individually or in the aggregate with other Loans or other extensions of credit or participations therein to the same relationship, in excess of $1,000,000; provided, that (A) the Bank may make an extension of credit in the Ordinary Course of Business in connection with the sale of an asset classified as "Other Real Estate Owned" if said extension of credit is not in excess of $1,000,000, and (B) the Bank may make, renew or amend any extension of credit in the Ordinary Course of Business if, with respect to a pre-existing relationship with a borrower, (1) there has been no material adverse change with respect to, or in the relationship with, such borrower, or (2) there has been such a material adverse change but the Bank is attempting to mitigate loss with respect to the borrower in the Ordinary Course of Business; provided, further that, with respect to this Section 5.1(b)(ix), the Purchaser agrees that it will either give or deny any requested consent no later than two (2) Business Days after the Purchaser has received a written request therefor, together with all material information relating thereto, provided, further, that if the Purchaser does not object to such request within two (2) Business Days after receipt thereof, the Purchaser's consent shall be deemed to have been given;

(x)      other than in prior consultation with the Purchaser, alter materially the interest rate or pricing fee or fee pricing policies with respect to depository accounts of the Bank or waive any material fees with respect thereto;

(xi)      acquire by the Bank (other than by way of foreclosure, deed in lieu of foreclosure, acquisitions of control in a fiduciary or similar capacity, or in satisfaction of debts previously contracted in good faith) all or any material portion of the assets, business, deposits or properties (including any Loans or advances or any participations therein) of any other Person, other than in the Ordinary Course of Business;

(xii)      merge or consolidate the Bank with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence;

(xiii)      amend the Charter Documents of the Bank;

(xiv)      file any application to establish, or terminate the operations of, any branch or banking office of the Bank;

(xv)      implement or adopt any change in the Bank's accounting principles, practices or methods, other than as required by GAAP or applicable accounting requirements of a Governmental Authority;

(xvi)      make, revoke or amend any material Tax election of the Bank, enter into any agreement with any Governmental Authority in respect of income or other

0

material Taxes of the Bank, concede any claim or assessment in respect of income or other material Taxes of the Bank or file any amended Tax Return of the Bank, other than in the Ordinary Course of Business;

(xvii)     settle any Proceeding by the Bank involving an amount in excess of $~~750,000~~100,000 in the aggregate, other than any settlement (A) in the Ordinary Course of Business (including Proceedings against borrowers in the Ordinary Course of Business) or (B) of any Proceeding relating to, arising out of or in connection with this Agreement or the Contemplated Transactions provided that, with respect to this clause (B), such settlement would not (1) require any payments for Liabilities by or adversely and materially affect the Bank or the Business or (2) prevent or materially delay the Contemplated Transactions; provided, that, with respect to this Section 5.1(b)(xvii), the Purchaser agrees that it will either give or deny any requested consent no later than two (2) Business Days after the Purchaser has received a written request therefor, together with all material information relating thereto, provided, further, that if the Purchaser does not object to such request within two (2) Business Days after receipt thereof, the Purchaser's consent shall be deemed to have been given;

(xviii)     initiate any Proceeding by the Bank except for (A) Proceedings brought in the Ordinary Course of Business that involve an amount, in the aggregate, not in excess of $~~750,000~~100,000, or (B) Proceedings against borrowers in the Ordinary Course of Business; provided, that, with respect to this Section 5.1(b)(xviii), the Purchaser agrees that it will either give or deny any requested consent no later than two (2) Business Days after the Purchaser has received a written request therefor, together with all material information relating thereto, provided, further, that if the Purchaser does not object to such request within two (2) Business Days after receipt thereof, the Purchaser's consent shall be deemed to have been given;

(xix)     terminate, surrender, abandon, restrict or permit the termination, cancellation or surrender of any Material Permit;

(xx)     establish, adopt, enter into or amend any collective bargaining agreement to which the Bank is a party; ~~or~~

(xxi)     terminate (other than for cause), enter into, materially amend or modify or renew any employment, indemnification, consulting, severance, change in control or similar Contract with any director, officer, employee or consultant requiring payments thereunder in excess of $50,000 in any 12-month period, or grant any salary or wage increase or increase any employee benefit, including incentive or bonus payments (or, with respect to any of the preceding, communicate any intention to take such action), except (x) to make changes that are required by any applicable Legal Requirements, (y) for increases in annual base salary, wages or consulting fees in the Ordinary Course of Business, other than executive officers, or (z) in connection with annual renewal of welfare and fringe benefits in the Ordinary Course of Business or other ordinary course changes required by the insurer or other Third Party vendor; or

0

(xxii)        (xxi) enter into any Contract with respect to, or otherwise agree or commit to do, or adopt resolutions of the Bank's board of directors in support of, any of the foregoing.

Without in any way limiting any party's rights or obligations under this Agreement, the parties understand and agree that (1) nothing contained in this Agreement shall give the Purchaser, directly or indirectly, the right to control or direct the operations of the Company, the Bank or the Business prior to the Closing and (2) prior to the Closing, the Company shall exercise, consistent with, and subject to, the terms and conditions of this Agreement and the DIP Loan Term Sheet, complete control and supervision over the Bank and its operations.

Section 5.2.    *Access*.

(a)    Subject to the Bidding Procedures and Legal Requirements, from the date hereof until the Closing Date or earlier termination of this Agreement, upon reasonable written request in advance by the Purchaser, the Company shall, and shall cause the Bank to, during normal business hours, afford to the Purchaser and its Representatives reasonable access to (i) the books and records and other documents relating to the assets, properties, operations, Liabilities of the Bank or the Other Purchased Assets or the Assumed Liabilities; and (ii) any other information concerning the Business, the Other Purchased Assets or the Assumed Liabilities, in each case, as the Purchaser may reasonably request in connection with the Contemplated Transactions, provided, that no such access shall unduly interfere with the normal operations of the Company, the Bank or the Business.  Notwithstanding anything to the contrary in this Agreement, neither the Company nor the Bank shall be required to provide access to or disclose any information to the Purchaser or its Representatives if such access or disclosure (A) is prohibited pursuant to the terms of any confidentiality obligations to a Third Party (including with respect to confidential supervisory information), (B) would violate Legal Requirements, or (C) would adversely affect any attorney-client or other legal privilege (such limitations in clauses (A), (B) or (C), the "**Disclosure Limitations**"); provided, that the parties shall reasonably cooperate in seeking to find a way to allow disclosure of such information to the extent doing so would not (in the good faith belief of the Company after consultation with outside counsel) constitute a Disclosure Limitation.  Notwithstanding the foregoing, the Purchaser shall not have the right to conduct invasive environmental investigation of any kind, or conduct any structural evaluation of any kind, including in the form of soil and groundwater sampling, on any Leased Real Properties or Owned Real Property.

(b)    Any and all information provided or made available to the Purchaser and its Representatives pursuant to or in connection with this Agreement shall be used solely for the purpose of effecting the Contemplated Transactions and shall be treated as "Confidential Information" as defined in the Confidentiality Agreement and subject to all of the terms of the Confidentiality Agreement, the provisions of which are hereby incorporated into this Agreement and acknowledged by the parties as a continuing obligation in accordance with its terms.

