Abigail V. O'Brient (*admitted pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4826
Email: aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams Young & Hunsicker LLC 2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email: bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| MODE ELEVEN BANCORP, | ) |
| | ) Case No. 25-20240 |
| | ) |
| Debtor in Possession | ) |

---

## OBJECTION TO CLAIM NO. 4 FILED BY NEXO INC. AND NOTICE OF OPPORTUNITY TO OBJECT

---

Debtor and debtor in possession Mode Eleven Bancorp (the "<u>Debtor</u>"), by and through its undersigned counsel, pursuant to 11 U.S.C. § 502, Federal Rule of Bankruptcy Procedure 3007, and Local Bankruptcy Rule 3007-1, hereby objects to Claim No. 4 (the

"SRA Claim") filed by Nexo Inc. ("Nexo").  In support of this Objection, the Debtor states as follows:

## PRELIMINARY STATEMENT

1.    In February 2022, after it conducted nearly two years of negotiations and diligence, Nexo – a digital asset wealth platform with a global footprint – purchased 1,060 shares of the Debtor's stock for $5 million.  Around the same time, Nexo entered into a Strategic Relationship Agreement with the Debtor to facilitate the parties' exploration of potential collaboration on several business lines. This Strategic Relationship Agreement, by its express terms, did not bind the parties to any further transactions, and explicitly relieved the Debtor (and Nexo) of any obligation to enter into any definitive agreements whatsoever.  Less than a year after executing the Strategic Relationship Agreement, Nexo agreed to pay $45 million in penalties to the SEC and state regulators, and stopped doing business in the United States.[1]

2.    Now, recognizing its $5 million equity investment in the Debtor is relatively worthless, Nexo asserts an inflated general unsecured contract damages claim based on the Strategic Relationship Agreement – a transparent attempt to artificially elevate its rights at the expense of the Debtor's legitimate creditors and other shareholders.  Under applicable law, the Strategic Relationship Agreement is merely (and expressly) an agreement to agree,

---

[1] *See Nexo Agrees to Pay $45 Million in Penalties and Cease Unregistered Offering of Crypto Asset Lending Product* (Jan. 19, 2023), https://www.sec.gov/newsroom/press-releases/2023-11; *see also Nexo Announces Gradual Departure from United States* (Dec. 4, 2022), https://nexo.com/blog/nexo-announces-gradual-departure-from-the-united-states.

not a contract under which Nexo has any right to damages, and Nexo's claim must be disallowed as a matter of law.

## BACKGROUND

### A.    The Chapter 11 Case

3.      On June 9, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Subchapter V of Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Wyoming, commencing the above-captioned bankruptcy case.  The Debtor continues to operate its business as debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

4.      As described further in the *Declaration of John Miller, CEO of Mode Eleven Bancorp, in Support of Chapter 11 Petition and Related Motions* [Dkt. 6], the Debtor filed this Chapter 11 case to (i) preserve the value of its assets, particularly its equity interest in Summit National Bank (the "Bank"), for the benefit of stakeholders, including the rural communities served by the Debtor and the Bank, and (ii) conduct a robust and fair sale process to facilitate the sale of substantially all of its assets under section 363 of the Bankruptcy Code, including its interest in the Bank, to a well-funded purchaser capable of obtaining the requisite regulatory approvals to consummate the transaction.

5.      On August 4, 2025, the Court approved the sale of the Debtor's equity interest in the Bank for $5,450,000.  [Dkt. 123]

6.      On September 8, 2025, the Debtor filed its *Subchapter V Plan of Liquidation* (as may be amended, restated, and modified from time to time, the "Plan").  [Dkt. 168].  In

pertinent part, the Plan provides for distribution of the proceeds of the Debtor's assets in accordance with the Bankruptcy Code's priority scheme. [Dkt. 174]. The Plan forecasts that unsecured creditors will be paid in full and holders of common stock in the Debtor will receive approximately $59.15 per share. [Dkt. 174-1]. A hearing on confirmation of the Plan is scheduled for December 8, 2025. [Dkt. 208]

**B.**     **The Debtor and its Business**

7.     Debtor is a bank holding company organized under the laws of the State of Wyoming, headquartered in Hulett, Wyoming.

