Abigail V. O'Brient (*admitted pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4826
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email:  bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| In re: | ) |
| | ) |
| MODE ELEVEN BANCORP, | ) Chapter 11 |
| | ) |
| | ) |
| | ) Case No. 25-20240 |
| Debtor in Possession. | ) |

---

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION MODE ELEVEN BANCORP FOR AN ORDER: (A) APPROVING THE SHARE PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS; AND (C) GRANTING RELATED RELIEF**

---

Mode Eleven Bancorp ("Debtor"), debtor-in-possession herein, by and through its undersigned counsel, hereby files this motion (the "Sale Motion") for entry of an order in the form attached hereto: (i) approving the Share Purchase Agreement (as defined below) and authorizing the sale (the "Sale") of substantially all assets of the Debtor (the "Assets")

to Mr. Greg Jacobson (the "Buyer"); (ii) authorizing the sale of the Assets free and clear

of all liens, claims, rights, encumbrances and other interests; and (iii) granting such other

and further relief as is just and proper.[1]

In support of this Sale Motion, the Debtor respectfully states as follows:

## JURISDICTION

1.      This Bankruptcy Court (the "Court") has jurisdiction to consider this matter

pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C.

§ 157(b)(2).

2.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

3.      The bases for the relief requested herein are Bankruptcy Code sections 363

and 1107 and Federal Rules of Bankruptcy Procedure 2002, 6004, and 9014, and Local

Bankruptcy Rule 2002-1.

## PRELIMINARY STATEMENT

4.      The Debtor, with the assistance of its investment banker Hovde Group, LLC

("Hovde") and other advisors, conducted a formal process to market and sell substantially

all its assets, which began prepetition and continued to July and August of this year.  That

process resulted in Court-approved bidding procedures and an auction at which the Debtor

identified the Successful Bidder and Backup Bidder.[2]

---

[1]      Unless otherwise specified, all references herein to "Section," "§," "Bankruptcy
Code" and "Code" refer to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

[2]      All capitalized terms not defined herein have the meanings ascribed to them in the
*Motion for Entry of an Order (I) Approving the Bidding Procedures; (II) Approving Bid
Protections; (III) Approving Procedures for Assumption and Assignment of Certain*

5.      Given the nature of the Debtor's assets – 100% of the capital stock of Summit National Bank (the "Bank"), a national banking association – any sale transaction was subject to approval by the Office of the Comptroller of the Currency ("OCC") of the proposed purchaser's change-in-control application for the Bank.  Following the auction, the Debtor and Hovde continued to work to identify potential alternatives that could be pursued if a transaction with the Successful Bidder or Backup Bidder could not close.

6.      When the Successful Bidder and Backup Bidder informed the Debtor that they would not be able to close a sale, the Debtor reached agreement with the Buyer, who was the third-place bidder at the auction, on the terms of the Sale.  The Sale provides for a $2,000,000 purchase price and will permit a recapitalization of the Bank, mitigate the risk the Bank will be placed in receivership, allow the Bank to continue to serve the small-town communities in which it is located, and preserve the value of the Debtor's estate.  Accordingly, the Debtor respectfully requests Court approval of the Sale pursuant to the attached order and the terms of the Share Purchase Agreement (as defined herein).

## **BACKGROUND**

**A.      The Prepetition Sales Process and the Petition**

7.      As set forth in the *Declaration of John Miller in Support of Motion for Order (A) Approving the Share Purchase Agreement and the Sale of Substantially All of the Debtor's Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims,*

---

*Executory Contracts and Related Notices; (IV) Scheduling the Bid Deadline, the Auction and Sale Hearing; (V) Approving the Form and Manner of Notice Thereof; and (VI) Granting Related Relief* (the "Bidding Procedures Motion") (Dkt. 28).

