Abigail V. O'Brient (*admitted pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars,
Los Angeles, California 90067-4643
Telephone: + 1 (424) 332-4846
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email:  bhunsicker@markuswilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| In re: | ) |
| | ) Chapter 11 |
| MODE ELEVEN BANCORP, | ) |
| | ) Case No. 25-20240 |
| | ) |
| Debtor in Possession | ) |

**DECLARATION OF JOHN MILLER IN SUPPORT OF MOTION FOR ORDER (A) APPROVING THE SHARE PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS; AND (C) GRANTING RELATED RELIEF**

I, John Miller, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1.  I am the President and Chief Executive Officer of Mode Eleven Bancorp (the "Debtor"), a bank holding company organized under the laws of the State of Wyoming. I have served as the Debtor's CEO since December 15, 2023. In addition, since December 8, 2023, I have been the President and Chief Executive Officer of the Debtor's wholly owned subsidiary, Summit National Bank (the "Bank"). I submit this declaration in support of the *Motion of Debtor and Debtor in Possession Mode Eleven Bancorp for an Order: (A) Approving the Share Purchase Agreement and Authorizing the Sale of Substantially All of the Debtor's Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests; and (C) Granting Related Relief* [Dkt. 245] (the "Sale Motion").[1]

2.  I am familiar with the Debtor's and the Bank's day-to-day operations, financial affairs, and books and records. Except as otherwise set forth herein, all statements in this Declaration are based on my own personal knowledge. If called on to testify in this matter, I could and would competently testify to the matters set forth herein.

A.  **Necessity of a Prompt Sale of the Debtor's Assets**

3.  Since prior to the Petition Date, the Debtor and the Bank, a national bank whose deposits are insured by the Federal Deposit Insurance Corporation (the "FDIC"), have faced heightened regulatory scrutiny attributable, among other reasons, to the Bank's

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

2

shrinking capital and projected continued losses. As a result of the Bank's poor and deteriorating financial condition, the Bank is now at imminent risk of being placed into receivership by the Office of the Comptroller of the Currency (the "OCC").

4. The OCC, the Bank's regulator, considers a banking institution critically undercapitalized when such institution's ratio of tangible equity to total assets (the "Ratio") is equal to or less than 2%. 12 CFR § 6.4(b)(5). If the Bank's Ratio falls to 2% or lower, the OCC may take immediate action and, without notice or condition, appoint the FDIC as receiver of the Bank to immediately begin the process of liquidating and winding up the Bank. 12 U.S.C. 1821(c)(2).

5. The Bank has been precipitously approaching a Ratio below 2%. As of the Petition Date, the Bank's Ratio was 3.28%. By the end of July 2025, the Bank's tangible equity had fallen to $1,840,000 and its total assets were valued at approximately $85,000,000, such that its Ratio was 2.165%. The Bank continued to lose additional capital, and its Ratio was projected to fall to 1.853% by the end of August 2025, at which point the Bank would have been in severe danger of the OCC taking swift action to appoint the FDIC as the Bank's receiver.

6. To avoid this outcome, the Debtor and the Bank identified a strategy to keep the Ratio from sliding further downwards. This strategy was to inject capital into the Bank through a sale of the Bank (a "Sale") to a well-funded purchaser, who would provide debtor in possession financing to the Debtor to inject into the Bank. The Sale was approved by this Court on August 4, 2025. However, despite the successful marketing and auction of the Bank, and the approval of the Sale by the Court, the Bank's Ratio was declining at a

3

rate such that it was anticipated to fall below the 2% threshold before the Sale would have been able to close in or around October 2025.

7.    To avert that outcome, the Debtor obtained Court approval to borrow $500,000 from the successful bidder, and injected those funds into the Bank on September 4, 2025.  This infusion of capital was anticipated to be sufficient for the Bank's Ratio to remain above the 2% threshold through the closing of the Sale to the successful bidder or backup bidder.

8.    In an abundance of caution, the Debtor took additional actions to ensure the Bank's Ratio would remain about the 2% threshold through the anticipated date of closing the Sale.  To remain above the required capital ratios, management has acted aggressively to reduce risk-weighted assets and operating expenses. Specifically, the Bank has intentionally shrunk its balance sheet by allowing non-core deposit runoff and natural loan runoff to continue. As a result, total assets have declined from approximately $90 million to an estimated $75 million by year-end. In addition, the Bank has implemented significant expense-reduction measures. These include reductions in discretionary spending and active negotiations with vendors to lower or restructure outstanding invoices. At the senior management level, I personally reduced my salary to the federal minimum wage to further preserve capital and demonstrate management's commitment to stabilizing the institution. Collectively, these actions have been undertaken to preserve capital, maintain compliance with regulatory capital requirements, and position the Bank for continued stabilization.

9.    ███████████████████████████████████████████████
████████████████████████████████████████████████████

4

███ Following expedited outreach to potential purchasers, as detailed in the Declaration of Sean Enright filed concurrently herewith, the Debtor now seeks approval of a private sale to Greg Jacobson, the third-place bidder at the auction held on July 28, 2025.

10.   It is likely that before the end of January 2026 the Bank's Ratio will dip below 2%. Based on ███ my understanding of the OCC's prompt corrective action regulations, I believe the OCC will take prompt action if the Ratio falls below 2%. ███

███

11.   The Bank ███ capital restoration plan which included the infusion of capital in connection with the consummation of the Sale. Now that the previously approved sale cannot be consummated, and the Bank's most recent projections indicate the Bank will fall below the Ratio threshold by before the end of January 2026, it is imperative that the Sale be approved as quickly as possible so that the Bank remains above the OCC's 2% Ratio threshold long enough to consummate the Sale. If the Bank

5

fails to do so, the OCC will have grounds to place the Bank into receivership prior to the consummation of the Sale, frustrating the Debtor's and the Bank's attempts to strategically recapitalize the Bank and preserve value for the Debtor's estate and stakeholders. In my opinion, the OCC is likely to do so.

Dated: January 5, 2026
Las Vegas, Nevada

                                      /s/ *John Miller*

                                      John Miller
                                      Chief Executive Officer
                                      Mode Eleven Bancorp