Abigail V. O'Brient (*admitted pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4826
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams Young & Hunsicker LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email:  bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| In re: | ) |
| | ) |
| MODE ELEVEN BANCORP, | ) Chapter 11 |
| | ) |
| | ) |
| | ) Case No. 25-20240 |
| Debtor in Possession. | ) |

**DECLARATION OF SEAN P. ENRIGHT IN SUPPORT OF MOTION OF DEBTOR AND DEBTOR IN POSSESSION MODE ELEVEN BANCORP FOR AN ORDER (A) APPROVING THE SHARE PURCHASE AGREEMENT AND AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTOR'S ASSETS; (B) AUTHORIZING THE SALE OF ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, RIGHTS, ENCUMBRANCES AND OTHER INTERESTS; AND (C) GRANTING RELATED RELIEF AND OPPORTUNITY TO OBJECT**

I, Sean P. Enright, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury:

1. I am a Managing Director with Hovde Group, LLC ("Hovde").

2. This declaration (this "Declaration") is submitted in support of the *Motion of Debtor and Debtor in Possession Mode Eleven Bancorp for an Order: (A) Approving the Share Purchase Agreement and Authorizing the Sale of Substantially All of the Debtor's Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests; and (C) Granting Related Relief* [Dkt. 245] (the "Sale Motion")[1] filed in the above-captioned chapter 11 case of debtor and debtor in possession Mode Eleven Bancorp ("Debtor").

3. Except as otherwise set forth herein, all statements in this Declaration are based on my own personal knowledge. If called on to testify in this matter, I can and would competently testify to the matters set forth herein.

A. **The Prepetition Sale Process**

4. On May 20, 2025, the Debtor and its wholly owned subsidiary Summit National Bank ("Summit" and together with the Debtor the "Company") entered into an engagement agreement pursuant to which Hovde was retained to act as investment banker for the Company. In connection with its engagement as investment banker, Hovde agreed to provide investment banking services focusing on the sale of the Company (the "Sale"), both on a pre- and postpetition basis, including, as necessary, assisting the Debtor and its counsel with negotiation and consummation of a Sale in the Debtor's chapter 11 case.

5. Hovde begun marketing the Debtor's assets in earnest during the prepetition period, identifying and reaching out to potential buyers of the Debtor's assets and laying the groundwork for an efficient sale process. In connection with its marketing efforts, Hovde met with the

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion.

2

Company's board of directors to discuss and prepare detailed marketing materials and to collect diligence materials and confidential information, including financial statements, significant agreements, and operational details relevant to the Debtor's assets. Hovde set up a confidential virtual data room (the "VDR") to facilitate the diligence process for potential buyers, and populated the data room with the diligence materials and confidential information collected from the Company, which ultimately comprised over two hundred and fifty documents.

6. Prior to the Petition Date, nine interested parties entered into NDAs with the Debtor, including two banks and a credit union.

7. Hovde responded to numerous additional inquiries from interested parties and arranged meetings between such interested parties and the Company, in each case, as requested by such interested parties and as appropriate and acceptable to the Company. Hovde advised the Company with respect to the inquiries, and presented the Company with results of its analyses and made recommendations with respect to a proposed Sale, including developing a strategy to effectuate a Sale.

### B. The First Postpetition Sale Process

8. Following the Petition Date, Hovde continued the marketing process it had commenced during the prepetition period. Hovde continued to engage with potential buyers, and continued preparing and circulating detailed marketing materials with respect to a potential Sale. In addition, upon request by potential buyers, Hovde caused additional documents concerning the Debtor and its assets to be uploaded to the VDR to facilitate diligence by potential buyers. During the prepetition and postpetition marketing process, Hovde ultimately contacted 59 potential buyers.

9. During this process, 30 potential buyers entered into NDAs with the Debtor, including several state-chartered and national-chartered banks and credit unions, and several other potential buyers that consisted of investor groups, individual investors and other non-depository financial companies. Such parties were provided with access to the VDR so that each interested party that executed an NDA was afforded the opportunity to conduct due diligence to each such party's reasonable satisfaction. Throughout the postpetition marketing process, my colleagues or I followed up with each interested party that signed an NDA to gauge continued interest, to answer questions from such interested parties concerning the Debtor and its assets, and to continue to facilitate interested party due diligence.

10. On or before the deadline to submit indications of interest (each, an "IOI"), six potential buyers (the "IOI Parties") submitted a formal or informal IOI, indicating their continued interest in pursuing a potential Sale with the Debtor. Following the submission of the IOIs, my colleagues or I followed up with each IOI Party to further facilitate additional due diligence as requested. In addition, my colleagues and I facilitated calls between these potential buyers and the Debtor's financial services regulatory counsel to allow the Debtor to conduct reverse due diligence regarding each potential buyer's ability to obtain the requisite regulatory approvals to consummate the acquisition of the Debtor's assets. My colleagues and I also advised each IOI Party of the deadline to submit a qualified bid (each such bid, a "Qualified Bid") for the Debtor's assets, July 25, 2025 (the "Bid Deadline").

