Abigail V. O'Brient (*admitted pro hac vice*)
Covington & Burling LLP
1999 Avenue of the Stars
Los Angeles, CA 90067-4643
Telephone: (424) 332-4826
Email:  aobrient@cov.com

Bradley T. Hunsicker (Wyoming Bar No. 7-4579)
Markus Williams LLC
2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 307-638-1975
Email:  bhunsicker@MarkusWilliams.com

COUNSEL FOR DEBTOR
AND DEBTOR IN POSSESSION
MODE ELEVEN BANCORP

**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF WYOMING**

| | |
|---|---|
| In re: | ) |
| | ) |
| MODE ELEVEN BANCORP, | ) Chapter 11 |
| | ) |
| | ) |
| | ) Case No. 25-20240 |
| Debtor in Possession. | ) |

**MOTION OF DEBTOR AND DEBTOR IN POSSESSION MODE ELEVEN BANCORP FOR ENTRY OF ORDER CONFIRMING THE AUTHORITY OF THE DEBTOR TO DOWNSTREAM CAPITAL TO SUMMIT NATIONAL BANK**

Mode Eleven Bancorp ("Debtor"), debtor-in-possession herein, by and through its

undersigned counsel, hereby files this motion (the "Motion") respectfully requesting entry

1

of an order, substantially in the form attached hereto as **Exhibit A**, confirming the Debtor is authorized to downstream capital to its primary asset and wholly owned subsidiary, Summit National Bank (the "Bank"), a national banking association. The declaration of John Miller in support of the Motion (the "Miller Declaration") is filed concurrently herewith.

## RELIEF REQUESTED

1. This Motion seeks authority, pursuant to sections 105(a) and 363(b) and (c) of Title 11 of the United States Code (the "Bankruptcy Code"),[1] and rules 2002, 6004 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for the Debtor to provide capital, via an equity contribution, of up to $500,000 to the Bank. This capital infusion is necessary for the Bank to maintain a tangible equity to total asset ratio sufficient for it to avoid being designated as "critically undercapitalized" and to avoid appointment of a receiver by the Office of the Comptroller of the Currency to liquidate and wind up the Bank. Absent this capital infusion, the Office of the Comptroller of the Currency will likely appoint the Federal Deposit Insurance Corporation as receiver to liquidate and wind up the Bank, which would irreparably damage the Debtor's ability to consummate the pending sale of the Bank and otherwise preserve and maximize value for its estate, creditors and other stakeholders. Miller Declaration at ¶ 3.

---

[1] Unless otherwise specified, all references herein to "Section," "§," "Bankruptcy Code" and "Code" refer to the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*

**JURISDICTION AND VENUE**

2.      This Bankruptcy Court (the "Court") has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

3.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

**BACKGROUND**

4.      On June 9, 2025 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing the Debtor's chapter 11 case (the "Chapter 11 Case").  The Debtor continues to operate its business and manage its assets as a debtor in possession under sections 1107(a) and 1108 of the Bankruptcy Code.  As of the date hereof, no trustee (other than the subchapter v trustee), examiner or official committee of unsecured creditors has been appointed in this Chapter 11 Case.

5.      A description of the Debtor's business and the reasons for filing this Chapter 11 Case is set forth in the *Declaration of John Miller, CEO of Mode Eleven Bancorp, in Support of Chapter 11 Petition and Related Motions* [Dkt. 6] (the "First Day Declaration"), which the Debtor hereby adopts and incorporates as if fully set forth herein.

**A.     The Bank's Need for Additional Capital and the Sale Process**

6.      The Debtor is a bank holding company headquartered in Hulett, Wyoming, and its primary asset is its equity interest in the Bank.  First Day Declaration at ¶¶ 10-11. The Bank is subject to regulation, examination, and supervision by the Office of the

3

Comptroller of the Currency (the "OCC"). *Id.* at ¶ 20.

7. The Debtor has historically injected capital into the Bank as needed in the ordinary course of the Debtor's business. For example, in 2022 the Debtor raised approximately $7 million in new capital, which it downstreamed to the Bank to enable the Bank to initiate its banking-as-a-service business strategy. More recently, in each of March 2025 and June 2025, the Debtor downstreamed $500,000 to the Bank to help the Bank satisfy the capital requirements (in excess of otherwise applicable regulatory minimums) imposed by the Bank's June 4, 2024 Consent Order with the OCC. Miller Declaration at ¶ 4. In addition, as discussed further below, the Debtor downstreamed $500,000 to the Bank on September 4, 2025.