(c)    From and after the Closing, until the closing of the Bankruptcy Case, the Purchaser shall provide the Company and its Representatives reasonable access, during normal business hours and upon reasonable advance notice, to the extent any such access would not unduly interfere with the normal operations of the Bank or the Business, to the facilities,

personnel, the books and records or other relevant documents, including data, work papers, schedules, memoranda and other documents (including for the purpose of examining and copying) of the Bank, the Business, the Other Purchased Assets or the Assumed Liabilities with respect to periods, events or occurrences prior to the Closing Date, for the purposes of (i) complying with Legal Requirements or any other requirements of any Governmental Authority, including the Bankruptcy Court, (ii) the closing of the Bankruptcy Case and the wind-down of the Company's estate, if applicable (including reconciliation of claims and preparation of Tax Returns or other Tax Proceedings and the functions of any trusts established under a Chapter 11 plan of the Company or any other successors of the Company), or (iii) other reasonable business purposes, in each case, subject to the Disclosure Limitations, provided, that the parties shall reasonably cooperate in seeking to find a way to allow access or disclosure of such information to the extent doing so would not (in the good faith belief of the Purchaser after consultation with outside counsel) constitute a Disclosure Limitation.  Unless otherwise consented to in writing by the Company, the Purchaser shall not, for a period of seven (7) years following the Closing Date, destroy, alter or otherwise dispose of any of such books and records or other relevant documents without first offering to surrender to the Company such books and records or any portion thereof that the Purchaser may intend to destroy, alter or discard.  Notwithstanding anything to the contrary contained herein, the Purchaser acknowledges that the Company has the right to retain originals or copies of all books and records related to the Bank, the Business, the Other Purchased Assets or the Assumed Liabilities with respect to periods, events, or occurrences prior to the Closing Date.

Section 5.3.   *Transition Services Agreement.*  At or prior to the Closing, the Parties shall enter into a transition services agreement substantially in the form set forth on Exhibit A attached hereto (the "**Transition Services Agreement**"), pursuant to which the Purchaser shall and shall cause the Bank to provide certain services to the Company, at the sole cost of the Bank, with respect to the Bankruptcy Case and the wind-down and/or dissolution of the Company and its estate.

~~Section 5.3. *Employee Matters.*[8]~~

~~(a)  The Purchaser shall, or shall cause one of its Affiliates to continue the employment as of the Closing of each Employee who is employed by the Bank as of immediately prior to the Closing (the "**Transferred Employees**"), and provide compensation and benefits to such Transferred Employees, in each case consistent with the requirements of Legal Requirements, and otherwise on the terms set forth in this Section 5.3.~~

~~(b) The Purchaser shall, and shall cause its Affiliates to, provide each Transferred Employee with credit for such Transferred Employee's service with the Bank and its Affiliates and predecessors prior to the Closing for all purposes, including for purposes of eligibility and determination of level of benefits, under any Benefit Plan sponsored or maintained by the Purchaser or any of its Affiliates in which such Transferred Employee is eligible to participate on or following the Closing Date (each, a "**Purchaser Plan**"); provided, that such service shall not~~

---

~~[8]  **Note to Draft**: Parties to discuss the entry of a transition services agreement to allow certain Bank employees to assist the Company with completion of the bankruptcy proceeding.~~

0

be recognized to the extent that such recognition would result in a duplication of benefits.  With respect to each Purchaser Plan that is a health or welfare plan, the Purchaser shall, and shall cause its Affiliates to use commercially reasonable efforts to, (i) waive any limitation on health and welfare coverage of such Transferred Employees due to pre-existing conditions, waiting periods, active employment requirements and requirements to show evidence of good health and (ii) credit each such Transferred Employee with all deductible payments, co-payments and co-insurance paid by such Transferred Employee under any Group Benefit Plan prior to the Closing during the year in which the Closing occurs for the purpose of determining the extent to which any such Transferred Employee has satisfied any applicable deductible and whether such Transferred Employee has reached the out-of-pocket maximum for such year.

(c)  Nothing express or implied in this Section 5.3 or this Agreement shall (i) confer upon any Transferred Employee, or legal representative or beneficiary thereof, any rights or remedies, including any right to employment or benefits for any specified period, of any nature or kind whatsoever, under or by reason of this Agreement, (ii) be treated as an amendment to, or prevent the termination of any Group Benefit Plan, any Purchaser Plan or any other Benefit Plan sponsored or maintained by the Purchaser, the Company, the Bank or their respective Affiliates, as applicable, or (iii) obligate the Purchaser, the Company, the Bank or any of their respective Affiliates to maintain any particular Benefit Plan.

(d) Prior to the Closing, any written or material oral communications proposed to be delivered by the Purchaser or any of its Affiliate or its or their respective Representatives to any Transferred Employee regarding such employees' level of (or rights with respect to) continued employment or benefits or compensation at or after the Closing will be subject to the prior written approval of the Company.

Section 5.4.    *Consents and Approvals.*

(a)    ~~Each party shall and shall cause their respective Affiliates to, use their respective~~<u>After the date hereof and prior to the Closing or earlier termination of this Agreement, the Purchaser and the Company agree to use</u> reasonable best efforts to prepare all documentation, to effect all applications, notices, registrations, and filings and to <u>obtain all Consents from any Governmental Authority necessary or advisable to obtained by it, or its Affiliates, in order to consummate the Contemplated Transaction, including the Purchaser Required Approvals, as soon as practicable, and to</u> take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper, or advisable to consummate the Contemplated Transactions ~~as soon as practicable, including obtaining all Consents from any Governmental Authority necessary or advisable to be obtained by it, or its Subsidiaries or Affiliates in order to consummate the Contemplated Transactions, including the Purchaser Required Approvals, and the Purchaser shall use reasonable best efforts to obtain each such Consent as promptly as reasonably practicable and~~ .   After the date hereof and prior to the Closing or earlier termination of this Agreement, the Purchaser shall not, and shall cause its Affiliates not to, knowingly take any action that would be expected to have the effect of denying, withdrawing or materially delaying or conditioning any such Consent.  ~~In furtherance of the foregoing, as soon as reasonably practicable following the date hereof, and in no event later than 15 days after the date of the entry of the Sale Order, the Purchaser shall prepare and file any and all applications, notices, registrations and filings required with respect to each of the Purchaser Required Approvals.~~<u>For</u>

0

the avoidance of doubt, none of the obligations in this Section 5.4 shall require Purchaser, the Company or the Bank to take any action that would result in the imposition of a Materially Burdensome Regulatory Condition.  Notwithstanding the foregoing, at the written request of Purchaser, the Company shall cause the Bank to agree to take any action that would constitute a Materially Burdensome Regulatory Condition so long as such action is conditioned upon the occurrence of the Closing.

(b)    ~~The parties shall coordinate and cooperate with each other in exchanging and providing such information as necessary to carry out the efforts set forth in  Section 5.4(a).   After the date hereof and prior to the Closing or earlier termination of this Agreement,  each party shall (i) have the right to review in advance, and to the extent practicable consult with the other party prior to sending any substantive notices to, making any filings or submissions with, or having any communications with any Governmental Authority with respect to the~~   In furtherance of the foregoing, as soon as reasonably practicable following the execution and delivery of this Agreement, but in no event later than 20 days thereafter, the Purchaser, with the reasonable cooperation of the Company, shall cause to be filed, submitted or published (as the case may be) all required notices and prepare all necessary documentation and effect all necessary filings in connection with obtaining the Purchaser Required Approvals.  The Purchaser and the Company will cooperate with each other and will each furnish the other and the other's counsel with all information reasonably requested concerning themselves, their directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any application, petition or any other statement or application made by or on behalf of Purchaser, the Company or the Bank to any Governmental Authority in connection with the Contemplated Transactions.  The Purchaser and the Company shall have the right to review and discuss in advance all filing made, or written materials submitted, in connection with the Contemplated Transactions with any Governmental Authority.  Notwithstanding anything herein to the contrary, neither the Purchaser nor the Company shall be required to furnish the other with any confidential portions of any material to be filed in connection with the Contemplated Transactions ~~(other than~~, or any other portions of material to be filed in connection ~~therewith~~with the Contemplated Transactions that contain competitively sensitive business or other proprietary information filed under a claim of confidentiality or confidential supervisory information~~), (ii) promptly consult with the other party with respect to all substantive notices sent, all confidential filings or submissions made or any other confidential information supplied by such party to any Governmental Authority in connection with this Agreement and the Contemplated Transactions, and (iii) promptly inform the other party of any communication from any Governmental Authority regarding any of the Contemplated Transactions, including advising the other party upon receiving any communication from the OCC that causes such party to believe that there is a reasonable likelihood that any Purchaser Required Approvals will not be obtained or may be delayed, conditioned or withdrawn (a "Regulatory Communication").   Upon the receipt of any Regulatory Communication, without limiting the scope of the foregoing, the receiving party shall, to the extent permitted under any Legal Requirements (A) promptly advise the other party of the receipt of such Regulatory Communication and, subject to any prohibition under any Legal Requirements, provide a copy of such Regulatory Communication to the other party (or, in the case of oral Regulatory Communications, advise the other party of the substantive contents thereof), and (B) provide the other party with a reasonable opportunity to participate in the preparation of any response thereto and the preparation of any other substantive submission or communication to any Governmental Authority with respect to the Contemplated~~