8.     The Debtor's primary asset is its 100 percent ownership interest in the Bank, a national banking association providing banking products and services to businesses and consumers in Hulett, Wyoming, Ekalaka, Montana, and Salmon, Idaho.

9.     In the small-town communities it serves, the Bank provides full-service retail and commercial banking, including: (1) deposit gathering; (2) lending for commercial, agricultural, real estate, construction, and consumers; and (3) assisting borrowers with refinancing, acquisition, and bridge lending opportunities.

10.     Approximately 80 individuals or entities hold equity interests in the Debtor. Many of the Debtor's stockholders are individual investors from Hulett, Wyoming. Much of the Debtor's early funding was provided by these members of the local community. As the Debtor, under prior management, sought to fund transformation of the Debtor's business strategy, the Debtor raised several tranches of new capital, and the pool of equity investors expanded to include investment funds, as well as individual investors from outside the Hulett area.

11.    In 2021, under the leadership of its former Chief Executive Officer, the Debtor sought to leverage its compliance, technology, and business innovation experience to create a new fintech division of the Bank.  The expansion into fintech was intended to provide the Bank's clients with convenient access to a banking-as-a-service ("BaaS") platform that could be used by clients to service their own customers, including lending-as-a-service, deposits and branded accounts, access to payment rails, digital asset custody, and compliance management.  Implementation of this new fintech division required significant investment by the Debtor.

12.    In February 2022, the Office of the Comptroller of the Currency conditionally approved the Bank's establishment of this new fintech division.  Final approval was never granted.

**C.    The Debtor's Agreements with Nexo**

13.    On or about February 1, 2022, following approximately two years of diligence and negotiations between the parties, the Debtor and Nexo entered into a subscription agreement pursuant to which the Debtor sold 1,060 shares of voting common stock to Nexo for $5,003,200, implying a market valuation of approximately $100 million. [Claim No. 3-4]

14.    Around the same time, on or about February 8, 2022, the Debtor and Nexo entered into a Strategic Relationship Agreement (the "SRA"), which is governed by New York law.  [Claim No. 4-4]  Pursuant to the SRA, the Debtor and Nexo agreed they would "expeditiously and in good faith…discuss the scope and terms of a proposed mutually beneficial commercial arrangement…and negotiate the terms of definitive agreements

related to the Strategic Relationship" until no later than December 31, 2022.  *Id.* at § 1.

The "Strategic Relationship" included five proposed product lines:  lending collateralized

by digital assets, deposits of government-issued currencies and digital assets, institutional

custody of digital assets, trading and exchange of digital assets, and development of co-

branded card programs.  *Id.* at § 3.  The Debtor's ability to implement these business lines

(other than co-branded card programs) was limited "[t]o the extent SNB is permitted under

applicable regulations and by regulatory approvals." *Id*.

15.    While the SRA contemplated further discussions between the parties,

importantly, Nexo and the Debtor agreed and expressly recognized there was "[n]o

[b]inding [a]greement [w]ith [r]espect to a [t]ransaction," and agreed that "neither party

shall be obligated to enter into the Strategic Relationship or otherwise originate loans

within the Proposed Scope."[2]  *Id.* at § 4.  Instead, "[a] binding commitment with respect to

the Strategic Relationship will be created only upon the execution of definitive transaction

documents" "which may be entered into (or not) in each party's sole discretion."  *Id.*

## NEXO'S PROOFS OF CLAIM AND PLAN TREATMENT

16.    On August 8, 2025, Nexo filed two proofs of claim.  In Claim No. 3, Nexo

asserts a general unsecured claim in the amount of $5,003,200.00 based on Nexo's demand,

in March 10, 2025 (the "<u>Demand Letter</u>"), for recission of the subscription agreement.