*Rights, Encumbrances and Other Interests; and (C) Granting Related Relief* (the "Miller Declaration") and the *Declaration of Sean P. Enright in Support of Motion for Order (A) Approving the Share Purchase Agreement and the Sale of Substantially All of the Debtor's Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests; and (C) Granting Related Relief* (the "Enright Declaration"), each filed concurrently with the Sale Motion, the Debtor has been working to recapitalize the Bank since before the Petition Date. *See* Miller Decl. at ¶ 3; Enright Decl. at ¶¶ 4-5. On May 20, 2025, the Debtor and the Bank (collectively, the "Company") entered into an engagement agreement with Hovde pursuant to which Hovde was retained to act as investment banker for the Company to provide investment banking services focusing on the sale of the Company or its assets, both on a pre- and postpetition basis, including, as necessary, assisting the Debtor and its counsel with negotiation and consummation of the Sale. Enright Decl. at ¶¶ 4-5

8. Hovde begun marketing the Debtor's assets during the prepetition period, identifying and reaching out to potential buyers and laying the groundwork for an efficient sale process. Enright Decl. at ¶¶ 4-6. In connection with its marketing efforts, Hovde met with the Company's board of directors to discuss and prepare detailed marketing materials and to collect diligence materials and confidential information, including financial statements, significant agreements, and operational details relevant to the Debtor's assets. *Id.* at ¶ 5. Hovde set up a confidential virtual data room (the "VDR") to facilitate the

diligence process for potential buyers, and populated the data room with the diligence materials and confidential information collected from the Company. *Id.*

9.  Prior to the Petition Date, nine interested parties entered into NDAs with the Debtor, including two banks and a credit union. Enright Decl. at ¶ 6. Hovde responded to numerous additional inquiries from interested parties and arranged meetings between such interested parties and the Company, in each case, as requested by such interested parties and as appropriate and acceptable to the Company. *Id.* at ¶ 7. Hovde advised the Company with respect to the inquiries and presented the Company with results of its analyses and made recommendations with respect to a proposed sale, including developing a strategy to effectuate a sale. *Id.*

10.  As described in the Miller Declaration and the *Declaration of John Miller in Support of Debtor's Chapter 11 Petition and Related Motions* (the "First Day Declaration") [Dkt. 6], the Bank has been at risk of being placed into receivership since prior to the Petition Date, and in light of the need to stabilize the Company's operations, raise capital to support the Bank and ███████████████████████████, the Company engaged in extensive prepetition efforts to pursue transactions to address these concerns. *See* Miller Decl. at ¶¶ 4-5; First Day Decl. at ¶¶ 20-23, 29-33.

11.  However, the Company's efforts to enter into a capital raising transaction were not successful and the Debtor determined that bankruptcy was necessary to preserve the Debtor's banking business as a going concern, and specifically to maintain the Bank's value, both as an asset of the Debtor and as a banking resource for small communities in

the Mountain West.  *See* First Day Decl. at ¶34.

12.    Accordingly, on June 9, 2025 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to manage its business as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.  No official creditors' committee or other committee has been formed.

**B.    Postpetition Actions**

13.    Since the Petition Date, in addition to pursuing a sale of the Assets, the Debtor has been engaged in aggressive efforts to prevent further regulatory action against the Bank, including by maintaining the Bank's required capital ratios.  *See* Miller Decl. at ¶ 8.  The Debtor's management has reduced risk-weighted assets by shrinking the Bank's balance sheet through non-core deposit and natural loan runoff.  *Id.*  In addition, the Debtor has targeted operating expenses by reducing discretionary spending, negotiating with vendors to lower or restructure outstanding invoices, and reducing Mr. Miller's salary to the federal minimum wage to preserve capital and demonstrate management's commitment to stabilizing the Bank and the Debtor.  *Id.*  In addition, the Debtor obtained Court approval to borrow $500,000 from the Successful Bidder to infuse the Bank with sufficient funding to maintain the minimum capital ratio necessary to avoid becoming critically undercapitalized through the anticipated closing of a sale to the Successful Bidder or Backup Bidder.  *Id.* at ¶ 7.

14.    These efforts have been successful and have allowed the Bank to avoid

becoming critically undercapitalized during the case.  However, as described below, the Debtor has been unable to close a sale with the Successful Bidder or Backup Bidder and urgently needs to complete the Sale to the Buyer to preserve value, avoid the Bank being placed in receivership, and maintain the Bank as viable regional banking resource.