11. Following the IOI deadline, my colleagues and I contacted each potential purchaser that had executed an NDA but had not submitted an IOI or notified us of their withdrawal from the process, informed each such purchaser that the Debtor would accept a Bid from such

4

purchaser notwithstanding such purchaser's failure to submit an IOI, and advised each potential purchaser of the Bid Deadline and requirements for submitting a Qualified Bid.

12.  Three potential buyers, each of which had submitted an IOI, submitted a Qualified Bid by the Bid Deadline. Accordingly, the Debtor determined to hold an auction (the "Auction") in accordance with the Bidding Procedures, and such Auction was held and adjourned on July 28, 2025.

13.  On the day before the Bid Deadline, the Debtor received an indication of interest from a potential buyer of a subset of the Debtor's assets. The Debtor, in consultation with Hovde and its other advisors, determined such indication of interest did not constitute a Qualified Bid, including because the indication of interest was not binding and did not constitute a definitive agreement. However, the Debtor, in consultation with Hovde and its other advisors, concluded that a consortium bid between this potential bidder and a Qualified Bidder could result in the Debtor's estate realizing meaningful additional value from the Sale. Following discussions with Hovde and Debtor's counsel, this potential buyer indicated its willingness to purchase the Debtor's assets in a consortium with a Qualified Bidder. Hovde, on behalf of the Debtor, reached out to each potential buyer that submitted a Qualified Bid to gauge each such potential buyer's interest in participating in a consortium purchase. Two of the three bidders that submitted Qualified Bids expressed interest in further discussions regarding a potential consortium bid, and Hovde arranged for such bidders to engage with the potential buyer that submitted the indication of interest to acquire a subset of the Debtor's assets.

14.  At the Auction, the Qualified Bid submitted by Victor Remsha was deemed the initial best or otherwise highest bid. Three Qualified Bidders participated in the Auction. During the Auction, multiple rounds of bidding occurred.

15. At the conclusion of the Auction, the Debtor determined that Mr. Remsha submitted the highest or otherwise best bid (the "Successful Bid") for the Debtor's assets. Therefore, the Debtor named Victor Remsha as the successful bidder (the "Successful Bidder"). A true and correct copy of the Share Purchase Agreement reflecting the Successful Bid was filed at Docket No. 102-1 (the "Successful Bidder SPA"). The Debtor further determined that Christian Colon submitted the next highest or otherwise best bid for the Debtor's Assets. Therefore, the Debtor named Christian Colon as the backup bidder (the "Backup Bidder"). A true and correct copy of the Share Purchase Agreement reflecting the Backup Bid was filed at Docket No. 102-3 (the "Backup Bidder SPA"). Greg Jacobson, the other Qualified Bidder that participated in the Auction, submitted the third-highest bid, for $3,250,000. A true and correct copy of the SPA executed by Mr. Jacobson in connection with the Auction is attached hereto as **Exhibit A**.

16. The Successful Bidder SPA provided for a purchase price of $5,450,000 in cash, plus additional non-cash consideration, such as the provision of debtor-in-possession financing and the assumption of certain liabilities related to the Debtor's assets, subject to certain terms and conditions, in exchange for the Debtor's assets.

17. The Backup Bidder SPA provided for a purchase price of $4,500,000 in cash, plus additional non-cash consideration, such as the provision of debtor-in-possession financing and the assumption of certain liabilities related to the Debtor's assets, subject to certain terms and conditions, in exchange for the Debtor's assets.

18. Following a hearing on August 4, 2025, the Court approved the sale of the Debtor's assets to the Successful Bidder, and, in the event the Successful Bidder failed to close, to the Backup Bidder.

19. In order to close the transactions contemplated by the Successful Bidder SPA and the Backup Bidder SPA, such bidders were required to obtain approval, by the Office of the Comptroller of the Currency (the "OCC"), of their change in control applications for the Debtor's wholly owned subsidiary, Summit National Bank.

20. The OCC did not approve the change in control application of either the Successful Bidder or the Backup Bidder by the outside closing dates under such bidders' respective share purchase agreements.

C. **The Second Sale Process**

21. In order to mitigate the risk to the Debtor and its estate that the OCC would not approve the change in control applications of the Successful Bidder and the Backup Bidder, preventing the sale of the Debtor's assets to either such bidder, on or around November 6, 2025, Hovde began reaching out to potential purchasers of the Debtor's assets to determine their interest in potentially acquiring such assets in the event the transactions with the Successful Bidder and Backup Bidder did not close.