8. As a bank holding company, the Debtor is required by the Dodd-Frank Act and Federal Reserve Board regulations to serve as a source of financial strength for the Bank. 12 U.S.C. § 1831o-1 (a bank holding company regulator must require a holding company to serve as a source of financial strength to its bank subsidiary that is in "financial distress"); 12 C.F.R. § 225.4(a) (Federal Reserve Board regulation requiring a bank holding company to serve as a source of financial and managerial strength to its subsidiary bank); *see also In the Matter of Mode Eleven Bancorp*, Order to Cease and Desist Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, Docket No. 24-008-B-HC, dated March 28, 2024 (requiring Mode Eleven to submit a capital plan addressing, among other things, its obligation to serve as a source of financial strength to the Bank).

9. Prepetition, the Bank became subject to enforcement action by the OCC.

First Day Declaration at ¶ 23. On or about June 4, 2024, the Bank entered into a Consent Order with the OCC to address purported deficiencies in the Bank's Bank Secrecy Act/Anti-Money Laundering program, capital and strategic planning, liquidity risk management, transactions with affiliates, accounting, and compliance with laws. *Id.* The Consent Order required the Bank to take a number of actions to remediate the purported issues and improve the Bank's financial condition including, *inter alia*, increasing its tangible equity to total asset ratio (the "Capital Ratio") to at least thirteen percent (13%), increasing its leverage ratio to at least ten percent (10%), and submitting strategic and capital plans to the OCC. *Id.* at ¶ 24.

10. As of the Petition Date, the Bank was well below the minimum 13% Capital Ratio mandated in the Consent Order. *Id.* at ¶ 25. Because the Debtor lacked sufficient liquidity to inject funds to allow the Bank to satisfy the required Capital Ratio, the Debtor commenced this case to maintain the Bank's value both as an asset and as a banking resource for smaller communities in the Mountain West, while affording the Debtor an opportunity to conduct a robust marketing process to allow the sale of the Bank to a well-funded purchaser capable of obtaining the requisite regulatory approvals to consummate the transaction. *Id.* at ¶ 34.

11. To preserve the value of the Bank through the sale process, throughout this case, the Debtor has engaged in aggressive efforts to prevent further regulatory action against the Bank, including by maintaining the Bank's required Capital Ratio. *See Declaration of John Miller in Support of Motion for Order (A) Approving the Share*

5

*Purchase Agreement and the Sale of Substantially All of the Debtor's Assets; (B) Authorizing the Sale of Assets Free and Clear of All Liens, Claims, Rights, Encumbrances and Other Interests; and (C) Granting Related Relief* [Dkt. 247] (the "Miller Sale Declaration") at ¶ 8. The Debtor's management has reduced risk-weighted assets by shrinking the Bank's balance sheet through non-core deposit and natural loan runoff. *Id.* In addition, the Debtor has targeted operating expenses by reducing discretionary spending, negotiating with vendors to lower or restructure outstanding invoices, and reducing Mr. Miller's salary to the federal minimum wage to preserve capital and demonstrate management's commitment to stabilizing the Bank and the Debtor. *Id.*

12. On August 4, 2025, the Court entered an order approving the sale of substantially all of the Debtor's assets – primarily, its 100% ownership interest in the Bank – to Victor Remsha for $5,450,000, and, in the event Mr. Remsha failed to close the sale, to Christian Colon. [Dkt. 123]

13. On August 25, 2025, the Debtor obtained Court approval to borrow $500,000 from Mr. Remsha to infuse the Bank with sufficient funding to maintain the minimum Capital Ratio necessary to avoid becoming critically undercapitalized until the anticipated closing of the sale to Mr. Remsha or Mr. Colon. Miller Sale Declaration, at ¶ 7. The Debtor contributed those funds to the Bank on September 4, 2025.[2] *Id.*

---

[2] On September 25, 2025, the Debtor obtained Court approval to borrow an additional $500,000 from Mr. Remsha to allow the Debtor to provide further capital to the Bank. [Dkt. 187] In the event the share purchase agreement between Mr. Remsha and the Debtor was terminated, Mr. Remsha was not obligated to advance these funds to the Debtor. [Dkt. 162, Ex. 1, § 13] Ultimately,