0

~~Transactions and to review any such response, submission or communication prior to the filing or submission thereof (other than portions of materials to be filed or submitted in connection therewith that contain competitively sensitive business or proprietary information filed or submitted under a claim of confidentiality or confidential supervisory information).   The Purchaser shall not agree to participate in any substantive meeting (telephonic, in-person or virtual) with any Governmental Authority in respect of any filing, submission, investigation or other inquiry in connection with the Contemplated Transactions unless, to the extent permitted under Legal Requirements, it consults with the Company in advance and, to the extent permitted by such Governmental Authority, gives the Company and their respective counsel the opportunity to attend and participate at such meeting.   Notwithstanding anything to the contrary contained herein, this Section 5.4(b) shall not apply to any~~ Regulatory Communication, ~~filing or submission by the Company, the Bank or their respective Representatives with the Bankruptcy Court.~~.

(c)     In furtherance and not in limitation of the foregoing, the Purchaser shall use its reasonable best efforts to respond to any request for information, resolve any objection and avoid and eliminate any impediment under any Legal Requirements or that may be asserted by any Governmental Authority with respect to this Agreement or the Contemplated Transactions, and avoid the entry of, or have vacated, lifted, reversed or overturned any Legal Requirement, whether temporary, preliminary or permanent, that would ~~restraint~~restrain, prevent, condition or delay the Closing. ~~Notwithstanding anything to the contrary contained herein, nothing contained in this Agreement shall be deemed to require the Purchaser or the Company or any of their respective Affiliates, and neither the Purchaser or the Company nor any of their respective Affiliates shall be permitted (without the written consent of the other party), to take any action, or commit to take any action, or agree to any condition or restriction, in connection with obtaining the foregoing Consents of any Governmental Authority, that would~~ reasonably be expected to have a Material Adverse Effect on the Bank, the Purchaser and their respective Affiliates, taken as a whole, after giving effect to the Contemplated Transactions (a "**Burdensome Condition**").

(d)     The Purchaser and the Company shall use their reasonable best efforts to: subject to any Legal Requirements,

(i)     permit each other to review and discuss in advance, and consider in good faith the views of the other in connection with, any proposed written communication (or other correspondence or memoranda) between any such party and any Governmental Authority relating to the other party; and

(ii)     promptly inform each other of (A) and supply to each other any substantive written communication (or other correspondence or memoranda) submitted to (except to the extent such submission is confidential), or received by them from, any Governmental Authority, in each case regarding any of the Contemplated Transactions, except to the extent that such communication relates to the information described in the next to last sentence of Section 5.4(b) and (B) any and all communications from the OCC indicating that, in the reasonable belief of such party, there is a reasonable likelihood that the Purchaser Required Approvals may be delayed or may not be obtained.

0

(e)   (d)  Any filing fees in connection with the making or obtaining of any Consents pursuant to this Section 5.4, including the Purchaser Required Approvals, shall be borne by the Purchaser.  Notwithstanding anything herein to the contrary, this Section 5.4 shall not apply to any communication, filing or submission by the Company, the Bank or their respective Representatives with the Bankruptcy Court.

(f)   (e)  The parties agree to cooperate in good faith in connection with providing notice to or obtaining any consent from any Person other than a Governmental Authority that is necessary or advisable in connection with the Contemplated Transactions; provided that, in no event shall the Company be required to make any payment, make, undertake or amend any commitment to any such Person, or waive any rights of the Company or its Affiliates, in each ease, in order to provide such notice or obtain any such consent.

Section 5.5.   *Notice of Certain Events.*  From and after the date hereof to the Closing Date, the parties shall promptly notify each other in writing of any circumstance, event or action the existence, occurrence or taking of which would reasonably be expected to cause any condition to the Closing set forth in Article 6 not to be satisfied; provided that any failure to give any such notice by the Company or the Purchaser shall not in itself constitute a failure to satisfy the conditions set forth in Section 6.1(b) or Section 6.2(b), respectively.

Section 5.6.   ~~Section 5.5.~~ *Indemnification; D&O Insurance; D&O Tail Coverage.*

(a)   From and after the Closing Date, the Purchaser shall ~~and shall~~ cause the Bank to, to the fullest extent provided by Legal Requirements, indemnify, defend and hold harmless each present and former officer, director or employee of the Company or the Bank (the "**D&O Indemnified Parties**"), and shall advance expenses to such D&O Indemnified Parties as incurred, with respect to all costs, expenses, Proceedings, judgments, fines, losses, damages, Taxes, penalties or other Liabilities to the extent arising out of (i) the fact that such D&O Indemnified Party was an officer, director or employee of the Company or the Bank, or (ii) acts or omissions prior to the Closing in such Person's capacity as an officer, director or employee of the Company or the Bank, to the same extent as such D&O Indemnified Parties are entitled to be indemnified pursuant to the applicable Charter Documents of the Company or the Bank, as applicable, in effect as of the date of this Agreement ~~or any indemnification agreements between such D&O Indemnified Parties and the Company or the Bank (the "Indemnification Agreements")~~, or otherwise arising by operation of any Legal Requirements in effect as of the date of this Agreement.  For a period of six (6) years from the Closing Date, the Purchaser shall ~~not, and shall~~ cause the Bank not to, amend, repeal or otherwise modify any exculpation, indemnification, advancement of expenses or insurance coverage provisions of the applicable Charter Documents of the Bank in effect as of the date of this Agreement for the benefit of the D&O Indemnified Parties ~~or any Indemnification Agreements to which the Bank is a party, in each case,~~ in any manner that could adversely affect the rights thereunder of any of the D&O Indemnified Parties relating to any acts or omissions prior to the Closing.

(b)   At or prior to the Closing, the Purchaser shall use commercially reasonable efforts to cause the Bank to cause the D&O Indemnified Parties covered by the directors' and officers' liability insurance policy maintained by the Bank and in effect immediately prior to the Closing (the "**D&O Policy**") to continue to be covered by the D&O

0

Policy for a period of six (6) years after the Closing (provided, that the Purchaser may substitute therefor policies of at least the same coverage and amounts containing terms and conditions which are no less advantageous in any aspects to the insured) with respect to claims arising from facts, events, acts or omissions which occurred at or prior to the Closing; provided, that the Purchaser shall not be required to expend on an annual basis more than ~~300% of the current annual premium paid as of the date of this Agreement by the Company or the Bank for such insurance~~$200,000 (the "**Premium Cap**") for such insurance, and if such premiums for such insurance would at any time exceed the Premium Cap, the Purchaser shall cause ~~to be maintained~~the Bank to maintain policies of insurance which, in the Purchaser's good faith determination, provide the maximum coverage available at an annual premium equal to the Premium Cap.  In lieu of the foregoing, in consultation with the Purchaser, the Bank may, at or prior to the Closing, at the Purchaser's cost obtain a six-year "tail" policy under the D&O Policy providing equivalent coverage to that described in the preceding sentence if and to the extent that the same may be obtained for an aggregate one-time premium payment that does not exceed the Premium Cap.