[Claim No. 3]

---

[2]    The "Proposed Scope" was defined by the parties as "a *proposed* mutually beneficial
commercial arrangement for the development of products and markets related to the origination
by SNB of loans collateralized by digital assets…"  *Id*. at § 1 (emphasis added).

17.    In Claim No. 4, Nexo asserts a general unsecured claim in an unspecified amount based on the Debtor's alleged breach of the SRA.  [Claim No. 4]  In the Demand Letter attached to Claim No. 4, Nexo asserts the Debtor "breached its obligations under the SRA, including the requirement of expeditious and good faith negotiations regarding implementation of the FinTech strategic plan," and that this "breach was intentional and premeditated as [the Debtor] never intended to perform but rather was simply using the SRA to induce Nexo to invest in [the Debtor] at the inflated offering price through the pretext of working together."  [Claim No. 4-3, at p. 6]

18.    On October 17, 2025, Nexo filed a motion to amend Claim No. 4 to specify its alleged damages based on breach of the SRA, in the amount of $7,564,321.  [Dkt. 197, at ¶¶ 5-6]  To support these alleged damages, Nexo attached an expert report to its motion to amend. [Dkt. 197-2]

19.    The Plan classifies Claim No. 3 in Class 2 (Subordinated Claims), and provides that pursuant to Bankruptcy Code § 510(b), on account of its claim for recission of its purchase of common stock in the Debtor and related damages, Nexo will receive the same per-share distribution as other holders of common stock in the Debtor.  [Dkt. 174, § 5.2]  Nexo did not object to the Plan's treatment of Claim No. 3.  [*See generally* Dkt. 196]

20.    If Allowed (as defined in the Plan), Claim No. 4 would be classified in Class 1 (General Unsecured Claims), which the Plan provides will receive the proceeds of the Debtor's assets, following payment of administrative expense claims and priority tax claims, until all general unsecured claims are satisfied in full.  [Dkt. 174, § 5.1]  The Debtor estimates funds totaling approximately $3,527,134.11 will be available to pay Class 1

Claims – which, excluding the SRA Claim, total $487,845.07 – leaving funds available for distribution to shareholders (including Nexo on account of Claim No. 3).  [Dkt. 174-1]

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this Objection under 28 U.S.C. § 1334.  This is a core proceeding within the meaning of 28 U.S.C. § 152(b)(2).  Venue is proper pursuant to 28 U.S.C. § 1408.

## STANDARD OF REVIEW

22.    The Bankruptcy Code provides that "[a] a claim or interest, proof of which is filed under section 501 of this title, is deemed allowed, unless a party in interest… objects." 11 U.S.C. § 502(a).

23.    If an objection to a claim is asserted, "the court, after notice and a hearing, shall determine the amount of such claim in lawful currency of the United States as of the date of the filing of the petition, and shall allow such claim in such amount, except to the extent that: (1) such claim is unenforceable against the debtor and the property of the debtor, under any agreement or applicable law for a reason other than because such claim is contingent or unmatured…"  11 U.S.C. § 502(b)(1).

24.    "To determine whether a claim is allowable by law [under § 502(b)(1)], bankruptcy courts look to 'applicable nonbankruptcy law.'" *In re Ener1, Inc*., No. 12-10299, 2016 Bankr. LEXIS 3780, at *11 (Bankr. S.D.N.Y. Oct. 20, 2016) (quoting *In re W.R. Grace & Co.*, 346 B.R. 672, 674 (Bankr. D. Del. 2006)).

25.    The burden of proof under section 502(a) shifts throughout the process of adjudicating a claim objection. "The objecting party has the burden of going forward with

evidence supporting the objection. Such evidence must be of probative force equal to the allegations contained in the proof of claim.  However, an objection raising only legal issues is sufficient.  Once the objecting party has reached this threshold, the creditor has the ultimate burden of persuasion as to the validity of and amount of the claim."  *In re Geneva Steel Co.*, 260 B.R. 517, 524 (B.A.P. 10th Cir. 2001), aff'd, 281 F.3d 1173 (10th Cir. 2002) (internal citations omitted).