### Bidding Procedures and Auction

15.     As described in the Miller Declaration and the Enright Declaration, following the Petition Date the Debtor, with the assistance of its advisors, continued the prepetition marketing process and concurrently examined alternatives to a sale of its Assets and has determined that in light of the Debtor's financial situation, the regulatory issues facing the Debtor and the Bank, and the value of the Assets, a more viable alternative to a sale of the Assets does not exist.  First Day Decl. at ¶¶ 29-35; Miller Decl. at ¶¶ 3, 6, 11; Enright Decl. at ¶¶ 8, 21-22.

16.     In support of the Debtor's sale of the Assets, the Debtor initially filed the Bidding Procedures Motion seeking an order (the "Bidding Procedures Order") approving procedures (the "Bidding Procedures") proposed by the Debtor in order to facilitate the sale of the Assets. The Court granted the Bidding Procedures Motion and entered the Bidding Procedures Order on July 11, 2025 [Dkt. 83].

17.     During this sale process, 30 parties entered NDAs with the Debtor and were granted access to the VDR.  *See* Enright Decl. at ¶ 9.  On or before the deadline to submit indications of interest (each, an "IOI") under the Bidding Procedures, six potential purchasers submitted formal or informal indications of interest (each, an "IOI Party") and

Hovde advised the IOI Parties of the deadline to submit a Qualified Bid under the Bidding Procedures.  *See id.* at ¶ 10.  Three parties submitted a Qualified Bid by the Bid Deadline and an Auction was conducted among these parties on July 28, 2025.  *See id.*  at ¶ 12.

18.    Following the Auction, the Debtor identified a Successful Bidder and a Backup Bidder, as contemplated by the Bidding Procedures.  *See id.* at ¶ 15.  The Buyer submitted the third-highest bid at the Auction.  *See id.*  Following a hearing on August 4, 2025, the Court approved the sale of the Debtor's assets to the Successful Bidder and to the Backup Bidder in the event the Successful Bidder failed to close.  [Dkt. 123].

19.    ████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████

### The Proposed Private Sale

20.    In order to mitigate the risk that the Debtor would be unable to close a transaction with the Successful Bidder or the Backup Bidder, in November 2025 Hovde began contacting potential purchasers of the Debtor's assets to determine their interest in acquiring those assets in the event a transaction with the Successful Bidder or the Backup Bidder did not close.  *See* Enright Decl. at ¶¶ 21-22.

21.    During this process, Hovde contacted twelve potential purchasers, of which approximately half participated in the prior sale process.  These potential purchasers

included state-chartered banks and credit unions, investor groups, individual investors, and other non-depository financial companies. *See id.* at ¶ 22. During this process, four potential buyers entered into NDAs with the Debtor (in addition to the parties that had executed NDAs during the initial sale process). *Id.* Such parties were provided with access to the VDR so that each interested party that executed an NDA was afforded the opportunity to conduct due diligence to each such party's reasonable satisfaction. *Id.* Throughout this marketing process, Hovde followed up with each interested party that signed an NDA to gauge continued interest, to answer questions from such interested parties concerning the Debtor and its assets, and to continue to facilitate interested party due diligence. *Id.*

22.    When the Debtor determined it would be unable to consummate a sale to the Successful Bidder or the Backup Bidder, Hovde informed potential purchasers that, if they wished to submit an offer to acquire the Debtor's assets, such potential purchasers would be required to (i) enter into a share purchase agreement in substantially the form previously approved by the Court, (ii) provide evidence of financial wherewithal, and (iii) provide information to allow the Debtor to asses such party's ability to obtain regulatory approval to purchase a federally chartered bank. *Id.*

23.    Ultimately, two potential purchasers submitted offers during this process: the Buyer and an investor group. *Id.* at ¶ 24. A true and correct copy of the Buyer's share purchase agreement is attached hereto as **Exhibit A** (the "Share Purchase Agreement"). The Buyer's offer to acquire the Debtor's assets for a $2,000,000 purchase price was

expressly conditioned on the transaction being consummated as a private sale. *Id.* While the other potential bidder offered a somewhat higher purchase price than the Buyer, following reverse due diligence, the Debtor concluded that the investor group would be unlikely to obtain regulatory approval to consummate the transaction, such that its offer is not higher or otherwise better than the Buyer's offer. *Id.* In addition, one potential purchaser, another investor group, submitted a letter of intent on November 26, 2025, but never submitted an executed share purchase agreement, though Hovde advised the group on numerous occasions that an executed share purchase agreement was a requirement for its offer to be considered by the Debtor. *Id.*