22. During this process, Hovde contacted fourteen potential purchasers, of which approximately half had participated in the prior sale process. These potential purchasers included state-chartered banks and credit unions, investor groups, individual investors, and other non-depository financial companies. During this process, five potential buyers entered into NDAs with the Debtor (in addition to the parties that participated in the second sale process after executing NDAs during the initial sale process). Such parties were provided with access to the VDR so that each interested party that executed an NDA was afforded the opportunity to conduct due diligence to each such party's reasonable satisfaction. Throughout this marketing process, my colleagues or I followed up with each interested party that signed an NDA to gauge continued interest, to answer

questions from such interested parties concerning the Debtor and its assets, and to continue to facilitate interested party due diligence.

23. After the Debtor determined it would be unable to consummate a sale to the Successful Bidder or the Backup Bidder, Hovde informed potential purchasers that, if they wished to submit an offer to acquire the Debtor's assets, such potential purchasers would be required to enter in to a share purchase agreement in substantially the form previously approved by the Court, to provide evidence of financial wherewithal, and to provide information to allow the Debtor to asses such party's ability to obtain regulatory approval to purchase a federally chartered bank.

24. Ultimately, two potential purchasers submitted SPAs during this process: Mr. Jacobson and an investor group. A true and correct copy of Mr. Jacobson's share purchase agreement is attached hereto as **Exhibit B** (the "Jacobson SPA"). Mr. Jacobson's offer to acquire the Debtor's assets was expressly conditioned on the transaction being consummated as a private sale. While the other potential bidder, an investor group, offered a somewhat higher purchase price than Mr. Jacobson, following reverse due diligence, the Debtor concluded that such investor group would be unlikely to obtain regulatory approval to consummate the transaction, such that this offer is not higher or otherwise better than Mr. Jacobson's offer. In addition, one potential purchaser, another investor group, submitted a letter of intent on November 26, 2025, but never submitted an executed share purchase agreement, though I advised the group on numerous occasions that an executed share purchase agreement was a requirement for its offer to be considered by the Debtor.

**D.    Mr. Jacobson's Bid Represents the Highest and Best Value**

25. Based on the extensive marketing efforts undertaken by the Debtor and Hovde described above, along with my experience, I believe that Mr. Jacobson's bid represents the highest

8

and best value for the assets of the Debtor. The value purchasers will pay to acquire the stock of a bank of the Bank's size is typically assessed by reference to consolidated tangible book value, which is a measure of the value of the tangible assets of the bank relative to its liabilities. For banks comparable in size to the Bank with little to no profitability, the purchase price is typically no greater than 1.5 times tangible book value, and the average price is closer to 1.1 times tangible book value. Based on the Bank's tangible book value, Mr. Jacobson's bid offers a purchase price of approximately 1.3 times tangible book value which is consistent with industry average and consistent with the multiple of the third-highest bid submitted in the Auction, which was 1.3 times the Bank's then tangible book value.

26. Although the Debtor did not conduct a second auction, I believe the Debtor: (a) conducted a comprehensive marketing process for the potential sale of the Debtor's assets, and (b) afforded all potential buyers an opportunity to participate in the sale process and submit a bid for the Debtor's assets.

27. Based on my professional experience and knowledge of the above captioned chapter 11 case, I believe that: (a) the Sale process was robust and fair, (b) Mr. Jacobson and his professional advisors conducted themselves in a non-collusive, fair and good-faith manner in connection with the Sale process, and (c) Mr. Jacobson's bid represents fair and reasonable terms for the purchase of the Debtor's assets, based on the extensive marketing process described herein.

28. Except as otherwise provided in the proposed order approving the Sale to Mr. Jacobson, the Debtor is seeking to sell its assets free and clear of all liens, claims, encumbrances and other interests. I believe Mr. Jacobson would not have submitted his bid, and would not consummate the Sale, if the Sale was not free and clear of all liens, claims, encumbrances and other interests. Further, I believe that failing to sell the Debtor's assets in this manner would result

in significantly reduced consideration for such assets, which would adversely impact the Debtor's ability to preserve and maximize the value of the assets for its estate.

29. I am not aware of any facts indicating that the Debtor or Mr. Jacobson entered into the Jacobson SPA for the purpose of hindering, delaying or defrauding creditors. I believe that under the circumstances, including the extensive marketing process conducted by the Debtor and Hovde, the consideration provided by Mr. Jacobson is fair and reasonable, and the highest and best value from a party the Debtor believes capable of receiving regulatory approval to consummate the proposed transaction.

Dated: January 5, 2026                     */s/ Sean P. Enright*

                                          Sean P. Enright
                                          Hovde Group, LLC
                                          2820 Selwyn Avenue, Suite 315
                                          Charlotte, NC 28209