14. The Debtor's efforts described above in Paragraph 11 were successful and allowed the Bank to avoid becoming critically undercapitalized during the Chapter 11 Case. However, the Debtor was unable to close the Court-approved sale to either Mr. Remsha or Mr. Colon, because the closing of the sale was conditioned upon ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Miller Sale Declaration, at ¶ 9. As a result, the Debtor is currently seeking approval of a sale of its equity interests in the Bank to Greg Jacobson, who submitted the third-highest offer at the auction conducted on July 28, 2025, for $2,000,000 (the "Sale"). [Dkt. 245]

15. However, the Bank remains at risk of being placed into receivership by the OCC prior to the closing of the Sale. Miller Sale Declaration, at ¶ 3. The OCC considers a banking institution critically undercapitalized when such institution's Capital Ratio is equal to or less than 2%. 12 CFR § 6.4(b)(5). Pursuant to 12 U.S.C. § 1821(c)(2), the OCC has the authority, under certain circumstances, to appoint the Federal Deposit Insurance Corporation (the "FDIC") as receiver to liquidate and wind up the affairs of an insured national bank, and 12 U.S.C. § 1821(c)(5) specifies the grounds upon which the OCC may appoint the FDIC as receiver. One such ground is that the banking institution is critically undercapitalized or otherwise has substantially insufficient capital. 12 U.S.C. § 1821(c)(5)(L).

---

the Debtor did not borrow additional funds from Mr. Remsha before the share purchase agreement was terminated. Miller Decl. at ¶ 7.

16. The Bank has been precipitously approaching a Capital Ratio below 2%. Miller Sale Declaration, at ¶ 5. As of the Petition Date, the Bank's Capital Ratio was 3.25%. *Id.* By the end of July 2025, the Bank's tangible equity had fallen to $1,840,000 and its total assets were valued at approximately $85,000,000, such that its Capital Ratio was 2.165%. *Id.* The Bank continued to lose additional capital, and its Capital Ratio was projected to fall to 1.853% by the end of August 2025. *Id.*

17. It is likely that before the end of January 2026, the Bank's Capital Ratio will dip below 2%. *Id.* at ¶ 10. The Bank anticipates the OCC will take prompt action if the Ratio falls below 2%, based on the requirements of the OCC's prompt corrective action regulations, 12 C.F.R. Part 6, and on ███████████████████. *Id.* ███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████. *Id.*

18. If the Bank is placed into receivership, the Sale will not be able to be consummated, and the Debtor's estate, creditors and other stakeholders will lose significant value as a result.

19. As noted above, ███████████████████████████

███████████. Miller Sale Declaration, at ¶ 9. As a result, Mr. Remsha terminated his share purchase agreement pursuant to Section 6.5(b)(v) thereof, and in accordance with Section 2.4 of the share purchase agreement, on or about November 17, 2025, Mr.

8

Remsha's earnest money deposit of $545,000 (the "Remsha Deposit") was released to the Debtor. Miller Decl. at ¶ 8.

20. In order to allow consummation of the Sale, the Debtor has determined, in its business judgment, that it may be appropriate to contribute up to $500,000 of funds from the Remsha Deposit into the Bank, as and when needed, to maintain a Capital Ratio above 2% (the "Potential Capital Injection"). *Id.* at ¶ 9.

## BASIS FOR RELIEF

21. As set forth above, the Debtor historically, in the ordinary course of its operations, has injected capital into the Bank as needed to support the Bank's operations and ensure its ability to meet the required Capital Ratio, consistent with the Debtor's obligation, under applicable law and regulations, to serve as a source of strength for the Bank. *Id.* at ¶ 4. As such, the Debtor submits that the Potential Capital Injection constitutes an ordinary course use of estate property authorized pursuant to 11 U.S.C. § 363(c). *See McCall v. BOTW Holdings, LLC*, No. 25-CV-108-KRH, 2025 WL 2947147, at *3-5 (D. Wyo. Sept. 26, 2025) (noting that, although the Tenth Circuit has not adopted an "ordinary course" test, the standard "is purposefully not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate").

22. Nonetheless, out of an abundance of caution and to the extent that any party in interest may assert that the Potential Capital Injection is not in the ordinary course of the Debtor's business such that Court approval is required under Section 363(b)(1) of the

9

Bankruptcy Code, the Debtor seeks confirmation of its authority to make the Potential Capital Injection into the Bank.