~~(c)  Notwithstanding any provision in this Agreement to the contrary, the parties hereby acknowledge that one or more of the D&O Indemnified Parties may have certain rights to exculpation, indemnification, advancement of expenses or insurance coverage provided by the Company or such D&O Indemnified Party or another Person of which such D&O Indemnified Party is a director, officer, stockholder, member, partner or employee (an "Additional D&O Provider").  The parties hereby agree that, with respect to any such D&O Indemnified Party, the Bank (i) is, relative to each Additional D&O Provider, the indemnitor of first resort (i.e., the Bank's obligations to the applicable D&O Indemnified Party under this Agreement and the applicable Charter Documents of the Bank and other applicable Indemnification Agreements to which the Bank is a party are primary, and any duplicative, overlapping or corresponding obligations of an Additional D&O Provider are secondary), (ii) shall be required to make all advances and other payments under this Agreement and the applicable Charter Documents of the Bank or the Indemnification Agreements to which the Bank is a party, and shall be fully liable therefor, without regard to any rights any D&O Indemnified Party may have against any Additional D&O Provider, and (iii) irrevocably waives, relinquishes and releases any such Additional D&O Provider from any and all claims against such Additional D&O Provider for contribution, subrogation or any other recovery of any kind in respect thereof.~~

(c)    ~~(d)~~  The rights of each D&O Indemnified Party under this ~~Section 5.5~~Section 5.6 shall be in addition to, and not in limitation of, any other rights such Person may have under the Charter Documents of the Company or the Bank, or under any other applicable Contracts ~~(including the Indemnification Agreements)~~ or Legal Requirements or any other remedy to which such Person is entitled at law, in equity or otherwise.  The provisions of this ~~Section 5.5~~Section 5.6 shall survive the Closing and expressly are intended to benefit, and are enforceable by, each of the D&O Indemnified Parties, each of whom is an intended third-party beneficiary of this ~~Section 5.5~~Section 5.6.

(d)    ~~(e)~~  In the event that, after the Closing, the Bank or the Purchaser (or their respective successors or assigns), directly or indirectly, (i) consolidates with or merges into any other Person and is not the continuing or surviving corporation or entity of such consolidation or merger or (ii) transfers or conveys all or substantially all of its properties and other assets to any

0

Person, then, and in each such case, the Purchaser shall cause, and shall cause the Bank to cause, as the case may be, proper provision to be made so that such successors and assigns shall assume the obligations of the Purchaser and the Bank set forth in this ~~Section 5.5~~Section 5.6.

Section 5.7.   ~~Section 5.6.~~*Communications with Customers and Suppliers*.  Prior to the Closing, the Purchaser shall not, and shall cause ~~its~~his Affiliates and instruct ~~its~~his and their Representatives not to, contact, or engage in any discussions or otherwise communicate with, the Company's or the Bank's customers, suppliers, licensors, licensees and other Persons with which the Company or the Bank have commercial dealings without obtaining the prior written consent of the Company (other than any such communication with the Persons with whom Purchaser or ~~its~~his Affiliates already have relationship prior to the date hereof and in the Ordinary Course of Business of the Purchaser or ~~its~~his Affiliates consistent with past practice without reference to or any purpose relating to the Bank, the Company, the Business or the Contemplated Transactions).

Section 5.8.   ~~Section 5.7.~~*Resignations*.  On the Closing Date, the Company or the Bank, as applicable, shall cause to be delivered to the Purchaser duly signed resignations, effective as of the Closing, of all directors of the Bank to the extent requested by the Purchaser prior to the Closing.

Section 5.9.   ~~Section 5.8.~~*Public Announcements*.  Other than mutually agreed press releases and other materials to be issued upon the announcement of this Agreement or thereafter, with respect to which the parties shall cooperate in good faith to jointly prepare or communicate consistent with the joint communication policy of the parties, from and after the date of this Agreement, neither party shall make any public announcement or public comment regarding this Agreement or the Contemplated Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, delayed or conditioned), unless and only to the extent that any such public announcement or public comment is required by a Governmental Authority or Legal Requirements; provided that, the Purchaser shall, to the extent reasonably practicable and permitted by such Governmental Authority or Legal Requirements, as applicable, use reasonable best efforts to first allow the Company to review such public announcement or public comment and provide comments thereon, and the Purchaser shall consider such comments in good faith.  Notwithstanding anything to the contrary in this Agreement (including this ~~Section 5.8~~Section 5.9), nothing herein shall prohibit the Company or the Bank from complying with the Bidding Procedures Order, or filing any documents in connection with the entry of the Sale Order, or any other requirements of the Bankruptcy Court, the Bankruptcy Code or other Legal Requirements.

Section 5.10.   ~~Section 5.9.~~*Tax Sharing Agreement*.  Anything in any other agreement to the contrary notwithstanding, all Liabilities between the Company on the one hand and the Bank on the other hand, under any Tax allocation or Tax sharing agreement (including the Tax Sharing Agreement) in effect prior to the Closing Date (other than this Agreement) shall cease and terminate as of the Closing Date as to all past, present and future taxable periods.

Section 5.11.   ~~Section 5.10.~~*Preparation and Filing of Tax Returns; Taxes*.

(a)   The Company shall include the income of the Bank on the Company's consolidated, unitary, affiliated or other combined federal and state income Tax Returns for all

0

periods through the Closing Date (such period, the "**Pre-Closing Tax Period**" and such Tax Returns, the "**Company Tax Returns**") and pay any federal and state income Taxes attributable to such income.  The Bank shall furnish Tax information reasonably sufficient for the Company to include such income in the Company Tax Returns to the Company.  The Company shall timely prepare and file (or cause to be prepared and filed) the Company Tax Returns, and shall prepare all Company Tax Returns in a manner consistent with prior practice in respect of the Bank unless otherwise required by Legal Requirements or unless the Purchaser consents to such different treatment.  The Purchaser and the Company agree to report all transactions not in the Ordinary Course of Business occurring on the Closing Date after the Closing, unless otherwise directed by the Purchaser, on the first day of the Bank's separate federal and state income Tax Returns to the extent permitted by Treasury Regulations Section 1.1502-76(b)(l)(ii)(B).  The Company shall provide reasonable evidence of its filing of the Company Tax Returns and payment of Taxes shown as due on such Tax Returns to the Bank promptly after the filing of such Tax Returns.

(b)     Except as otherwise provided in this Agreement, all Taxes that relate to Straddle Tax Period shall be allocated in the following manner:

(i)      in the case of Taxes (A) based upon, or measured by reference to, income, receipts, profits, wages, capital or net worth, (B) imposed in connection with the sale, transfer or assignment of property, or (C) required to be withheld, such Taxes shall be deemed equal to the amount which would be payable if the taxable year ended as of the end of the day on the Closing Date using "closing of the books methodology"; and

(ii)     in the case of other Taxes, such Taxes shall be deemed equal to the amount of such Taxes for the entire period multiplied by a fraction, the numerator of which is the number of days in the period ending on the Closing Date and the denominator of which is the number of days in the entire period.

(c)     The Bank shall pay the Company, for the Pre-Closing Tax Period in which the Bank is included in the Company Tax Return, the portion of the consolidated federal and any combined state income Tax Liability attributable to the Bank determined as follows:

(i)      The Bank shall pay an amount equal to the lesser of (1) the total Tax paid on a Company Tax Return or (2) the Bank's full separate federal or state (as the case may be) income Tax Liability attributable to the net taxable income of the Bank that would have been paid if the Bank had filed a separate federal or state income Tax Return. Such amount shall be computed (with any adjustments to the computation) in accordance with past practices.

(ii)     The payment of the amount determined in accordance with this Section 5.10(c)Section 5.11(c) shall be made to the Company in accordance with the Company's schedule for payment of amounts due upon the consolidated group's quarterly income Tax declarations and the balance, if any, shall be payable in one installment due on or before the fifteenth day of the third month following the close of the Company's Tax year; provided that, the Bank shall not be required to pay the same

0

amount to the Company more than once under this ~~Section 5.10(c)~~Section 5.11(c) and the Tax Sharing Agreement.

Section 5.12.  ~~Section 5.11.~~ *Tax Cooperation*~~. Prior~~.  Following the Closing but prior to the closing of the Bankruptcy Case, in connection with the preparation of Tax Returns, audit examinations and any Proceedings relating to the Tax Liabilities imposed on or attributable to the Bank, the Bank and the Purchaser, on the one hand, and the Company, on the other hand, shall reasonably cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful for the preparation of such Tax Returns, the conduct of audit examinations or the defense of claims by taxing authorities as to the imposition of Taxes.  The Company shall provide to the ~~Purchaser~~Bank copies of all information, returns, books, records and documents relating to any Tax matters of or attributable to the Bank and the Other Purchased Assets.