## ARGUMENT

26.    Claim No. 4 should be disallowed, pursuant to 11 U.S.C. § 502(b)(1), because Nexo is not entitled, as a matter of law, to damages based on the Debtor's alleged breach of the SRA.  Under New York law, which governs here, it is clear the SRA is merely an agreement to agree, rather than a contract under which Nexo could recover damages.

27.    It is black-letter law that an "agreement to agree" is not an enforceable contract under which a party could recover for an alleged breach. "[I]n determining whether the document in a given case is an enforceable contract or an agreement to agree, the question should be asked in terms of 'whether the agreement contemplated the negotiation of later agreements and if the consummation of those agreements was a precondition to a party's performance.'" *Amcan Holdings, Inc. v. Canadian Imperial Bank of Com.,* 70 A.D.3d 423, 427 (2010) (citing *IDT Corp. v. Tyco Group*, 13 N.Y.3d 209, 213 n.2 (2009) (affirming order granting summary judgment that no breach of a settlement agreement occurred, due to failure of parties to enter into further definitive agreements contemplated by settlement agreement and articulating legal standard utilized in *Amcan*)). An agreement that leaves material terms for future negotiations is an unenforceable

agreement to agree.  *Doller v. Prescott*, 167 A.D.3d 1298, 1299-1300 (2018) (dismissing breach of contract claim because memorandum of understanding providing the parties would "proceed diligently and in good faith to satisfy the conditions required in order to enter into definitive agreements," while leaving material terms undefined, is an unenforceable "agreement to agree" because material terms were left for future negotiations); *In re Lyondell Chem. Co.*, 491 B.R. 41, 56-57 (Bankr. S.D.N.Y. 2013) (citing *Amcan* and explaining the "strong presumption against finding binding obligation in agreements which include open terms, call for future approvals and expressly anticipate future preparation and execution of contract documents."); *StarVest Partners II, L.P. v. Emportal, Inc.*, 101 A.D.3d 610, 612-13 (2012) (dismissing a breach of contract claim because the subject term sheet expressly provided no binding contract would be created unless further documents were executed); *Meadow Ridge Cap., LLC v. Levi*, 920 N.Y.S.2d 242, at *9 (Sup. Ct. 2010) (finding a letter of intent an unenforceable agreement to agree and dismissing a promissory estoppel claim because the letter of intent expressly did not bind the parties to consummate any transaction).

28.     Thus, courts applying New York law consistently hold that even when an agreement contains many of the terms to be embodied in a definitive agreement, the preliminary agreement is nonetheless unenforceable if it specifically contemplates execution of further definitive documents. For example, in *Amcan*, the parties entered into a written "Summary of Terms and Conditions" outlining the proposed terms of two credit lines in significant detail, including descriptions of the credit lines, the amount of funding to be provided under each line, amortization and interest rates, fees, collateral, a proposed

closing date, and definitions of key terms.  70 A.D.3d at 424.  The Summary of Terms and

Conditions specifically required execution of formal credit documents, but no such

documents were ever executed.  *Id.* at 425.  In dismissing a breach of contract claim, the

court determined the Summary of Terms and Conditions was not a binding agreement, but

merely an unenforceable agreement to agree.  *Id.* at 426-27.  In so holding, the court

explained, "[a]lthough the summary was detailed in its terms, it was clearly dependent

upon a future definitive agreement, including a credit agreement.  At no point did the

parties explicitly state that they intended to be bound by the summary pending the final

credit agreement, nor did they waive the finalization of such agreement."  *Id.* at 426.  The

court emphasized that the parties' obligations were clearly conditioned on the execution of

definitive agreements, and determined this requirement was dispositive on the issue of

whether the preliminary Summary of Terms and Conditions was an agreement to agree,

rather than an enforceable contract.  *Id.* at 426-27.