**C.      The Buyer's Bid and Proposed Share Purchase Agreement**

24.     Based on the extensive marketing efforts undertaken by the Debtor and Hovde, the Debtor has concluded that the Buyer's bid represents the highest and best available value for the Assets. The value purchasers will pay to acquire the stock of a bank of the Bank's size is typically assessed by reference to consolidated tangible book value, which is a measure of the value of the tangible assets of the bank relative to its liabilities. *See id.* at ¶ 25. For banks comparable in size to the Bank with little to no profitability, the purchase price is typically no greater than 1.5 times tangible book value, and the average price is closer to 1.1 times tangible book value. *Id.* Based on the Bank's tangible book value, the Buyer's offer constitutes a purchase price of approximately 1.3 times tangible book value, which is consistent with industry average. *Id.* In addition, although the Buyer's offer is expressly conditioned upon the Debtor seeking approval of the Sale as a

private sale, the proposed Sale Order expressly reserves the Debtor's ability to consummate a sale with a backup purchaser if the Buyer fails to consummate the Sale. *See* Sale Order at ¶ U.

## RELIEF REQUESTED

25.    By this Sale Motion, the Debtor requests entry of an order, substantially in the form of the proposed Sale Order filed herewith: (a) approving the Share Purchase Agreement; (b) authorizing the Sale, pursuant to § 363(b) and § 363(m), of the Assets to the Buyer subject to the terms of such Share Purchase Agreement; (c) authorizing the Sale of the Assets free and clear of all liens, claims, rights, encumbrances and other interests under § 363(f); and (d) granting related relief.

## ARGUMENT

### A.    The Sale Should be Approved as an Exercise of the Debtor's Sound Business Judgement

26.    Section 363(b)(1) of the Bankruptcy Code provides that a debtor, "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). "In determining whether to approve a proposed sale under section 363, courts generally apply standards that, although stated various ways, represent essentially a business judgment test." 3 COLLIER ON BANKRUPTCY P 363.02 (16th ed. 2020); *see also Allen v. Absher (In re Allen)*, 607 F. App'x 840, 843 (10th Cir. 2015) (citing *In re Caste, Inc*., 312 B.R. 426, 428 (Bankr. D. Colo. 2004)) ("The 'business judgment' test applies to determine whether a sale under § 363(b) should be approved."). A sale of the debtor's assets should be authorized pursuant to § 363 if a sound

business purpose exists. *See, e.g.*, *In re Martin*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *Fulton State Bank v. Schipper* (*In re Schipper*), 933 F.2d 513, 515 (7th Cir. 1991)); *Stephens Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *In re Lionel Corp.*, 722 F.2d 1063, 1071 (2d Cir. 1983).

27.     Courts typically consider the following factors in determining whether a sale of a debtor's assets satisfies this standard: (1) whether a sound business reason exists for the sale; (2) whether there has been adequate and reasonable notice to interested parties; (3) whether that the sale price is fair and reasonable; and (4) whether the proposed buyer is proceeding in good faith.  *In re Med. Software Sols.*, 286 B.R. 431, 439–40 (Bankr. D. Utah 2002); *In re Decora Indus., Inc.*, No. 00-4459 JJF, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (citing *In re Del. & Hudson Ry. Co.*, 124 B.R. 169, 176 (D. Del. 1991)); *In re The Landing*, 156 B.R. 246, 249 (Bankr. E.D. Mo. 1993) (citing *In re George Walsh Chevrolet, Inc.*, 118 B.R. 99, 102 (Bankr. E.D. Mo. 1990)).

**(a)     A Sound Business Purpose Exists for the Sale and the Sale Price Is Fair**

28.     Here, a sound business purpose exists for the Sale. As described above, the Debtor has sought expert advice and considered all viable alternatives, engaged in extensive consultation with business advisors, and determined that the Sale will maximize the value of the Assets.  *See* First Day Declaration at ¶¶ 29-35.  In addition to the Debtor's prepetition marketing efforts, the Debtor previously proposed, and the Court approved, Bidding Procedures designed to maximize the purchase price realized from the sale of its Assets by affording potential purchasers adequate time to perform diligence, value the

Assets, and formulate an offer. *See Declaration of Kirk S. Hovde in Support of Bidding Procedures* [Dkt. 30] at ¶¶ 6-9. The process established by the Bidding Procedures generated three actionable offers for the Assets, including an offer from the Buyer.