23.  A business judgment standard governs a debtor's decision to use estate property outside the ordinary course of business. *See, e.g., In re Podzemny*, No. 09-14226-J11, 2011 WL 576591, at *6 (Bankr. D.N.M. Feb. 8, 2011) ("In considering a debtor's request to use estate property outside the ordinary course of business, the Court must determine whether the debtor has sufficiently justified the proposed transaction. This requires a showing of an 'articulated business justification' for use of the estate property."); *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-14, 514 n. 13 (Bankr. D. Utah 1981) ("[T]he court will not entertain objections to a trustee's conduct of the estate where that conduct involves a business judgment made in good faith, upon a reasonable basis, and within the scope of his authority under the Code . . . [Section 363(b)] was not intended as a vehicle for challenging the trustee's management decisions."); *In re Krause*, 349 B.R. 255, 260 n.17 (Bankr. D. Kan. 2006) ("Under § 363(b) a debtor in possession or trustee must articulate a business justification for using or selling estate property outside the ordinary course of business."); *In re Otero Cnty. Hosp. Ass'n, Inc.*, No. 11-11-13686-JA, 2011 WL 13506754, at *1 (Bankr. D.N.M. Sept. 8, 2011) (approving motion for use of estate property to fund lease of capital equipment pursuant to section 363(b) upon finding requested relief was in best interest of debtor, its estate and all parties in interest).

24.  Where a business judgment standard applies, "[b]usiness judgments should be left to the board room and not to this Court." *In re Simasko Prod. Co.*, 47 B.R. 444, 449

(Bankr. D. Colo. 1985). "More exacting scrutiny [of the debtor's business decisions] would slow the administration of the debtor's estate and increase its cost, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially." *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1311 (5th Cir. 1985).

25.  Here, the Debtor has exercised sound business judgment in determining that it may be necessary to make the Potential Capital Injection to prevent the failure of the Bank, and to allow the Sale to close and the Bank to be successfully recapitalized. Without the Potential Capital Injection, there is substantial risk that by the end of January, the Bank's Capital Ratio will likely fall below 2%, at which time it would meet the OCC's standard to be considered "critically undercapitalized" and would be subject to being placed into receivership, liquidated and wound up, resulting in the failure of the Sale, and the loss of significant value for the Debtor's estate, creditors and other stakeholders. *Id*. The Potential Capital Injection will serve as a bridge to maintain the Bank's Capital Ratio at the necessary level until the Sale closes.

26.  Courts routinely authorize debtors to fund the operations and other capital needs of non-debtor subsidiaries, particularly where failure to provide such funding would halt operations or otherwise financially harm the subsidiaries and thereby diminish the value of the debtor parent's equity interest in those subsidiaries. *See, e.g.*, *In re Anthology, Inc., et al.*, Case No. 25-60498, Dkt. No. 285 (Bankr. S.D. Tex. Nov. 12, 2025) (order authorizing debtor transfers to non-debtor affiliates consistent with prepetition practices);

*In re Luminar Technologies, Inc., et al.*, Case No. 25-90807, Dkt. No. 44 (Bankr. S.D. Tex. Dec 16, 2025) (order authorizing debtor payments on behalf of non-debtor affiliates consistent with prepetition practices); *In re Eagle Bulk Shipping Inc.*, No. 14-12303-SHL, 2014 WL 5093305, at *2 (Bankr. S.D.N.Y. Sept. 19, 2014) (final order authorizing debtor payment of non-debtor subsidiaries' workforce obligations consistent with prepetition practices); *In re EPV Solar, Inc.*, No. 10-15173 (MB), 2011 WL 13502981, at *2 (Bankr. D.N.J. Dec. 9, 2011) (order authorizing debtor provision of operational funding to non-debtor subsidiaries as needed in its sole discretion); *In re Synagro Techs., Inc.*, No. 13-11041 (BLS), 2011 WL 13495792, at *3 (Bankr. D. Del. Mar. 31, 2011) (order authorizing debtor transfer of funds to non-debtor subsidiaries in the ordinary course of business).