Section 5.13.  ~~Section 5.12.~~ *Post-Closing Actions*.  Without prior written consent of the Company, the Purchaser shall not, and shall not cause or permit the Bank to, (a) amend any Tax Returns filed with respect to any tax year ending on or before the Closing Date, (b) make or change any Tax election or accounting method or practice that has retroactive effect to any such year, or (c) make or initiate any voluntary disclosure or other communication with any Governmental Authority relating to any actual or potential Tax payment or Tax Return filing obligation of the Bank, the Company or any Affiliate thereof for any such year.

Section 5.14.  ~~Section 5.13.~~ *Tax Refunds*.  The Purchaser shall, or shall cause the Bank to~~,~~ pay the Company the amount of any cash Tax refunds or credits of Taxes actually received by the Purchaser or the Bank that arise with respect to any Pre-Closing Tax Period (including any such amount that is credited against the year in which an audit is settled or ultimately concluded) and the amount of any benefit of any overpayment actually received with respect to any such Tax period (including any such amount that is credited against the year in which an audit is settled or ultimately concluded) that is applied in a taxable period (or portion thereof) beginning on or after the Closing Date (other than, in each case, refunds, credits or overpayments attributable to the carryback of losses, credits or similar items from a taxable period or portion thereof beginning on or after the Closing Date), in each case, net of any reasonable costs or Taxes incurred in connection therewith.  Such payments shall be made within 15 days of receipt of any such refund or credit or application of any such overpayment by the Purchaser or the Bank.

Section 5.15.  ~~Section 5.14.~~ *Tax Proceedings*.  The Company and the ~~Purchaser~~Bank shall promptly notify each other upon receipt after the Closing of any notice of any inquiries, assessments, audits, Proceedings or similar events received from any taxing authority with respect to any Taxes, or Tax attributes (including net operating losses), including such items included in any consolidated, affiliated, unitary or other combined Tax Return, attributable to a Pre-Closing Tax Period (any such inquiry, assessment, audit, Proceeding or similar event, a "**Tax Matter**").  Prior to the Closing, the Company shall have the right to control the process, disposition and decision of whether to settle any Tax Matter; provided, however, that if and to the extent any such Tax Matter attributable to a Pre-Closing Tax Period would adversely affect Taxes with respect to a Tax period or portion thereof occurring after the Closing Date for which Purchaser or the Bank is liable (including a reduction of a Tax refund, net operating loss or other

43

0

Tax attribute), the Company shall permit the Purchaser to participate in the Proceeding and shall not settle or otherwise compromise such Proceeding in respect of such Tax Matter attributable to a Pre-Closing Tax Period without the prior written consent of Purchaser, which consent shall not be unreasonably withheld, conditioned or delayed.  Following the Closing, the Purchaser shall have the right to control the process, disposition and decision of whether to settle any Tax Matter, provided, that, the Purchaser shall (a) diligently prosecute such Tax Matter, (b) keep the Company reasonably informed of the status or developments with respect to such Tax Matter, and (c) obtain the written consent from the Company to settle any Tax Matter that would result in current or future Taxes for which the Company would be liable for under this Agreement.  The Company shall have the right to fully participate in any such Tax Matter at its own expense.

Section 5.16.  ~~Section 5.15.~~  *Transfer Taxes*.  The Contemplated Transactions shall be exempt from Transfer Tax to the fullest extent available in accordance with Section 1146 of the Bankruptcy Code.  To the extent any Transfer Taxes are nonetheless payable in connection with the Contemplated Transactions, notwithstanding any other provision of this Agreement, the Purchaser shall be responsible for all transfer, sales, use, stamp, conveyance, value added, recording, registration, documentary, filing and other similar non-income Taxes and administrative fees (including notary fees) (**"Transfer Taxes"**) arising in connection with the consummation of the Contemplated Transactions, whether levied on the Company or the Purchaser.  The Purchaser shall timely prepare (or cause to be prepared) and file (or cause to be filed) any Tax Returns with respect to Transfer Taxes arising in connection with the consummation of the Contemplated Transactions (the "**Transfer Tax Returns**") and pay such Transfer Taxes when due.  To the extent that any such Transfer Taxes are by Legal Requirement payable by the Company rather than the Purchaser, the Purchaser shall, within 10 Business Days after the Closing, transfer the amount due in immediately available funds to an account designated by the Company.

Section 5.17.  ~~Section 5.16.~~  *Bankruptcy Filings.*

(a)    The Company and the Purchaser shall consult with one another regarding pleadings or papers that either of them intends to file with the Bankruptcy Court in connection with, or which might reasonably affect the Bankruptcy Court's approval of, the Sale Order.

(b)    The Purchaser agrees that it will promptly take such actions as are reasonably requested by the Company to assist in obtaining the entry of the Sale Order and a finding of adequate assurance of future performance by the Purchaser, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for the purposes, among others, of providing necessary assurances of performance by the Purchaser under any executory Contracts or unexpired leases of the Company that constitute the Other Purchased Assets, if applicable, and demonstrating that Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

Section 5.18.  ~~Section 5.17.~~  *Appeal*.  If the Sale Order or any other Orders of the Bankruptcy Court relating to the Contemplated Transactions is appealed by any Person, or petition for certiorari or motion for rehearing or reconsideration is filed with respect thereto, subject to rights otherwise arising from this Agreement, including each party's respective right to

0

terminate this Agreement, the Company and the Purchaser shall use commercially reasonable efforts to defend against such appeal, petition or motion.

Section 5.19.  ~~Section  5.18.~~  *Bidding Procedures*.    Nothing in this Agreement shall prevent the Company from modifying the Bidding Procedures as necessary or appropriate to maximize value for the Company's estate in accordance with the Company's or its board of directors' fiduciary obligations.

Section 5.20.   *Plan*.  The Company covenants and agrees that if the Sale Order is entered and remains unstayed and in effect, and provided this Agreement has not been terminated, the terms of any plan of reorganization or liquidation submitted, supported or sponsored by the Company for confirmation, or proposed Order dismissing the Bankruptcy Case, shall not conflict with, supersede, abrogate, nullify, modify or restrict the terms of this Agreement and the rights of Purchaser hereunder, or in any way prevent or interfere with the consummation or performance of the Contemplated Transactions approved pursuant to the Sale Order.  The terms of this Section 5.20 shall be included in the Sale Order.

Section 5.21.  ~~Section  5.19.~~  *Ability to Supplement Disclosure Schedule.*   The parties acknowledge and agree that the Disclosure Schedule delivered by the Company to the Purchaser concurrently with the execution of this Agreement may not be completed as of the date of this Agreement.  Prior to the ~~Closing~~entry of the Sale Order, from time to time, the Company may supplement, modify or amend the Disclosure Schedule with respect to any fact, event, circumstance or matter that is required to be set forth or disclosed in the Disclosure Schedule (a "**Disclosure Update**") to make the Disclosure Schedule or the relevant representations and warranties made by the Company in this Agreement true and correct as of the date hereof and as of the Closing Date.  Upon delivery of a Disclosure Update, the Disclosure Update shall be deemed to be incorporated into and to have supplemented, modified or amended the Disclosure Schedule and the representations and warranties of the Company contained herein as of the date hereof and as of the Closing Date.

Section 5.22.   *DIP Loan*.  Upon the Company's request prior to the Closing Date, the Purchaser shall negotiate the DIP Loan Term Sheet with the Company in good faith and on terms and conditions consistent with those agreed by the Purchaser at the Auction.  Upon Bankruptcy Court approval of the DIP Loan Term Sheet, Purchaser shall provide the DIP Loan to the Company in accordance with the DIP Loan Term Sheet and the Order approving the DIP Loan Term Sheet.