29.    Under this governing standard, there can be no serious dispute that the SRA

is not a contract entitling Nexo to any damages, let alone the $7,564,321 it seeks.  The SRA

explicitly contemplates further definitive agreements, and contains no detail whatsoever

regarding the material terms or other conditions or provisions of these agreements.  [Claim

4-4, § 1]  Moreover, Nexo and the Debtor explicitly recognized there was "[n]o [b]inding

[a]greement [w]ith [r]espect to a [t]ransaction," and agreed that "neither party shall be

obligated to enter into the Strategic Relationship or otherwise originate loans within the

Proposed Scope."  *Id.* at § 4.  Instead, the parties agreed that "[a] binding commitment with

respect to the Strategic Relationship will be created ***only upon*** the execution of definitive

transaction documents." *Id.* (emphasis added). Indeed, the SRA expressly permitted the Debtor to "enter[] into [such agreements] (or not) in each party's sole discretion." *Id.*

30.     In light of the foregoing, there is no need to reach the merits of Nexo's factual assertions, its alleged damages, or the numerous flaws in the expert report attached to its claim.[3] This issue is simple and can be decided as a matter of law based on the express language of the SRA and governing New York law.  Nexo's repeated and explicit acknowledgement and agreement that the Debtor had no obligation to further the Strategic Relationship, unless and until the parties entered further definitive agreements, is dispositive.  The SRA was merely an agreement to agree, and under applicable non-bankruptcy law, Nexo cannot assert a claim against the Debtor based on the purported breach of this agreement.  Accordingly, the SRA Claim should be disallowed in its entirety pursuant to 11 U.S.C. § 502(b)(1).

**WHEREFORE**, the Debtor respectfully requests this Court enter an order disallowing the SRA Claim and granting such other and further relief as the Court deems just and proper.

Dated: November 5, 2025

Respectfully submitted,
COVINGTON & BURLING LLP

By: /s/ *Abigail V. O'Brient*

Abigail V. O'Brient (admitted *pro hac vice)*
Covington & Burling LLP
1999 Avenue of the Stars

---

[3]  In the event the SRA Claim is not disallowed as a matter of law on the grounds set forth herein, the Debtor intends to file a subsequent objection to the SRA Claim on multiple additional grounds, including numerous indisputable facts which directly contradict the allegations and assumptions made in the SRA Claim and the expert report attached thereto.

Los Angeles, CA 90067-4643
Telephone: 424-332-4846
Email: aobrient@cov.com

MARKUS WILLIAMS YOUNG &
HUNSICKER LLC

By: /s/ *Bradley T. Hunsicker*

Bradley T. Hunsicker (WY Bar No 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email: bhunsicker@markuswilliams.com

*Counsel for Debtor and Debtor-in- Possession*
*Mode Eleven Bancorp*

## <u>NOTICE OF OPPORTUNITY TO OBJECT</u>

YOU ARE HEREBY NOTIFIED that if you desire to oppose this Objection to Claim, you are required to file with this Court and serve on Abigail V. O'Brient and Bradley T. Hunsicker, counsel for the Debtor, whose addresses are shown below, a written response to the Objection to Claim on or before December 8, 2025, or the relief requested may be granted by the Court.

Dated: November 5, 2025

Respectfully submitted,
COVINGTON & BURLING LLP

By: /s/ *Abigail V. O'Brient*

Abigail V. O'Brient (admitted *pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars,
Los Angeles, CA 90067-4643
Telephone: 424-332-4846
Email: aobrient@cov.com

MARKUS WILLIAMS YOUNG &
HUNSICKER LLC

By: /s/ *Bradley T. Hunsicker*

Bradley T. Hunsicker (WY Bar No 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email: bhunsicker@markuswilliams.com

*Counsel for Debtor and Debtor-in- Possession
Mode Eleven Bancorp*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Objection to Claim was filed and served this 5th day of November, 2025, upon those registered for notice via CM/ECF.

*/s/ Abigail V. O'Brient*
Abigail V. O'Brient