29.     Moreover, even after the Auction concluded and the Debtor designated a Successful Bidder and a Backup Bidder, Hovde and the Debtor continued to work to identify alternatives in the event that neither bidder could close. *See* Enright Decl. at ¶ 21. As a result, additional parties entered NDAs with the Debtor and had the opportunity to perform diligence on the Assets. *Id.* at ¶ 22.

30.     Although the Debtor initially proceeded with a marketing process that culminated in the Bidding Procedures and Auction, "a [section] 363(b) sale transaction does not require an auction procedure." *In re Trans World Airlines, Inc.*, 2001 WL 1820326, at *4 (Bankr. D. Del. Apr. 2, 2001)). Indeed, "private sales are not unheard of in bankruptcy proceedings, and are in fact expressly contemplated by the bankruptcy rules." *In re 160 Royal Palm, LLC*, 600 B.R. 119, 127 (S.D. Fla. 2019) (citing Fed. R. Bankr. P. 6004(f)(1) ("All sales not in the ordinary course of business may be by private sale or by public auction.")). More generally, courts have held that a debtor has broad discretion in determining an asset sale process that is appropriate under the circumstances. *See Berg v. Scanlon (In re Alisa P'ship)*, 15 B.R. 802, 802 (Bankr. D. Del. 1981) ("[T]he manner of sale is within the discretion of the trustee . . . ."); *In re Bakalis*, 220 B.R. 525, 531 (Bankr. E.D.N.Y. 1998) (a trustee has "'ample discretion to administer the estate, including

authority to conduct public or private sales of estate property.'") (citing *In re WPRV-TV, Inc.*, 143 B.R. 315, 319 (D.P.R. 1991)).

31.     The critical inquiry is whether a debtor has exercised sound business judgment in structuring an asset sale to maximize the value obtained for the benefit of the estate.  The principal policy of section 363 "is to provide maximum flexibility to the trustee, subject to the oversight of those for whose benefit he acts, i.e., the creditors of the estate." *See In re NEPSCO, Inc.*, 36 B.R. 25, 26 (Bankr. D. Me. 1983).  Accordingly, if, under the circumstances, the Debtor concludes that a private sale is in the best interests of the estate and will maximize value, that exercise of discretion and business judgment is permissible under section 363.  *See Penn Mut. Life Ins. Co. v. Woodscape Ltd. P'ship (In re Woodscape Ltd. P'ship)*, 134 B.R. 165, 174 (Bankr. D. Md. 1991) ("[t]here is no prohibition against a private sale . . . and there is no requirement that the sale be by public auction."); *In re 160 Royal Palm*, 600 B.R. at 127; *In re Bakalis*, 220 B.R. at 531.

32.     *In re 160 Royal Palm* is instructive under the facts of the present case.  In *Royal Palm*, the debtor retained a broker, commenced a marketing process, and obtained bankruptcy court approval of a competitive bidding and auction process for the sale of its sole asset, a hotel.  *See* 160 B.R. at 124.  The debtor's sale and auction process was interrupted by litigation between the debtor and a potential buyer substantially delaying the sale, creating additional risk to the estate, and ultimately prompting the debtor to pivot to a private sale to a different purchaser.  *Id.* at 125.  Among other conditions, this new purchaser required the debtor to proceed by private sale.  *Id.*  The bankruptcy court granted

the debtor's motion to forego the auction process and approve the private sale free and clear of liens, claims and encumbrances. *Id.* The original proposed purchaser appealed the bankruptcy court's decision, arguing, among other things, that the bankruptcy court had abused its discretion in approving a private sale. *Id.* at 126.

33.    On appeal, the district court affirmed the bankruptcy court. *Id.* at 131. The district court noted that a debtor's conduct of a section 363 sale is a matter of discretion that depends on the dynamics of the particular situation, and held that the bankruptcy court properly deferred to the debtor's business judgment to proceed with a private sale. *Id.* at 127. Among other things, the district court credited the fact that "the Debtor had actively marketed the property, employed an international real estate broker to help sell the property, and had been continuously working towards that sale since before the petition date." *Id.* The court further noted that "Debtor, within its discretion and in acting in accordance with its business judgment, was entitled to conclude that the public auction was no longer in the best interests of the Debtor's creditors." *Id.* The court concluded by noting that the proposed purchase agreement was expressly conditioned upon a private sale and deferred to the debtor's business judgment in "pursuing a 'bird in the hand' approach" to obtain certainty and finality. *Id.* at 128.