27. Moreover, as noted above, the Debtor is required by law and regulation to serve as a source of financial strength for the Bank. 12 U.S.C. § 1831o-1; 12 C.F.R. § 225.4(a). In litigation related to the bankruptcy case of another bank holding company, Irwin Financial Corporation, the court determined the debtor bank holding company's former officers had not breached their fiduciary duties by causing the debtor to contribute millions of dollars in capital to two subsidiary banks. *Levin v. Miller*, No. 111CV01264SEBMPB, 2017 WL 1197287, at *2 (S.D. Ind. Mar. 31, 2017), *aff'd,* 900 F.3d 856 (7th Cir. 2018). In granting summary judgment in favor of the former officers, the court relied heavily on the source of strength doctrine, explaining:

> The undisputed evidence before us establishes that as early as February 2008, the Board was focused on ensuring that the Banks remained 'adequately capitalized.' . . . The evidence clearly demonstrates that in designating this priority, the Board was responding to concerns raised by bank regulators

> regarding Union Bank & Trust's capital and liquidity 'and the parent company's expected role as a source of strength for the Bank.' At the time the Board considered and approved the 2009 capital contributions, Irwin, as a bank holding company, was subject to various federal banking laws and regulations, including the "source of strength" doctrine. Federal Reserve Board regulations explicitly required that: "A bank holding company shall serve as a source of financial and managerial strength to its subsidiary banks and shall not conduct its operations in an unsafe or unsound manner." 12 C.F.R. § 225.4(a)(1). The Federal Reserve's 1987 policy statement addressing these obligations further provided that "in serving as a source of strength to its subsidiary banks, a bank holding company should ... provide adequate capital funds to its subsidiary banks during periods of financial stress or adversity. *Policy Statement; Responsibility of Bank Holding Companies to Act as Sources of Strength to Their Subsidiary Banks*, 52 Fed. Reg. 15707-01 (April 30, 1987). It was against the backdrop of this regulatory scheme that both the Board and Defendants carried out their ongoing duties. While we agree with the Trustee that, at the time the Board authorized the capital contributions, these regulations did not *compel* Irwin to downstream funds to the Banks, both Defendants and the Board were entitled to consider these regulations and policies, including the source of strength doctrine, in their decisionmaking.

*Levin*, 2017 WL 1197287, at *13.

28. Similarly, here, the Debtor has properly considered the source of strength doctrine in exercising its business judgment that it may be necessary to make the Potential Capital Injection. The Potential Capital Injection is essential to enable the Debtor to maintain the value of its primary asset, its equity interest in the Bank, during the course of this Chapter 11 Case and is in the best interest of the estate and creditors. Indeed, failure to contribute capital to the Bank would likely lead to the receivership of the Bank with a resulting loss of value for the Debtor's creditors and other stakeholders. *Id*. Accordingly, to the extent court approval of the Potential Capital Injection is required pursuant to Section 363(b)(1), the Debtor respectfully submits that it should be granted authority to proceed

with the Potential Capital Injection, in the amount of up to $500,000, at such time(s) and in such increments as it determines, in its business judgment, are necessary to comply with its obligation to serve as a source of financial strength to the Bank.

### **WAIVER OF BANKRUPTCY RULE 6004(a)**

29.　The Debtor requests that the Court waive any stay of the effectiveness of the order approving this Motion.  Under Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth above, the Potential Capital Infusion is essential to prevent potentially irreparable damage to the Debtor's estate, which is anticipated to occur if the Debtor does not inject additional capital in the Bank by January 31, 2026.  Accordingly, the Debtor submits that ample cause exists to justify a waiver of the 14-day stay imposed by Bankruptcy Rule 6004(h), to the extent it applies.

**WHEREFORE**, the Debtor respectfully requests that the Court enter an order, substantially in the form attached hereto as **Exhibit A**, granting the relief requested in this Motion, and grant such other and further relief as the Court may deem just and proper.

Dated: January 9, 2026　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　COVINGTON & BURLING LLP

　　　　　　　　　　　　　　　　　　　　By: /s/ *Abigail V. O'Brient*
　　　　　　　　　　　　　　　　　　　　Abigail V. O'Brient
　　　　　　　　　　　　　　　　　　　　1999 Avenue of the Stars
　　　　　　　　　　　　　　　　　　　　Los Angeles, CA 90067-4643
　　　　　　　　　　　　　　　　　　　　Telephone: (424) 332-4826

Email: aobrient@cov.com

MARKUS WILLIAMS LLC

By: /s/ *Bradley T. Hunsicker*
Bradley T. Hunsicker (WY Bar No 7-4579) 2120 Carey Avenue, Suite 101
Cheyenne, WY 82001
Telephone: 307-778-8178
Facsimile: 303-830-0809
Email: bhunsicker@markuswilliams.com

*Counsel for the Debtor and Debtor-in-Possession Mode Eleven Bancorp*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion and a proposed order, was filed and served this 9th day of January 2026, upon those registered for notice via CM/ECF.

*/s/ Abigail V. O'Brient*
Abigail V. O'Brient