## ARTICLE 6
### CONDITIONS OF CLOSING

Section 6.1.   *Conditions to Purchaser's Obligations*.  The obligation of the Purchaser to consummate the Contemplated Transactions is subject to the fulfillment or (to the extent permitted by Legal Requirements) waiver on or prior to the Closing Date of the following conditions:

(a)   *Representations and Warranties*.  (i) The representations and warranties of the Company contained in Section 3.1(a), Section 3.1(b), Section 3.1(c), ~~Section 3.2 and Section~~

0

3.21 Section 3.2(a), Section 3.2(c), Section 3.3(a), and Section 3.24 shall be true and correct in all but *de minimis* respects as of the date of this Agreement and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent that any such representation and warranty is expressly made as of a particular earlier date, in which case such representation and warranty shall be true and correct in all but *de minimis* respects as of such earlier date), and (ii) each of the representations and warranties of the Company contained in Article 3 (other than those representations and warranties specified in clause (i) above) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifications contained therein) as of the date of this Agreement and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent that any such representation and warranty is expressly made as of a particular earlier date, in which case as of such earlier date), except where the failure of such representations and warranties described in this clause (ii) to be so true and correct (without regard to materiality or Material Adverse Effect qualifications contained therein) would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect on the Bank;

(b)   *Covenants*.  The covenants and agreements of the Company required to be performed at or before the Closing pursuant to this Agreement shall have been performed in all material respects at or before the Closing;

(c)   *Officer's Certificate*.  The Company shall have delivered to the Purchaser a certificate signed by an authorized officer of the Company certifying to the effect that the conditions set forth in Section 6.1(a) and Section 6.2(b) have been satisfied; and

(d)   *Deliverables*.  The Purchaser shall have received each of the documents, certificates, instruments and agreements required to be delivered pursuant to Section 7.2.; and

(e)   *No Material Adverse Effect*.  There shall not be continuing at the Closing any Material Adverse Effect on the Bank.

For the avoidance of doubt, if the Closing occurs, all conditions set forth in this Section 6.1 that have not been fully satisfied as of the Closing shall be deemed to have been waived by the Purchaser.

Section 6.2.   *Conditions to the Company's Obligations*.  The obligation of the Company to consummate the Contemplated Transactions is subject to the fulfillment or (to the extent permitted by Legal Requirements) waiver on or prior to the Closing Date of each of the following conditions:

(a)   *Representations and Warranties*.  (i) The representations and warranties of the Purchaser contained in Section 4.1(a), Section 4.1(b), Section 4.2, Section 4.5, Section 4.6, Section 4.7, and Section 4.11 Section 4.10 shall be true and correct in all but *de minimis* respects as of the date of this Agreement and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent that any such representation and warranty is expressly made as of a particular earlier date, in which case such representation and warranty shall be true and correct in all but *de minimis* respects as

0

of such earlier date), and (ii) each of the representations and warranties of the Purchaser contained in Article 4 (other than those representations and warranties specified in clause (i) above) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifications contained therein) as of the date of this Agreement and as of the Closing Date with the same effect as though such representations and warranties had been made as of the Closing Date (except to the extent that any such representation and warranty is expressly made as of a particular earlier date, in which case as of such earlier date), except where the failure of such representations and warranties in this clause (ii) to be so true and correct (without regard to materiality or Material Adverse Effect qualifications contained therein) would not reasonably be expected to, individually or in the aggregate, prevent, materially impair or materially delay the consummation of any of the Contemplated Transactions;

(b)    *Covenants*.  The covenants and agreements of the Purchaser required to be performed at or before the Closing pursuant to this Agreement shall have been performed in all material respects at or before the Closing;

(c)    *Purchaser's Certificate*.  The Purchaser shall have delivered to the Company a certificate signed by an authorized officer of the Purchaser certifying to the effect that the conditions set forth in Section 6.2(a) and Section 6.2(b) have been satisfied; and

(d)    *Deliverables*.  The Company shall have received each of the documents, certificates, instruments and agreements required to be delivered pursuant to Section 7.3.

The foregoing conditions are for the benefit of the Company only and accordingly the Company will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination or otherwise in the event of the failure to fulfill any other conditions in whole or in part.

Section 6.3.    *Mutual Conditions*.  The obligations of the Company and the Purchaser to consummate the Contemplated Transactions are subject to the fulfillment or (to the extent permitted by Legal Requirements) waiver by the parties of each of the following conditions:

(a)    *No Injunction or Restraining Order*.  No temporary, preliminary or permanent injunction or restraining Order or Legal Requirements shall be in effect which prohibits, restrains, makes illegal or enjoins the consummation of the Contemplated Transactions;

(b)    *Sale Order Entered*.  The Sale Order, together with any other Order of the Bankruptcy Court required to consummate the Contemplated Transactions, shall have been entered by the Bankruptcy Court and remain unstayed and in effect as of the Closing; and

(c)    *Purchaser Required Approvals*.  The Purchaser shall have obtained all the Purchaser Required Approvals without the imposition of any Materially Burdensome Regulatory Condition; each Purchaser Required Approval shall remain in full force and effect; and no Purchaser Required Approval shall have been amended, modified, reversed or vacated and all applicable waiting periods with respect to any Purchaser Required Approvals shall have expired.

0

Section 6.4.    *Frustration of Closing Conditions*.   The Purchaser may not rely on the failure of any condition set forth in this Article 6 to be satisfied if such failure was caused by the Purchaser's failure to comply with the terms of this Agreement.   The Company may not rely on the failure of any condition set forth in this Article 6 to be satisfied if such failure was caused by the Company's failure to comply with the terms of this Agreement.

Section 6.5.    *Termination.*

(a)    This Agreement may be terminated by either of the Purchaser or the Company immediately, upon delivery of written notice to the other party, in the event that the Sale Order is not entered by August 6, 2025, or Closing has not occurred on or before ~~September 30~~October 20, 2025 (the "**Outside Date**"); provided~~,~~ that, if the conditions to the Closing set forth in Section 6.3(c) have not been satisfied or waived on or prior to such date but all other conditions to the Closing set forth in Article 6 have been satisfied or waived (other than those conditions that by their nature can only be satisfied at the Closing (so long as such conditions are reasonably capable of being satisfied)), then the Company may, in its sole discretion, extend the Outside Date one or more times to a date no later than November 19, 2025, and such date, as so extended, shall be the Outside Date; provided, further that the terminating party shall only be entitled to exercise such right of termination if the terminating party is not then in breach of any representation, warranty, covenant or other agreement contained in this Agreement such that any condition to Closing set forth in Article 6, as applicable, would not have been satisfied.

(b)    This Agreement may also be terminated prior to the Closing:

(i)    at any time by the mutual written agreement of the Company and the Purchaser;

(ii)    by the Purchaser, upon written notice to the Company, if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Company which breach, individually or in the aggregate with other breaches by the Company, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in ~~Section 6.1(a) or (b)~~Section 6.1(a) or (b), as the case may be, and which is not cured within 30 days following written notice to the Company thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured within such time period (provided, that the Purchaser is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Purchaser);

(iii)    by the Company, upon written notice to the Purchaser, if there shall have been a breach of any of the covenants or agreements or any of the representations or warranties set forth in this Agreement on the part of the Purchaser which breach, individually or in the aggregate with other breaches by the Purchaser, would result in, if occurring or continuing on the Closing Date, the failure of the conditions set forth in ~~Section 6.2(a) or (b)~~Section 6.2(a) or (b), as the case may be, and which is not cured within 30 days following written notice to the Purchaser thereof (and in any event prior to the Outside Date) or which by its nature or timing cannot be cured

within such time period (provided, that the Company is not then in material breach of any of the covenants, agreements, representations or warranties set forth in this Agreement on the part of the Company);

(iv)    by either the Company or the Purchaser, upon written notice to each other, if there shall be in effect a final, non-appealable Order which prohibits, restrains, makes illegal or enjoins the consummation of the Contemplated Transactions;