34.    Here, similar reasons support approval of the Sale. The Debtor diligently pursued a sale pre- and postpetition, implemented the Bidding Procedures, and conducted the Auction. While the Bidding Procedures effectively market-tested the Assets and generated actionable bids, ultimately the Successful Bidder and Backup Bidder were not

able to close a transaction for reasons beyond the Debtor's control.  The Debtor, with the assistance of its broker, has canvassed the market, and has not obtained a higher or otherwise better proposal than the Buyer's offer.  Accordingly, the Debtor has determined that it is in the best interests of its estate to proceed instead with a private sale to the Buyer. It is the Debtor's business judgment that, under the current facts and circumstances, a renewed auction process would result in delay and additional administrative costs, with increasing risk that with the passage of time the Bank will be placed in receivership – an event that would drastically harm the Debtor's estate.  *See* Miller Decl. at ¶¶ 3-4, 9, 11. Moreover, given the previous thorough marketing of the Assets both pre- and postpetition, it is unlikely that a renewed auction process would realize substantially more value for the Debtor's estate.

35.     Accordingly, the Debtor's remaining option to generate value from the Assets is to promptly conclude a private sale to the Buyer, who was also a participant under the Bidding Procedures and auction.  The Debtor submits that the declarations filed in support of this Sale Motion support these conclusions, and establish the fairness of the sale price.  Therefore, the Debtor requests that the Court find that the Sale is a proper exercise of the Debtor's business judgment and should be authorized.

### (b)     Adequate and Reasonable Notice of the Sale Will Be Provided

36.     The Debtor has notified parties in interest of the deadlines for objecting to the Sale.

**(c)      The Sale Has Been Proposed in Good Faith Without Collusion, and the Buyer Is a "Good Faith Purchaser"**

37.      The Debtor requests that the Court find that the Buyer is entitled to the benefits and protections provided by section 363(m) of the Bankruptcy Code in connection with the sale of the Assets.  Section 363(m) of the Bankruptcy Code provides:

> [t]he reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of Property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such Property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

38.      Section 363(m) of the Bankruptcy Code thus protects the purchaser of assets sold pursuant to section 363 of the Bankruptcy Code from the risk that it will lose its interest in the purchased assets if the order allowing the sale is reversed on appeal, as long as such buyer purchased the assets in "good faith." While the Bankruptcy Code does not define "good faith," the Third Circuit in *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143 (3d Cir. 1986), held that:

> [t]he requirement that a Buyer act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a Buyer's good faith status at a judicial sale involves fraud, collusion between the Buyer and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*Id*. at 147 (citations omitted).

39.      The Debtor submits that the Buyer is a "good faith purchaser" within the

meaning of section 363(m) of the Bankruptcy Code and that a finding of good faith within the meaning of section 363(m) of the Bankruptcy Code is appropriate as to the Buyer.

40.     As set forth in the Declaration of the Buyer filed concurrently with this Sale Motion, the Sale is the result of arm's-length, good faith negotiation between the Debtor, the Buyer, and their advisors and representatives.  Accordingly, the Debtor believes that the Buyer, and the agreement to purchase the Assets, should be entitled to the full protection of section 363(m) of the Bankruptcy Code.

41.     The Debtor thus requests that the Court find that the Buyer has purchased the Assets in good faith within the meaning of section 363(m) and is entitled to the protections of sections 363(m) and (n) of the Bankruptcy Code.