(v)    by the~~either~~ Company, ~~upon written notice to~~ or the Purchaser, if (A) any Governmental Authority has denied a Purchaser Required Approval and such denial has become final, or has advised either party that it will not grant (or intends to rescind or revoke if previously granted) a Purchaser Required Approval without imposing any Materially Burdensome Regulatory Condition, or (B) any Governmental Authority shall have requested or advised that either party or any of their respective Affiliates withdraw any application with respect to a Purchaser Required Approval (other than solely for technical reasons); provided that, the terminating party shall not be entitled to exercise such right of termination if the failure to obtain a Purchaser Required Approval shall be caused by or due to the failure of such party to perform or observe, in any material respect, any obligations, covenants and agreements of such party as set forth herein;

(vi)    by either party, upon written notice to the other party, if (A) prior to the Closing, the Bankruptcy Case is dismissed or converted to a case under Chapter 7 of the Bankruptcy Code; (B) the Purchaser is not the Successful Bidder or Backup Bidder (each as defined in the Bidding Procedures) within three (3) Business Days after conclusion of the Auction; ~~or~~ (C) the Bankruptcy Court enters an Order denying approval of the Sale; or (D) the FDIC has been appointed receiver of the Bank; or

(vii)    by written notice from the Company to the Purchaser, prior to the entry of the Sale Order, if the Company or its board of directors determines that proceeding with the Contemplated Transactions pursuant to the terms of this Agreement or failing to terminate this Agreement would be inconsistent with such Person's or body's fiduciary duties.

(c)    In the event that this Agreement is validly terminated pursuant to this Section 6.5, this Agreement shall terminate and there shall be no Liability on the part of any party to this Agreement (or any Representative of such party) to the other party to this Agreement, except that (i) Section 1.2 *(Interpretation)*, Section 1.3 *(Governing Law)*, ~~Section 5.8~~Section 5.9 *(Public Announcement)*, this Section 6.5(c) *(Termination)*, Article 8 *(Miscellaneous)* (including relevant definitions in Section 1.1) and the Confidentiality Agreement shall survive such termination and remain in full force and effect, and (ii) nothing in this Section 6.5 will be deemed to interfere with the Company's rights to retain the Deposit Amount in accordance with Section 2.4.

0

## ARTICLE 7
### CLOSING

Section 7.1.    *Time and Place*.  The Closing shall take place remotely via the electronic exchange of documentation and signatures at 10:00 a.m. Mountain Time on the Closing Date, or at such other time and date, or both, as the Company and the Purchaser may mutually agree upon in writing.

Section 7.2.    *Company's Closing Deliverables*.  At the Closing, the Company shall deliver the following to the Purchaser:

(a)    stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank;

(b)    any transfers, assignments or other documents which are necessary to assign, sell and transfer the Other Purchased Assets to or the assumption of the Assumed Liabilities by the Purchaser as contemplated by this Agreement, as the Purchaser may reasonably require, and in such form and substance as mutually agreed by the parties;

(c)    a counterpart of the Transition Services Agreement, duly executed by the Company;

(d)    (c) the certificate required by Section 6.1(c); and

(e)    (d) a copy of the Sale Order.

Section 7.3.    *Purchaser's Closing Deliverables*.  At the Closing, the Purchaser shall deliver the following to the Company (or, in the case of the Purchase Price, as set forth in Section 2.5):

(a)    each and all the payments as set forth in Section 2.5;

(b)    a counterpart of the Transition Services Agreement, duly executed by the Purchaser;

(c)    (b) the certificate required by Section 6.2(c); and

(d)    (c) any transfers, assignments or other documents which are necessary to assign, sell and transfer the Other Purchased Assets to or the assumption of the Assumed Liabilities by the Purchaser as contemplated by this Agreement, as the Company may reasonably require, and in such form and substance as mutually agreed by the parties.

Section 7.4.    *Concurrent Delivery*.  It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents, in each case, at Closing by any party to the other pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

0

Section 7.5.    *Transfer of Shares, Other Purchased Assets and Assumed Liabilities*. Upon the terms and subject to the conditions set forth in this Agreement, and subject to the entry of a Sale Order, the Sale shall be deemed to take effect on the Closing Date.

## ARTICLE 8
### Miscellaneous

Section 8.1.    *Survival*.  All covenants and agreements contained herein which by their terms are to be performed by the Purchaser in whole or in part, or which prohibit actions by the Purchaser, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms until fully performed or satisfied.  All covenants and agreements contained herein which by their terms are to be performed by the Company in whole or in part, or which prohibit actions by the Company, subsequent to the Closing, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, shall survive the Closing until the closure of the Bankruptcy Case (upon which time such covenants and agreement shall terminate and be of no further force or effect).  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any instruments, certificates or other documents deliveries hereunder, in each case shall not survive the Closing and shall thereupon terminate and be of no further force or effect, including any actions for damages in respect of any breach or inaccuracy thereof.

Section 8.2.    *Expenses*.  Unless otherwise specifically provided herein, the Purchaser and the Company will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and execution of this Agreement, the consummation of the Contemplated Transactions and other matters pertaining hereto.

Section 8.3.    *Notices*.  All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (a) when delivered by hand (with written confirmation of receipt), (b) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested), (c) on the date sent by e-mail (so long as no "bounce-back" or similar "undeliverable" message is received by the sender thereof) if successfully transmitted prior to 5:00 p.m. (Mountain Time) on any Business Day, and on the next Business Day if successfully transmitted after such time or on a day that is not a Business Day, or (d) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid.  Such communications must be sent to the respective parties at the following addresses (or at such other address for a party as shall be specified in a notice given in accordance with this Section 8.3):

To the Purchaser:

[●]Victor Remsha
Attention: [●]

3 Hilltop Rd.,
Port Washington, NY 11050

51

0

Email: [●]vr@finsightvc.com

with a copy (which shall not constitute notice) to:
Nelson Mullins Riley & Scarborough LLP
[●]Atlantic Station
Attention: [●]

201 17th Street NW, Suite 1700
Atlanta, GA 30363
Attn:  Brennan Ryan
Telephone: 404.322.6218
Email: [●]brennan.ryan@nelsonmullins.com

Nelson Mullins Riley & Scarborough, LLP
One Financial Center
35th Floor
Boston, MA 02111
Attn:  Peter J. Haley
Telephone: 617.217.4714
Email:  peter.haley@nelsonmullins.com


To the Company:

Mode Eleven Bancorp
[●]133 Main Street
[●]

Hulett, WY 82720
Attention: [●]John Miller
Phone: (307) 202-9077
Email: [●]john.miller@summitnb.com


with a copy (which shall not constitute notice) to:

Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067
Attention: Abigail O'Brient, Charlotte May
Email: aobrient@cov.com, cmay@cov.com

Section 8.4.    *Further Assurances*.  From the date hereof until the date on which the Bankruptcy Case is closed, upon reasonable request by a party and solely at Purchaser's expense, each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either

0

before, on or after the Closing Date, to carry out the full intent and meaning of this Agreement, give effect to the Contemplated Transactions.