**B.    The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code for a Sale Free and Clear of Liens, Claims, and Interests**

42.     The Share Purchase Agreement and the proposed Sale Order contemplate the sale, transfer, and/or assignment of the Assets free and clear of all liens, claims, and encumbrances (other than any Permitted Encumbrances, as defined in the Share Purchase Agreement). Section 363(f) of the Bankruptcy Code permits a debtor to sell property free and clear of third-party interests only if –

(i)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;

(ii)    such entity consents;

(iii)   such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(iv)     such interest is in a bona fide dispute; or

(v)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

43.     Section 363(f) of the Bankruptcy Code is drafted in the disjunctive. Thus, satisfaction of any of the requirements enumerated therein will suffice to warrant the sale of the Assets free and clear of any applicable liens, claims and encumbrances. *See In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988). The Debtor is unaware of any liens or encumbrances on the Assets, other than the lien securing the debtor in possession financing extended by the DIP Lender (which loan will be repaid using Sale proceeds in accordance with the terms of the Debtor's *Subchapter V Plan of Liquidation* [Dkt. 168], as may be amended, restated, and modified)), but submits that any such lien, claim, and encumbrance satisfies at least one of the five conditions of § 363(f), and that any such lien, claim, or encumbrance will be adequately protected by either being paid in full at the time of closing, or by having it attach to the sale proceeds, subject to any claims and defenses the Debtor may possess with respect thereto. The Debtor accordingly requests authority to convey the Assets to the Buyer free and clear of all liens, claims, and encumbrances except for the liens, claims, and encumbrances that expressly permitted under the terms of the Share Purchase Agreement, with such liens, claims, and encumbrances to attach to the sale proceeds with the same validity (or invalidity), priority and perfection as existed immediately prior to the Sale, subject to the terms of the Share Purchase Agreement and

the Sale Order.

44.     Accordingly, this Court should approve the Sale of the Debtor's Assets to the Buyer free and clear of liens, claims, and encumbrances under section 363(f), and any potential claimants should be compelled to look exclusively to the proceeds of the Sale for satisfaction of their claims.

## **WAIVER OF BANKRUPTCY RULE 6004(h)**

45.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." The Debtor requests that the Sale Order be effective immediately by providing that the fourteen (14) day stay under Bankruptcy Rule 6004(h) is waived.

## **NOTICE**

46.     The Debtor, by and through its undersigned attorneys, will provide notice of this motion to: (i) any entities known to have asserted any lien, claim, or encumbrance in or upon any assets comprising the Assets; (ii) all governmental taxing authorities that have or as a result of the Sale may have claims or liens, contingent or otherwise, against the estate; (iii) all state and local taxing authorities having jurisdiction over any of the Assets, including the Internal Revenue Service; (iv) all parties that have filed requests for notice under Bankruptcy Rule 9010(b) or are entitled to notice under Bankruptcy Rule 2002; (v) all known creditors of the Debtor; (vi) the Office of the United States Trustee for the

District of Wyoming; and (vii) the subchapter V trustee.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

## <u>CONCLUSION</u>

47.     The Debtor's proposed sale of its Assets as described in this Sale Motion is supported by sound business reasons, as set forth herein. The proposed sale is proper, necessary and serves the best interests of the Debtor, its estate and creditors, and all parties in interests. The Debtor thus requests that the Court approve the proposed Sale of its Assets free and clear of all interests, liens, claims, and encumbrances, as requested, to Buyer.

**WHEREFORE**, the Debtor respectfully requests that this Court grant this Sale Motion by entering an order in the form attached hereto as **Exhibit B**: (i) approving the Share Purchase Agreement with the Buyer; (ii) authorizing the Sale, pursuant to sections 363(b) and § 363(m), of the Assets to the Buyer subject to the terms of such Share Purchase Agreement; (iii) authorizing the Sale of the Assets free and clear of all liens, claims, rights, encumbrances and other interests under section 363(f); and (iv) granting related relief.

Dated: January 5, 2026                     Respectfully submitted,

                                           COVINGTON & BURLING LLP

                                           By: /s/ *Abigail V. O'Brient*
                                           Abigail V. O'Brient
                                           1999 Avenue of the Stars
                                           Los Angeles, CA 90067-4643
                                           Telephone: (424) 332-4826
                                           Email: aobrient@cov.com

MARKUS WILLIAMS YOUNG AND
HUNSICKER LLC

By: /s/ *Bradley T. Hunsicker*
Bradley T. Hunsicker (WY Bar No 7-
4579) 2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 303-830-0809
Email: bhunsicker@markuswilliams.com

*Counsel for the Debtor and Debtor-in-
Possession Mode Eleven Bancorp*