Section 8.5.    *Release*.  Effective as of the Closing, to the fullest extent permitted by Legal Requirements, the Purchaser, on behalf of ~~itself~~himself and ~~its~~his Related Parties (collectively, the "**Purchaser Releasing Parties**"), hereby knowingly, willingly, irrevocably, unconditionally and completely release, acquit and forever discharge each of the Company and the Company's Related Parties of and from any and all past, present and future Proceedings, executions, judgments, duties, debts, dues, accounts, bonds, Contracts and covenants (whether express or implied), Liabilities, losses, damages, controversies of any kind or nature whatsoever, whether in law or in equity, known or unknown, liquidated or unliquidated, absolute or contingent, which any Purchaser Releasing Party has, owns or holds, or claims to have, own or hold, or may have, own or hold, in each case, arising prior to the Closing Date or arising out of, in connection with or otherwise relating to any events, facts, conditions or circumstances existing prior to the Closing Date, against each of the Company or the Company's Related Parties, in each case relating to the Shares, the Company or its business or operations, the Business, the Other Purchased Assets or the Assumed Liabilities (including relating to any direct or indirect ownership interest in, or service as a controlling Person, director, officer, employee or agent of, the Company or the Business), including with respect to controlling equityholder or lender liability and breach of any fiduciary duty relating to any actions or failures to act prior to the Closing by the Company or any Company's Related Party or their respective board of directors or similar governing bodies; provided, that the foregoing release shall not apply to the rights and obligations under this Agreement ~~[or the DIP Loan~~ ~~Agreement]~~Term Sheet.  The Purchaser shall not, and shall cause the Purchaser Releasing Parties not to, make~~,~~ any claim or demand, or commence any Proceeding asserting any claim or demand, including any claim of contribution or any indemnification, against the Company or the Company's Related Parties with respect to any Liabilities released pursuant to this Section 8.5.  The Company's Related Parties shall be entitled to recover consequential damages (including reasonable attorneys' fees) in defending any Proceeding brought in contravention of the foregoing sentence.  The provisions of this Section 8.5 shall survive the Closing and expressly are intended to benefit, and are enforceable by, each of the Company's Related Parties, each of whom is an intended third-party beneficiary of this Section 8.5.  Notwithstanding the foregoing, this Section 8.5 and the release provided herein shall not apply to any monies due and unpaid to the Bank from the Company as of the Closing pursuant to the Contract that may be executed between the Company and the Bank under Section 5.1 of the Disclosure Schedule.

Section 8.6.    *No Rights Against Nonparties.*

(a)    This Agreement may be enforced only by the Company against, and any Proceeding by the Company may be brought only against, the Purchaser, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  Neither the Company nor any other Person shall have any recourse against any past, present, or future incorporator, general or limited partner, or Representative of the Purchaser ~~or its Affiliates~~ (including, following the Closing, the Bank) or any of their successors or permitted assigns (each, a "**Purchaser Non-Recourse Person**"), and no such Purchaser Non-Recourse Person shall have

53

any liability for any Liabilities of the Purchaser under this Agreement or for any claim, action, or other Proceeding based on, in respect of or by reason of the Contemplated Transactions.

(b)    This Agreement may be enforced only by the Purchaser against, and any Proceeding by the Purchaser may be brought only against, the Company, and then only as, and subject to the terms and limitations, expressly set forth in this Agreement.  Neither the Purchaser nor any other Person shall have any recourse against any past, present, or future incorporator, general or limited partner, or Representative of the Company or its Affiliates (including, prior to the Closing, the Bank) or any of their successors or permitted assigns (each, a "**Company Non-Recourse Person**"), and no such Company Non-Recourse Person shall have any liability for any Liabilities of the Company under this Agreement or for any Proceeding based on, in respect of or by reason of the Contemplated Transactions.

(c)    The provisions of this Section 8.6 are for the benefit of and shall be enforceable by each Purchaser Non-Recourse Person and Company Non-Recourse Person, which is an intended third-party beneficiary of this Section 8.6.

Section 8.7.    *Time of the Essence*.  Time shall be of the essence of this Agreement.

Section 8.8.    *Entire Agreement*.  This Agreement (and all related documents referred to herein, including the Disclosure Schedule and the schedules and exhibits hereto), the Confidentiality Agreement and the other documents, instruments, certificates and agreements specifically referred to herein or therein or delivered pursuant to hereto or thereto constitute the entire agreement between the Company and the Purchaser pertaining to the Contemplated Transactions and supersede all other prior agreements, undertakings, negotiations and discussions, whether oral or written, of the Company and the Purchaser.

Section 8.9.    *Assignability*.  Neither party to this Agreement may assign any of its respective benefits or Liabilities under or in respect of this Agreement without the prior written consent of the other party, which may be withheld in its absolute discretion.  Any attempted assignment without the necessary consent shall be void and invalid.

Section 8.10.    *Severability*.  Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or unenforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

Section 8.11.    *Waiver and Amendment*.  Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver.  No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement, nor a continuing waiver unless otherwise expressly provided.

Section 8.12.    *Benefit*.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder; except as set forth in ~~Section 5.5~~Section 5.6 (*Indemnification; D&O Insurance;*

0

*D&O Tail Coverage*), Section 8.5 (*Release*) and Section 8.6 (*No Rights Against Nonparties*), which will be for the benefit of and enforceable by the Persons set forth therein, and any such Person will have the rights and remedies provided for therein.

Section 8.13.  *Captions*.  The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

Section 8.14.  *Counterparts*.  This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument.  Electronically transmitted or facsimile copies shall be deemed to be originals.

Section 8.15.  *Specific Performance*.  The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached, in which case which monetary damages would not be an adequate remedy.  It is accordingly agreed that the parties shall be entitled to equitable relief including injunctions or temporary restraining orders to prevent breaches of this Agreement and to enforce specifically the terms and provisions of this Agreement, such equitable relief being in addition to any other remedy to which such party is entitled at law, in equity, in contract, in tort or otherwise.  The parties hereby agree not to raise any objections to the availability of the equitable remedy of specific performance to prevent or restrain breaches of this Agreement by the parties, as applicable, and to specifically enforce the terms and provisions of this Agreement to prevent breaches or threatened breaches of, or to enforce compliance with, the respective covenants and obligations of the parties under this Agreement, all in accordance with the terms of this Section 8.15. No party shall be required to provide any evidence of irreparable harm or bond or other security in connection with seeking an injunction or injunctions to prevent breaches of this Agreement or to specifically enforce the terms and provisions of this Agreement.

Section 8.16.  *Consent to Jurisdiction*.  The parties hereto agree that any Proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the Contemplated Transactions shall be brought in the United States Bankruptcy Court for the District of Wyoming, and each of the parties hereby irrevocably consents to the jurisdiction of such court (and of the appropriate appellate courts therefrom) in any such Proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such Proceeding in such court or that any such Proceeding brought in such court has been brought in an inconvenient forum. Process in any such Proceeding may be served on any party anywhere in the world, whether within or without the jurisdiction of such court.  To the fullest extent permitted by applicable law, each of the parties hereby consents to process being served by any party in any Proceeding by delivery of a copy thereof in accordance with the provisions of Section 8.3 of this Agreement.

Section 8.17.  *Waiver of Jury Trial*.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL

0

PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE CONTEMPLATED TRANSACTIONS.

Section 8.18. *Fiduciary Obligations*.   Subject to the terms and conditions of this Agreement, or any document related to the Contemplated Transactions, prior to the entry of the Sale Order, neither the Company nor any of its Representatives (or the board of directors or similar governing bodies of any of the foregoing Persons), in each case, in their capacity as such, are required to take any action, or to refrain from taking any action, to the extent inconsistent with their fiduciary obligations or Legal Requirements.   For the avoidance of doubt, subject to the terms and conditions of this Agreement, or any document related to the Contemplated Transactions, prior to the entry of the Sale Order, the Company retains the right to pursue any transaction or restructuring strategy that, in the Company's business judgment, will maximize the value of its estate.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

0

      IN WITNESS WHEREOF the parties have executed this Agreement as of the date first above written.

                        MODE ELEVEN BANCORP

                By: _____
                    Name:
                    Title:

[Purchaser]Victor Remsha

By:_____
[●]

[SIGNATURE PAGE TO SHARE PURCHASE AGREEMENT]

0

| Summary report: Litera Compare for Word 11.11.0.158 Document comparison done on 7/30/2025 3:25:44 PM | |
|---|---|
| **Style name:** Default Style | |
| **Intelligent Table Comparison:** Active | |
| **Original filename:** Mode Eleven - Form of Share Purchase Agreement (1).docx | |
| **Modified filename:** Mode Eleven - Share Purchase Agreement (V. Remsha) [Execution].docx | |
| **Changes:** | |
| Add | 518 |
| Delete | 489 |
| Move From | 22 |
| Move To | 22 |
| Table Insert | 0 |
| Table Delete | 0 |
| Table moves to | 0 |
| Table moves from | 0 |
| Embedded Graphics (Visio, ChemDraw, Images etc.) | 0 |
| Embedded Excel | 0 |
| Format changes | 0 |
| **Total Changes:** | 1051 |